**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| **GRAHAM BOSWELL,** | |
| *Plaintiff,* | Civil Action No: |
| -against- | |
| **WOFFORD COLLEGE, CATHERINE RAND, and DAVID HOGSED,** | **COMPLAINT** |
| *Defendants.* | |

Plaintiff Graham Boswell, ("Plaintiff" or "Boswell"), by his attorneys Nesenoff & Miltenberg, LLP and Cindy Crick Law LLC as and for his Complaint against Defendants Wofford College ("Wofford"), David Hogsed ("Hogsed"), and Catherine Rand ("Rand") (collectively "Defendants"), respectfully alleges as follows:

## NATURE OF THE ACTION

1.     This action stems from a conspiracy between a troubled Wofford College student, a Wofford College Campus Safety Officer, and Wofford College, who colluded to try to destroy a young man's future. The student, Defendant Catherine Rand, falsely accused Plaintiff of sexual assault following a consensual sexual encounter between the parties. What followed was an arrest without probable cause and a relentless campaign of defamation, retaliation and sexual harassment against Plaintiff, despite the fact that the sexual assault allegations were ultimately proven to be false.

1

2.      In light of Defendants' misconduct, as set forth in detail below, Plaintiff seeks relief for violations of, 42 U.S.C. § 1983, civil conspiracy, breach of contract, and other intentional torts under state law.

## PARTIES

3.      Graham Boswell is a natural person and resident of the State of Missouri, County of Jackson. At all relevant times herein, Boswell was a full-time student at Wofford College and a member of the US military.

4.      Defendant Wofford College is a private college located in Spartanburg, South Carolina, where it maintains its principal offices and place of business.

5.      Upon information and belief, Defendant David Hogsed is a natural person and resident of the State of South Carolina, County of Spartanburg. Hogsed was a Campus Safety Officer employed by Wofford during Plaintiff's unlawful arrest.

6.      Upon information and belief, Defendant Catherine Rand is a natural person and resident of the State of North Carolina, County of Buncombe. At all relevant times herein Rand was a student at Wofford College.

## JURISDICTION AND VENUE

7.      This Court has federal question, diversity, and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 28 U.S.C. § 1367 because: (i) the federal law claims arise under the constitution and statutes of the United States; (ii) Plaintiff is a citizen of the state of Missouri, Rand is a citizen of the state of North Carolina, and Hogsed and Wofford are citizens of the state of South Carolina; and  (iii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States

Constitution.

8.      Venue is proper in this judicial district pursuant to 28 U.S.C § 1391(b)(2) because a substantial part of the events which give rise to Plaintiff's claims took place in Spartanburg County, South Carolina, which is located in the District of South Carolina.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### Plaintiff Boswell and Defendant Rand

9.      Plaintiff Boswell and Defendant Rand (collectively the "Parties") first met in November 2020, when Rand was a sophomore at Wofford and Plaintiff was a junior.  They shared a class together the following semester and were acquaintances.

10.      On February 3, 2022, at approximately 11:00 PM, Plaintiff encountered Rand at the Kappa Sigma fraternity house. Rand was very flirtatious with Plaintiff, hugging him and leaning in very close to him. Plaintiff noted that Rand seemed visibly intoxicated and he was uncomfortable with her advances, given her apparent state.

11.      After this brief interaction with Rand, Plaintiff had no further contact with her that evening.

### Plaintiff and Rand's Encounter on February 11, 2022

12.      On February 11, 2022, Plaintiff attended a "pre-game" party at his friends' apartment, before Wofford's annual Black and Gold event[1].

13.      During the pre-game Rand approached Plaintiff, initiated a conversation with him inquiring about his relationship with his ex-girlfriend, and put her arm around him.

---

[1] An annual semi-formal party at Wofford.

14.    Rand's speech was clear and her behavior was normal and flirtatious. This differed greatly from Plaintiff's encounter with Rand the week before when she was visibly, heavily intoxicated.

15.    Rand told Plaintiff that she wanted to go back to his apartment with him.

16.    Plaintiff asked Rand if she wanted to go to his apartment before the Black and Gold event, and she said yes.

17.    Rand then walked with Plaintiff to Plaintiff's apartment. As surveillance video would later confirm, Rand walked unassisted, without stumbling or swaying and at one point pulled Plaintiff in close to her.

18.    Upon entering Plaintiff's apartment, Rand began kissing Plaintiff. Plaintiff had three roommates, so he asked Rand if she would like to go to his bedroom, and she said yes.

19.    In Plaintiff's bedroom Rand pulled Plaintiff towards his bed forcefully and aggressively.

20.    Rand asked Plaintiff if he was drunk, to which he responded that he had been drinking, but he was not drunk.

21.    Plaintiff then asked Rand if she was drunk, to which she responded that she had a few drinks, but she was not drunk.

22.    To remove any ambiguity, Plaintiff asked Rand a second time if she was certain she was not drunk, and she confirmed again that she was not drunk.

23.    Plaintiff also specifically asked Rand if she was ok with what was happening; in other words, if she was consenting to a sexual encounter with Plaintiff.

24.    Rand responded unequivocally in the affirmative, stating that she wanted to "f**k [Plaintiff] better than [he] had ever been f**ked before".

4

25.    Plaintiff and Rand proceeded to engage in foreplay, with Rand moaning loudly and repeatedly reiterating how she wanted to "f**k [Plaintiff] so bad."

26.    Rand then got on top of Plaintiff and grinded her body against his. At this time, Plaintiff briefly digitally penetrated Rand's vagina.

27.    Rand told Plaintiff again how she wanted to "f**k him so bad" and that she wanted to give him the "best sex of [his] life", and asked him to put on a condom.

28.    When Plaintiff leaned towards his desk drawer to retrieve a condom, he noticed what appeared to be menstrual blood on his hand. Plaintiff told Rand that he believed she just started her period, implying this would preclude them from having sex.

29.    Rand apologized and stated she was very embarrassed. Plaintiff tried to console Rand and told her that she shouldn't be embarrassed.

30.    Plaintiff then took a shower and gave Rand a damp towel so the two of them could clean away the blood.

31.    Rand removed the sheets from Plaintiff's bed and apologized for staining them. Plaintiff told her not to worry about it.

32.    Rand told Plaintiff that the next week she would give him the "best sex of [his] life" and asked him not to tell anybody what had happened, as she was embarrassed.  Plaintiff stated he would not tell anyone.

33.    Plaintiff and Rand both got dressed, left Plaintiff's apartment, and walked together towards the tent where the Black and Gold party was being held. Rand thanked Plaintiff for walking with her and said she was going to go home to freshen up and then come back out.

34.     Surveillance video shows Rand leaving Plaintiff and walking to her apartment with a cup, vape pen, and keys in one hand and a key card in the other hand, ascending a flight of stairs unassisted and without stumbling or dropping her belongings.

35.     Surveillance video also shows Rand a few minutes later descending the stairs, without holding onto the railing, holding numerous objects in her hands. Rand can be seen fixing her hair and exiting the building, showing no visible signs of incapacitation.

### Rands' Friends Contact Wofford Campus Safety and Rand Visits the Hospital

36.     On information and belief, later in the evening of February 11, 2022, Rand falsely told friends that Plaintiff had raped her and one of Rand's friends called Wofford's Campus Safety Office.

37.     Campus Safety Officers including Sergeant Gregory Elder ("Elder") met Rand and her friends in the area of the tennis courts on Wofford's campus.

38.     Rand did not display any evidence of intoxication or incapacitation in the body camera footage from the officers that reported to the scene on February 11, 2022.

39.      None of the reporting officers stated that Rand was highly intoxicated or had an odor of alcohol about her.

40.     Elder advised Rand that DNA evidence was vital to their investigation if a sexual assault occurred. Rand responded that she may want to talk to the officers later but that she was not ready to at that time.

41.     Rand and her friends returned to Rand's dorm room.

42.     An hour or so later Rand's friend called Campus Safety again stating that Rand was bleeding vaginally and needed medical attention.

43.     Elder drove Rand and her friends to the hospital.

44.     According to hospital records, Rand repeatedly *denied* that any sexual assault occurred, to several different practitioners, and stated she did not see the purpose/need for a forensic assault examination.

45.     The hospital records also described Rand as awake, alert, oriented to person, place, time and situation, normal speech, good eye contact, normal interaction, affect and behavior.

46.     The results from the non-forensic exam show no signs of trauma internal or external and no spermatic discharge.

**<u>Wofford Campus Safety Investigates</u>**

47.     From February 12 through 15, 2022, Elder interviewed and obtained written statements from five of Rand's friends in connection with the criminal investigation against Plaintiff.

48.     On February 14, 2022, Wofford Campus Safety Officer Theo Saar ("Saar") met separately with Plaintiff and Rand in the Campus Safety Office.  Plaintiff and Rand both signed No Contact Orders.

49.     During Plaintiff's meeting with Saar, Saar promised Plaintiff that if the criminal investigation resulted in an arrest warrant being issued that Plaintiff would be notified beforehand and that Campus Safety Officers would openly communicate with Plaintiff.

50.     Saar specifically reassured Plaintiff that Campus Safety Officers would not arrest Plaintiff during class.

51.     On February 14, 2022, Sergeant Elder conducted a video-recorded interview of Rand and obtained a written statement from her.  Rand stated that she accompanied Plaintiff to his apartment and blacked out until she woke up naked in his bed and "at that point it was too late [for her] to do anything."

7

52.     Elder wrote in his investigation notes that Rand stated that she was pursuing her claims against Plaintiff through the Title IX office only and that Rand realizes she can pursue criminal charges against Plaintiff at a later date.

53.     On or about February 18, 2022, Elder left Wofford's employ.

54.     On February 22, 2022, Rand returned to the Campus Safety Office and sought to pursue criminal charges against Plaintiff.

55.     Also on February 22, 2022, Hogsed became the lead investigator on the criminal case against the Plaintiff.

56.     Hogsed requested the assistance of the South Carolina Law Enforcement Division ("SLED") in the criminal investigation against Plaintiff.

57.     SLED Agent Michelle Rice-Johnson ("Rice-Johnson") was assigned to assist.

**Rand Sexually Harasses and Retaliates Against Plaintiff and Wofford Ignores Plaintiff's Complaint**

58.     Beginning in February 2022, Rand commenced a crusade to spread her false allegations against Plaintiff to as many members of the Wofford community as possible, especially those close to Plaintiff, which resulted in an extremely hostile environment for Plaintiff.

59.     Rand approached many individuals at several different parties and posted on social media that Plaintiff sexually assaulted her.

60.     On Friday, February 25, 2022, known as "Boys Bid Day" at Wofford[2] Rand approached numerous individuals[3] on the lawn at Wofford's senior apartments and Greek village

---

[2] Boys Bid Day is a big event on Wofford's campus. The party celebrates new pledge classes for fraternity organizations. The party starts on the lawns within the senior apartments where between 900-1400 students intermingle. Then the attendees proceed to the individual fraternity houses along the Greek row.

[3] Two of the individuals Ms. Rand approached were previous roommates of Boswell's and one individual was a current roommate, none of whom had any previous relationship or contact with Ms. Rand.

and then at Plaintiff's fraternity house stating, "I hate Graham Boswell, he raped and sexually assaulted me."

61.    Several witnesses interviewed by the Title IX investigators, including Rand's friend and sorority sister, confirmed to the investigators that on February 25, 2022, Rand walked around Plaintiff's fraternity house (Kappa Sigma) at the Boys' Bid Day party telling everyone: "I hate Graham Boswell, he raped and sexually assaulted me."

62.    According to one Title IX witness, Rand made these false rape claims "everywhere, to anyone".

63.    On February 28, 2022, Plaintiff received the Notice of Investigation & Allegations from Wofford's Title IX Office advising him that Rand alleged that on February 11, 2022 Plaintiff engaged in sexual intercourse with her while she was incapacitated and unable to consent.

64.    On or about February 28, 2022, Rand began posting Instagram stories about being a sexual assault survivor and then posted a Snapchat story that stated: "F**k graham boswell – All I gotta say."

65.    Also on February 28, 2022, Rand approached Plaintiff's fraternity brother at a dining hall stating: "I'm taking this shit criminal … about Graham [Boswell] raping me".

66.    Later that same day Rand held a meeting with Plaintiff's fraternity president and told him that Plaintiff raped her and asked that Plaintiff be removed from the fraternity.

67.    Rand continued to attend fraternity parties at Plaintiff's Kappa Sigma fraternity house, every subsequent weekend, and approached fraternity brothers to claim Plaintiff sexually assaulted her/raped her.

68.    Rand spoke to or attempted to speak to almost everyone in Plaintiff's fraternity, even individuals Rand had never spoken with before in order to defame Plaintiff.

69.    Upon information and belief, Rand approached a student in the mail room with numerous other students present and yelled, "Guess what, Graham assaulted me."

70.    On March 1, 2022, in a public study area in the Milliken Science Center Rand told another Wofford student that last week she told too many people about Plaintiff sexually assaulting her.

71.    Plaintiff first reported Rand's sexual harassment and retaliation to Wofford in an email to Matthew Hammett, Director for Civil Rights, Title IX Compliance at Wofford ("Hammett") on March 1, 2022.

72.    Plaintiff complained that he was being falsely accused of being a rapist on campus by Rand.

73.    Wofford failed to take any action in response to Plaintiff's complaint. Wofford did not take any steps to protect Plaintiff nor was an investigation opened in response to Plaintiff's March 1, 2022 complaint.

74.    Wofford's intentional failure or gross negligence in failing to swiftly and appropriately respond to Plaintiff's report of harassment emboldened Rand, allowing her to escalate the frequency and seriousness of her sexual harassment and retaliatory acts, and to expand her reach to include a campus wide petition to remove Plaintiff from Wofford.

**Wofford Continues Its Criminal Investigation Against Plaintiff**

75.    On March 2, 2022,[4] Hogsed interviewed the president and vice-president of Plaintiff's fraternity, Plaintiff's roommate, and two other fraternity members.

76.    On or about March 3, 2022, Rand was interviewed again this time by Rice-Johnson.

---

[4] The dates of the interviews are based on Plaintiff's review of the evidence. There are numerous conflicts between Hogsed's report of when the interviews took place and the time stamps on the footage from Hogsed's body worn camera, which is part of Hogsed's pattern of improperly handing evidence.

77.     Rand reported to Rice-Johnson that while at her apartment on the night of February 11, 2022 she drank a half bottle[5] or approximately 30 ounces of Deep Eddy vodka (the equivalent of 19-20 1.5 ounce shots) three grapefruit flavored White Claws,[6] and consumed a 25-miligram Delta 8 THC gummy.

78.     Rand stated that she brought a tumbler filled with two White Claws to a pre-game event for Wofford's Black and Gold party[7] and drank it before drinking an additional two White Claws[8] and a jello shot.[9]

79.     With respect to Rand's multiple interviews and statements, she repeatedly contradicted herself regarding, among other things, the amount of alcohol she consumed on the night in question and her level of intoxication. By way of example, she told Elder that she remembered walking to and entering Plaintiff's apartment, but she told Rice-Johnson that she had no memory of walking to Plaintiff's apartment.

80.     Rand also made blatant misrepresentations to Rice-Johnson about her pelvic exam at the hospital.

81.     Rand stated to Agent Rice-Johnson that the ER doctor said during her pelvic exam: "something's definitely torn."

82.     However, the ER records plainly state that the doctors found no signs of trauma and no damage whatsoever.

---

[5] Rand increased the amount to 2/3 of a bottle during her interview with the Title IX investigators.
[6] An alcoholic seltzer beverage.
[7] An annual semi-formal party at Wofford.
[8] Rand claimed she consumed a total of 7 White Claws.
[9] Rand told the Title IX investigators she had 2 jello shots.

83.    On March 7, 2022, Campus Safety Officers executed a search warrant for Plaintiff's apartment and seized his sheets, mattress cover, and a T-shirt. Plaintiff was forced to miss a class and a quiz due to the search.

84.    Plaintiff called his father during the search. Hogsed then scolded Plaintiff and harshly said: "Let me tell you something," a 22 year old **man** he should not be calling his father during a police search.[10]

85.    Hogsed also told Plaintiff that the search was done pursuant to a criminal investigation and therefore "Wofford's policies and procedures are set to the side now."

**Wofford Commences a Title IX Investigation Against Plaintiff**

86.    On March 11, 2022, Wofford appointed the Title IX Investigators.

87.    The Title IX Investigators interviewed Plaintiff on April 29, 2022 and Rand on May 26, 2022.[11]

88.    The Investigators also requested Campus Safety's file and residence hall surveillance footage.

**Wofford Completes Its Criminal Investigation of Plaintiff and Arrests Plaintiff Without Probable Cause**

89.    During the pendency of the criminal investigation Plaintiff retained counsel and submitted to a polygraph examination on March 8, 2022.

90.    The following questions and answers were given in the polygraph examination:

Q: Did you insert your penis into [Rand's] vagina?  A: No.
Q: Did [Rand] tell you she would have sex with you next week? A: Yes.

---

[10] This was not Hogsed's first display of malice towards Plaintiff. In 2019 upon hearing that Plaintiff's parents had donated targets for the rifle team, Hogsed told Plaintiff that it must be nice when your parents can buy everything.

[11] From June 14th through August 2nd the Investigators interviewed eight witnesses.

91.     On April 4, 2022, Plaintiff's criminal counsel met with Hogsed and provided him with the results of Plaintiff's polygraph examination.

92.     During the meeting Hogsed told Plaintiff's criminal counsel that Plaintiff had no place in the military because he relied on his parents.

93.     Plaintiff's counsel also gave Wofford Campus Safety Officers Plaintiff's written statement detailing the events of February 11, 2022, which was consistent with the evidence, including the surveillance videos and witness testimony.

94.     Hogsed advised Plaintiff's counsel that he was waiting on Rand's medical records before going to meet with the Solicitor's Office about pursuing an arrest warrant for Plaintiff. Hogsed also said he would bring the polygraph report with him to the meeting.

95.     There were two different affidavits drafted by Hogsed seeking the arrest warrant for Plaintiff.

96.     The affidavit that was ultimately signed by the Magistrate Court Judge lists assault causing vaginal bleeding[12] as the reason for the arrest.

97.      Defendants did not advise Plaintiff or Plaintiff's counsel that Hogsed would be arresting Plaintiff or ask that Plaintiff's counsel bring Plaintiff to the police station to be charged as Saar had specifically promised Plaintiff and as was the norm.[13]

98.     On April 11, 2022, Defendants purposely arrested Plaintiff on Wofford's campus in the middle of the school day, in the most humiliating and stigmatizing manner possible immediately after one of his classes at Wofford in front of his peers and his professor despite

---

[12] Yet, Hogsed testified at Plaintiff's preliminary hearing. that he would not have based the arrest warrant "just off vaginal bleeding". Hogsed also testified that he prepared the arrest warrant listing vaginal bleeding when Rand first reported the alleged assault to "get ahead of the game".

[13] When Plaintiff's counsel confronted Hogsed about this Hogsed said that he "didn't owe [her] anything."

knowing that Plaintiff was represented by counsel and would almost certainly have arranged for a voluntary surrender if they were advised that an arrest warrant had been issued.

99.    Plaintiff was embarrassed and humiliated by being arrested in front of his classmates and professor.

**Sexual Harassment and Retaliation Suffered by Plaintiff Post-Arrest**

100.    Plaintiff was treated like a pariah by Rand, Defendant Wofford and by his fellow students following his arrest and subjected to an extremely hostile environment on campus.

101.    Many news organizations reported Plaintiff's arrest for sexual assault featuring his name and photo.[14]

102.    Many news outlets also posted about Plaintiff's arrest on Facebook and Twitter.

103.    On, April 13, 2022, Wofford released a statement in connection with the news stories:

> *"Wofford College takes student safety seriously. All members of the campus community have the right to study, work, compete and socialize in a safe environment. The college is committed to making assistance for students readily available, and we are committed to our responsibilities according to the Clery Act." Id.*

104.    Many of the news outlets also reported that Plaintiff was a member of the college rifle team during his sophomore year, but "a spokesperson for Wofford confirmed he is no longer a member." *Id.*  Wofford's statement implied that Plaintiff was removed from the rifle team when in reality Plaintiff left the rifle team two years earlier to focus on ROTC and his academics.

105.    The evening news also aired a story regarding Plaintiff's arrest.[15]

---

[14] See e.g. Fox Carolina New Staff, *Wofford College student charged in sex crime investigation, SLED says* (April 13, 2022) https://www.wbtv.com/2022/04/13/wofford-college-student-charged-sex-crime-investigation-sled-says/ Nikolette Miller, Bethany Fowler Wofford student charged with sex crime, SLED says (April 13, 2022) https://www.wspa.com/news/local-news/wofford-student-charged-with-sex-crime-sled-says/

[15] Stephanie Moore, Wofford student arrested on sex charge, SLED says (April 13, 2022) https://www.wyff4.com/amp/article/wofford-student-sex-charge/39715874

106.    The televisions at Wofford were tuned to the channel that aired the evening news story regarding Plaintiff's arrest and many students saw the news story.

107.    Plaintiff was sexually harassed on campus subsequent to his arrest.

108.    Following Plaintiff's arrest, Rand threw a party hosted by another Wofford student, to celebrate Plaintiff's arrest. Rand was observed shouting "f**k Plaintiff" with a group of students from the front porch.

109.    Rand also bragged in a Wofford dining hall that she had put Plaintiff in jail for sexual assault.

110.    On April 13, 2022, Plaintiff reported in a phone call with Dean Roberta Hurley ("Dean Hurley") that he did not feel safe or comfortable on Wofford campus because of Rand's harassment and that Matthew Hammett, Director for Civil Rights, Title IX Compliance at Wofford has refused to protect him.

111.    Plaintiff advised Dean Hurley that Wofford's statement to the media that Plaintiff was "no longer on the rifle team," was a violation of Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g and Plaintiff's student rights.

112.    Dean Hurley denied that anybody at Wofford made a statement to the media. After Plaintiff read her the excerpt from the article, Dean Hurley said that the office of marketing and communications does not report to her.

113.    Plaintiff responded, "Regardless of who they report to, I would like you, President Samhat, and his cabinet to investigate who made a statement on my personal information to the media." Neither Dean Hurley nor President Nayef Samhat ever responded to Plaintiff's complaint.

114.    On April 14, 2022, a student posted on YikYak: [16] "So now we allow rapists to attend class." That same day, President Samhat emailed Plaintiff, stating that he received a request from Hammett requesting academic support for Plaintiff and advising Plaintiff that he did not need to attend class for the remainder of the term, despite the fact that Plaintiff never requested that he be excused from attending class.

115.    Several of Plaintiff's professors also emailed him separately advising that he would not be required to attend class.

116.    Upon information and belief, at the direction of Rand, Wofford students published a petition via Google documents on April 15, 2022, comprising false and defamatory statements about Plaintiff,[17] which was signed by Catherine Rand and allegedly more than 350 Wofford students (the "Petition").

117.    The Petition stated in part:

> Within the past week . . . one of our very own students has tarnished the name of our school. By assaulting another one of our students…The perpetrator of this action was arrested, bailed out, and then allowed to return to campus and resume his classes. This individual has had a pattern of violence with having at least three Title IXs against him.[18] … Due to lack of consequences, his confidence rose to escalate his behavior… we believe he should be limited to virtual classes on campus, as well as have limited ability to attend social functions….

118.    Anyone with the link to the Petition was able to view it, including the revision history.

---

[16] YikYak is a social media app that allows college students to create and view discussion threads within a 5-mile radius.

[17] Although it did not mention Boswell by name, the petition referred to all the specifics of the incident, which had been extensively reported on as set forth above.

[18] This characterization is patently false. Plaintiff does not have any history of violence and there were no previous Title IX Complaints filed against Plaintiff.

119.    The revision history demonstrates that the Petition originally included identifying characteristics about Plaintiff including that he was on the rifle team and that he is a member of the ROTC.

120.    The revision history also shows that the author of the Petition added students' names and that other students removed them.

121.    On April 15, 2022, Plaintiff's counsel immediately reported the Petition to Wofford's general counsel within a few hours of the petition being posted.

122.    Wofford's counsel responded that Plaintiff should seek accommodations from the Title IX Office, and forwarded the email to Hammett.

123.    Hammett responded to the report of retaliation and sexual harassment by suggesting Plaintiff request supportive measures, providing absolutely no relief to Plaintiff while the petition remained actively posted with false and defamatory remarks.

124.    The petition was ultimately shared with and signed by parents and alumni and currently remains active.

125.    Wofford's intentional failure to respond to Plaintiff's complaints about the severe and pervasive sexual harassment he faced on campus, including but not limited to being widely falsely accused of being a rapist, is an unmistakable sign of gender bias.

126.    On April 16, 2022, Plaintiff's car was keyed when he parked it on campus. Plaintiff filed a police report with the Wofford Campus Safety Office in connection with the vandalization, but they failed to make any arrests.

127.    Plaintiff asked Saar what Campus Safety can do to protect him and Saar suggested that Plaintiff "park in a different lot".

128.    Following these acts of sexual harassment and vandalism, Plaintiff feared being on campus. He did not have any meals on campus. Plaintiff drove to class instead of walking, for fear of being accosted.

129.    As a result of the severe and pervasive sexual harassment, Plaintiff felt so threatened that he moved off campus to a nearby hotel.

130.    As a result of the sexual harassment Plaintiff also stopped attending Campus Union[19] meetings, which had previously been a highlight for him.

131.    The sexual harassment continued when Wofford students posted hateful and threatening messages about Plaintiff on social media.

132.    Wofford students—and even some professors—posted signs on Wofford's campus and social media advocating for sexual assault victims, which included quotations mocking defenses to sexual assault, including certain defenses clearly referencing details from the alleged encounter between Plaintiff and Rand, e.g. "the blood was from her period", "she was all over him at the party", and "she was sober enough to consent". Anyone even remotely familiar with the matter would know that the signs were referring to Plaintiff.

**Wofford's Response to Plaintiff's Second Harassment/Retaliation Complaint**

133.    On April 18, 2022, Plaintiff's counsel wrote to Hammett detailing the severe and pervasive sexual harassment and retaliation suffered by Plaintiff.

134.    On or about April 21, 2022, the Petition was sent via email to Wofford President Samhat.

---

[19] Wofford's student government association.

135.    Shortly after the circulation of the Petition, Plaintiff was notified that his commissioning in the Army would be indefinitely delayed due to the pending criminal charges and the pressure caused by the Petition.

136.    On or about April 26, 2022, Wofford finally opened investigations into Plaintiff's reports of sexual harassment and retaliation against Rand, Wofford student Georgie McDevitt (one of the authors of the Petition), and a professor (collectively, the "Harassment Respondents").

137.    On April 28, 2022, Wofford sent Plaintiff three Notices of Investigation & Allegations ("NOA"), one against each of the Harassment Respondents.

138.    The NOA against Rand only listed four[20] of the possible nine sanctions for students, whereas the NOA issued to Plaintiff as respondent listed all nine sanctions.

**The Criminal Case Against Plaintiff Is Transferred to the Attorney General's Office**

139.    On May 6, 2022, Assistant Solicitor Wendy Hallford emailed Saar[21] advising him that Plaintiff's case was assigned to her and asking him if Rand was a suspect for the vandalism of Plaintiff's car.

140.    Saar responded that Rand was not a suspect.

141.    Upon information and belief, Saar and the other Wofford Campus Safety Officers had learned that the Solicitor's Office was not going to prosecute the case against Boswell.

142.    Saar then emailed the Solicitor on May 9, 2022, complaining about Ms. Hallford being assigned to Plaintiff's case due to his personal animus towards her.

143.    Specifically, Saar wrote, *inter alia*:

---

[20] Wofford included "Warning, Required Counseling, Probation, Other", but omitted "Suspension, Expulsion, Withholding Diploma, Revocation of Degree, and Organizational Sanctions"

[21] On information and belief, Saar has told previous complainants that his daughter was a victim of sexual assault and he would support them throughout the process.

> A few years ago, Ms. Hallford and I had the opportunity to work on a few cases. Ms. Hallford and I do not have the same views about how CSC victims should be viewed and treated, to say the least. We had very unpleasant meetings in the Solicitor's Office Conference room which escalated into yelling matches.

144.    Plaintiff's case was subsequently transferred from the Solicitor's Office to the Attorney General's Office.

**Further Harassment Suffered by Plaintiff**

145.    The women who published the Petition created an Instagram account "survivorsatwofford". As is evident from an Instagram post, on May 13, 2022, the group met with President Samhat and Hammett to discuss their unhappiness with Wofford's response to the Petition.

146.    Later that same day, Hammett emailed Plaintiff stating that Wofford would not allow Plaintiff to participate in any graduation events or activities.

147.    On May 18, 2022, Hammett emailed Plaintiff in response to Plaintiff's counsel's inquiry about Wofford's decision to prohibit Plaintiff from participating in graduation activities. Specifically, Hammett wrote:

> I am writing in response to communication we recently received from your attorney regarding my message of May 13th about your graduation ceremony participation.
>
> Pursuant to Section 6.09 of the Nondiscrimination and Anti-Harassment Policy, "If a student has an allegation pending for violation of this Policy, the College may place a hold on a student's ability to graduate and/or to receive an official transcript/diploma." Further, Section 8.04(C) permits the College to "deny a student participation in commencement activities if the student has an allegation pending."
>
> The Title IX office has permitted you to receive your degree assuming completion of your academic requirements at Wofford. However, the College has decided to not allow you to participate in the ceremonies and events this commencement weekend. You have stated repeatedly that you felt unsafe on Wofford's campus, and provided examples including threatened violence against you on Yik Yak and the vandalism of your vehicle. The College's decision on this issue is not

discriminatory harassment or in retaliation. The decision is founded on safety concerns and aligns with the Nondiscrimination and Anti-Harassment Policy.

148.    While Hammett's email claims that Wofford's decision to prohibit Plaintiff from participating in graduation activities is "not discriminatory harassment or in retaliation," the context of the decision suggests the complete opposite. The decision was made immediately after a meeting with the authors of the Petition.  While Hammett cited "safety concerns" as the reason for the decision Wofford failed to take any remedial measures against the individuals causing Plaintiff to fear for his safety and instead sought punitive measures against Plaintiff.

149.    The responses by President Samhat, Plaintiff's professors, and Hammett demonstrate Wofford's condoning of and acquiescence to the sexual harassment Plaintiff endured by complying with the demands of the harassers and penalizing Plaintiff while ignoring Plaintiff's complaints.

150.    Wofford's actions in this regard were in direct contravention to Section 6.02 of Wofford College's Nondiscrimination and Anti-Harassment Procedures (Jan. 4, 2022) (the "Policy"), which provides: "The College operates with the presumption that the Respondent is not responsible for the reported misconduct unless and until the Respondent is determined to be responsible for a policy violation by the preponderance of the evidence standard."

**Hogsed Demonstrates that Plaintiff was Arrested Without Probable Cause at the Preliminary Hearing**

151.    A preliminary hearing was held in connection with Plaintiff's arrest on July 18, 2022.

152.    Hogsed repeatedly lied and contradicted his own testimony during the preliminary hearing indicating there was no probable cause for arresting Plaintiff.

153.    According to Hogsed, one of Rand's friends told him, during an interview that was captured on his body-worn camera, that she witnessed Rand "straight-neck a bottle of vodka". However, the actual footage from the body camera contains no such statement.

154.    At one point, Hogsed testified that he had the hospital records when he went to the Solicitor's Office to request an arrest warrant for Plaintiff. Hogsed later testified that he did not remember whether he had the medical records or not when he went to the Solicitor's Office.

155.    Hogsed also stated that he failed to document when he received Rand's hospital records.

156.    Hogsed testified that he had a meeting with the Solicitor's Office on April 5, 2022 and brought everything he had and based on that, "it was decided" Plaintiff would be charged with criminal sexual conduct third degree. Hogsed admitted that he did not bring the polygraph report with him to the Solicitor's Office.

157.    Hogsed withheld significant exculpatory evidence from the judge by failing to provide the judge with Rand's hospital records.

158.    Hogsed stated that he did not know whether it came up to the judge that Rand had no injury or trauma to the vaginal area.

159.    Hogsed testified: "I'll admit it wholeheartedly, and I'll take the hit for this. I don't – I did not tell the Judge [who he requested sign Boswell's arrest warrant] that there was no damage to her."

160.    Hogsed also admitted that he did not tell the judge that Rand told three people at the hospital that night that she was not sexually assaulted.

161.    Hogsed further failed to give the judge a copy of Boswell's statement, which was consistent with the surveillance videos and other evidence.

162.    Hogsed failed to advise the judge about the results from Boswell's polygraph test claiming it was an oversight.

163.    There were two different affidavits drafted by Hogsed seeking the arrest warrant for Boswell.

164.    The affidavit that was ultimately signed by the Magistrate Court Judge lists assault causing vaginal bleeding as the reason for the arrest. However, Hogsed testified that he would not have based the arrest warrant "just off vaginal bleeding".

165.    Hogsed also has a history of failing to properly manage evidence. Hogsed was the forensic officer assigned to the investigation of the death of Spartanburg police officer Terry Paul Pritchard ("Pritchard").

166.    Pritchard's gun holster had imprints of blood, lint, thread and other components on it, yet Hogsed chose not to turn in the holster to the Evidence Room.

167.    The supervising officer said that Hogsed was not treating the holster as evidence without any further explanation.

168.    On or about August 11, 2022, the Attorney General's office dismissed the criminal charges against Plaintiff, after Hogsed repeatedly lied under oath at the preliminary hearing and demonstrated that Plaintiff was arrested without probable cause.

## Wofford Concludes the Title IX Proceeding and Found Plaintiff Not Responsible

169.    The Title IX Investigators issued a preliminary investigation report on August 8, 2022.

170.    Rand and Plaintiff submitted additional evidence in response to the report on August 19th and August 24th respectively.

171.    The Investigators interviewed four additional witnesses on September 1-2, 2022.

23

172.    Investigators responded to the Parties' responses on September 4, 2022. Rand provided an additional response on September 15, 2022 and Plaintiff responded on September 19, 2022.

173.    An updated investigation report with all evidence was provided to the Parties on September 27, 2022.

174.    Rand provided a response on October 7, 2022. Plaintiff provided his response on October 11, 2022.

175.    The report was finalized and provided to the Parties on October 14, 2022.

176.    Following a Title IX hearing held on October 24 and October 26, 2022, Plaintiff was found "not responsible" for Rand's sexual assault allegations.

177.    Wofford issued the Notice of Outcome on November 1, 2022.

178.    Specifically, the Title IX Hearing Panel found that any sexual activity between Plaintiff and Rand was not without Rand's consent.

179.    The Hearing Panel noted certain exculpatory evidence, including, but not limited to:

    a.  Plaintiff's roommates overheard male and female voices in a normal tone and a female giggling at the subject time;

    b.  Evidence that the vaginal bleeding occurred prior to any digital penetration as the photos of Plaintiff's jeans showed blood consistent with Plaintiff's statement that Rand was on top of him while they were fully clothed;

    c.  Evidence that Rand's bleeding was menstrual as Rand's OB/GYN noted in her letter that Rand's LMP[22] was on April 5, 2022 and Rand stated that she had a 28-day cycle, "a calendar analysis led the Hearing Panel to consider menstrual bleeding as a possible explanation for Complainant's vaginal bleeding during the encounter" on February 11, 2022;

---

[22] Last menstrual period.

     d.   Surveillance video showing Rand walking to Plaintiff's apartment, leaving Plaintiff's apartment, and entering her dorm "moving normally and without any evidence of impairment, much less incapacitation"; and

     e.   "The Hearing Panel found it important that in the video surveillance footage of Complainant entering her dorm building, she is holding her phone, cup, and vape pen, which was evidence of Complainant having the presence of mind to gather her belongings before leaving Respondent's apartment."

180.    The Hearing Panel also inexplicably did not give any weight to certain exculpatory evidence, such as Rand's denials of sexual assault to hospital staff: "The Hearing Panel believed that Complainant's behavior or statements to medical providers were not determinative of whether a sexual assault occurred."

181.    Yet the Hearing Panel still found Plaintiff not responsible for any violations of the Policy due to the overwhelming amount of evidence in his favor.

### Wofford Dismisses Plaintiff's Complaints of Sexual Harassment and Retaliation

182.    Wofford issued a Final Investigative Report regarding Plaintiff's complaint of sexual harassment and retaliation on February 7, 2023 (the "Report"), more than ten months after opening the investigation.

183.    The investigators failed to even interview Rand as a respondent to Plaintiff's complaint and instead regurgitated Rand's interview as complainant to include as evidence in the Report.

184.    The investigators further failed to interview several other individuals who submitted written statements attesting that Rand harassed them with her defamatory statements about Plaintiff.

185.    On March 13, 2023, over a year after Plaintiff's initial complaint, Wofford dismissed Plaintiff's sexual harassment and retaliation complaint and failed to sanction any of the

Harassment Respondents, despite the abundant documentary evidence and the corroborating statements of numerous witnesses during the investigation.

186.    In fact, Hammett acknowledged that the investigators gathered sufficient evidence to prove that Rand stated that Plaintiff sexually assaulted her "to numerous individuals on different dates." Yet, Hammett failed to even evaluate whether Rand's actions constituted sexual harassment (which it plainly did) and instead only considered whether it comprised retaliation.

187.    Hammett found that Boswell engaged in protected activity by participating in the Title IX process.

188.    However, Hammett determined, that:

> There is no way to infer that Rand acted with a retaliatory motive[23] (intent to interfere with Boswell's rights or retaliating because he participated in a resolution process). There is no reasonable belief that Plaintiff's status as a student or his rights were disadvantaged or restricted by Rand or that he was dissuaded from participating in a resolution process.

189.    However, as discussed above, Plaintiff was advised by Wofford's President and a number of his professors to stop attending classes in person. Plaintiff missed classes and exams/assignments. Plaintiff was afraid to be on campus. Plaintiff stopped attending Campus Union meetings. He did not eat any meals on campus. He drove to class instead of walking for fear of being accosted. Plaintiff felt so threatened that he moved off campus to a nearby hotel.

190.    Wofford also prohibited Plaintiff from attending his graduation ceremony, graduation activities and his commissioning ceremony because of "safety concerns".

191.    Accordingly, Wofford's finding that Plaintiff's status as a student or rights were not restricted is patently false.

---

[23] Motive is not a stated basis for dismissal in Wofford Policy or Title IX.

**Wofford Denies Plaintiff's Appeals**

192.    On March 16, 2023, Plaintiff appealed the dismissals of his complaints against Rand and McDevitt.

193.    Plaintiff's appeals were reviewed by Dr. Dwain C. Pruitt, Wofford's Chief Equity Officer ("Pruitt").

194.    On March 23, 2023 Pruitt issued a determination regarding Plaintiff's appeal of the dismissal of his complaint against Rand ("Rand Appeal Decision").

195.    On March 31, 2023 Pruitt issued a determination regarding Plaintiff's appeal of the dismissal of his complaint against McDevitt ("McDevitt Appeal Decision").

196.    The appeal determinations demonstrate unmistakable bias against Plaintiff as a male accused of sexual assault.

197.    In the Rand Appeal Decision Pruitt conceded that Rand was not interviewed in connection with Plaintiff's complaint and that instead "her testimony as Complainant against [Plaintiff] was 'repackaged,'" but shockingly concluded that there was "no evidence of investigative bias."[24]

198.    Pruitt reasoned that: "The appeal offers no evidence that another interview would have resulted in materially different responses from Ms. Rand."

199.    Pruitt's suggestion that Plaintiff should have speculated about what Rand's testimony to the investigators would be is ludicrous and a sign of gender bias as Wofford did not impose any impossible preconditions on Rand for her Complaint against Plaintiff.

---

[24] Pruitt did not even acknowledge that the investigators tried to pass off their initial interview with Rand as Complainant as if they reinterviewed Rand as the Respondent to Plaintiff's complaint.

200.    Pruitt's statements prove that Wofford failed to conduct a thorough or impartial investigation of Plaintiff's complaint and placed the burden of gathering evidence on Plaintiff.

201.    Additionally, in defense of the Investigative Report Pruitt stated: "My independent review of the document for your appeal identified several typographical errors, dropped words, and other signs of haste." Pruitt's mocking of Plaintiff's appeal is further evidence of Wofford's bias against Plaintiff.

202.    Pruitt also improperly narrowed the scope of his review: "The language used here is inappropriate because your complaint is about alleged retaliatory behavior defined in Section 3.05, not sexually harassing behavior as defined in Section 3.03."

203.    While Hammett may have categorized Plaintiff's complaints as retaliation, the actions Plaintiff complained of clearly also constituted sexual harassment. Undoubtedly if Plaintiff were a young woman complaining about a man disparaging her chastity (or lack thereof), neither Hammett nor Pruitt would question whether that was sexual harassment.

204.    Pruitt also criticized Plaintiff for not including Wofford's prohibition on Plaintiff's participation in commencement in Plaintiff's original Title IX Complaint, which would have been impossible as Plaintiff only learned of Wofford's decision to exclude him from commencement on May 13, 2022, months after Plaintiff filed his complaint.

205.    Finally, Pruitt acknowledged that the Policy, which provides that an appeal may be made to the "Title IX coordinator or their designee" "*may* appear to be unclear".

206.    However, Pruitt employed circular logic to justify any confusion or bias caused by the Policy stating that: "the Title IX Coordinator is not reviewing his own decision. I have no conflict or interest or bias because, as the Chief Equity Officer, I supervise the Title IX

Coordinator…" and therefore Pruitt concluded that he could review the appeal of Hammett's decision.

207.    In the McDevitt Appeal Determination Pruitt appallingly admitted that Wofford delayed adjudication of Plaintiff's complaints of harassment and retaliation until after its adjudication of Rand's complaint against Plaintiff stating:

> As you know, the College was actively completing formal resolution processes in sexual assault allegations against you in the Spring 2022 semester and also reviewing several retaliation counterclaims you filed. Given the alleged sexual assault case's complexity and the potential negative consequences for you should you have been found responsible for sexual assault under Wofford policy, that matter's resolution was pursued first…After the alleged sexual assault case was resolved, the College turned to your retaliation claims against three separate respondents, addressing each matter in turn.

208.    Pruitt admitted that Wofford failed to even investigate Plaintiff's harassment claims because there were sexual assault claims pending against him.

209.    Clearly Wofford breached its duty to presume Boswell's innocence regarding Rand's Title IX Complaint and instead presumed him guilty until he was proven innocent.

210.    The disparity between how Wofford treated both Rand's and Plaintiff's allegations and how Wofford handles both Rand and Plaintiff as respondents is a jarring and unmistakable sign of gender bias.

**Rand Contacts the US Army**

211.    Defendants knew that Plaintiff was a member of the Reserve Officers' Training Corps ("ROTC").[25]

---

[25] The ROTC is a college program offered across the country, where in exchange for a paid college education and a guaranteed post-college career, participants, or cadets, commit to serve in the military after graduation. Each service branch has its own version of ROTC. https://www.todaysmilitary.com/education-training/rotc-programs#:~:text=The%20Reserve%20Officers'%20Training%20Corps,officers%20in%20the%20U.S.%20Military.

212.    Defendants were aware that in 2023, Plaintiff was commissioning as an Officer in the United States Army.

213.    In March of 2023, Plaintiff was in the final stages of commissioning as an Officer in the United States Army.

214.    On March 16, 2023, three days after Wofford advised Plaintiff and Rand that it was dropping the investigation of Plaintiff's harassment and retaliation complaint, Rand contacted Captain Haskett, the Captain in the US Army who had been conducting an administrative investigation into Plaintiff due to Rand's allegations, and asked to make a statement.

215.    Upon information and belief, on March 21, 2023, Rand spoke with Captain Haskett and proceeded to defame Plaintiff by lying and stating that Plaintiff raped Rand while she was incapacitated.

216.    Upon information and belief, Rand submitted a false and distorted version of Wofford's confidential Title IX Report[26] regarding her complaint of sexual assault against Plaintiff, omitting the portions that were exculpatory to Plaintiff and Wofford's ultimate conclusion that Plaintiff did not assault Rand.

217.    The cover of the Title IX Report contains the following warning in bold lettering:

**This report is CONFIDENTIAL. Do NOT download, image, print, copy, or distribute any form of this Investigation Report. It may only be disclosed as provided by the Policy**

218.    Upon information and belief, Wofford permitted Rand, in violation of its policies, to copy and disseminate portions of the confidential Title IX Report and/or Wofford's failure to follow its own procedures allowed Rand to copy, print and distribute the privileged and confidential report.

---

[26] The full report was 64 pages. The report submitted by Rand to the Captain was only 50 pages.

219.    Plaintiff advised Hammett of Rand's egregious and malicious conduct in violation of Wofford's policies on March 24, 2023.

220.    To date, Wofford has failed to take any actions to penalize Rand.

**Agreements, Representations, Covenants & Warranties Between Plaintiff and Wofford**

221.    Upon Plaintiff's matriculation to Wofford, Plaintiff and Wofford became mutually bound by the Policy.

222.    The Policy and/or the various provisions contained therein are available online through the Wofford College website.

223.    Throughout the Title IX process in this case, Wofford breached its contractual obligations and the implied covenant of good faith and fair dealing by failing to abide by the Policy and the processes set forth therein, and by permitting gender bias to prevent Wofford from properly addressing the severe sexual harassment and retaliation suffered by Plaintiff.

224.    Wofford's Nondiscrimination and Anti-Harassment Policy and Procedures states: "Wofford College is committed to providing an educational and work environment, including programs and activities, free from discrimination, harassment, and retaliation."

225.    Plaintiff has been harassed and retaliated against in a discriminatory manner at Wofford such that he has been denied his rights to full access to the education programs and activities at Wofford.

226.    The Policy provides in pertinent part:

> **Section 3.02 Discriminatory Harassment**
> Discriminatory harassment constitutes a form of discrimination that is prohibited by College policy. Discriminatory harassment is defined as unwelcome conduct by any member or group of the community on the basis of actual or perceived membership in a class protected by policy or law when it creates a hostile environment.
> A hostile environment is one that unreasonably interferes with, limits, or effectively denies an individual's educational or employment access, benefits, or opportunities.

31

This discriminatory effect results from harassing verbal, written, graphic, or physical conduct that is severe or pervasive *and* objectively offensive.

**Section 3.03 Sexual Harassment**
The Department of Education's Office for Civil Rights (OCR), the Equal Employment Opportunity Commission (EEOC), and the State of South Carolina regard Sexual Harassment, a specific form of discriminatory harassment, as an unlawful discriminatory practice. Wofford College has adopted the following definitions in order to address the unique environment of an academic community, which consists not only of employer and employees, but of students as well. Acts of Sexual Harassment may be committed by any person upon any other person, regardless
of the sex, sexual orientation, and/or gender identity of those involved.
Sexual Harassment, as an umbrella category, includes the offenses of sexual harassment, sexual assault, domestic violence, dating violence, and stalking, and is defined as conduct on the basis of sex that satisfies one or more of the following:

\*\*\*

**B. Hostile Environment Sexual Harassment:** Unwelcome conduct determined by a reasonable person to be so severe *and* pervasive *and* objectively offensive that it effectively denies a person equal access to Wofford's education program or activity.

\*\*\*

227.     Wofford permitted Rand to sexually harass Plaintiff by inter alia, allowing her to go around campus screaming to anyone and everyone that Plaintiff was a rapist. Rand's actions had extreme consequences for Plaintiff. He was pressured to leave his housing, had his car vandalized, was afraid to walk to (and at times attend) class, and was intimidated from engaging in his extracurricular activities.

228.     The Policy further states:

Acts of alleged retaliation should be reported immediately to the Title IX Coordinator and will be promptly investigated. Wofford College is prepared to take appropriate steps to protect individuals who fear that they may be subjected to retaliation.

229.    Plaintiff first reported the sexual harassment and retaliation to Wofford on March 1, 2022.  Wofford failed to even open an investigation in response.[27]

230.    Wofford continued its pattern of ignoring Plaintiff's complaints in violation of the Policy after Plaintiff advised Wofford on March 24, 2023, that Rand contacted Captain Haskett and gave him a false and falsified version of Wofford's confidential Title IX Report. Nothing was done to sanction Rand.

231.    Wofford Policy **Section 3.05 Retaliation** states:

> *It is prohibited for the College or any member of Wofford's community to take materially adverse action by intimidating, threatening, coercing, harassing, or discriminating against any individual for the purpose of interfering with any right or privilege secured by law or policy,* or because the individual has made a report or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under this policy and procedure. (emphasis added)

232.    Wofford permitted Rand and Georgie McDevitt, both women, to take materially adverse actions intended to intimidate, threaten, coerce, and harass Plaintiff not to return to campus, interfering with his right to his education because he was a male.

233.    The Policy also provides:

> **Section 6.01 Resolution Oversight**
> The Title IX Coordinator will be responsible for direct oversight and the prompt, fair, thorough and impartial resolution of formal complaints filed with the College.
>
> **Section 7.04 The Title IX Coordinator's Initial Determination**
> The Title IX Coordinator will review the information available to determine whether the complaint will move forward for resolution under this Policy. To make their determination, the Title IX Coordinator may perform an initial inquiry, which may include, but is not limited to, preliminary conversations with witnesses and information gathering. The complaint will move forward to either formal resolution or facilitated resolution pursuant to this Policy unless it is clear on its face and/or based on the Title IX Coordinator's initial meetings with the parties that no reasonable grounds exist for believing that the conduct at issue is a violation of this Policy.

---

[27] Wofford finally opened an investigation after Plaintiff's counsel wrote to Wofford over 6 weeks later.

**Section 8.01 Investigation F. Evaluation of the final investigative report.** The Title IX Coordinator will evaluate the final investigative report and will direct that the complaint proceed to a hearing for a finding of "responsible" or "not responsible" unless it is clear from the final investigative report that no reasonable grounds exist for believing that the conduct at issue constitutes a violation of this Policy.

234.     Both Hammett and Pruitt failed to properly evaluate Plaintiff's complaint of sexual harassment and retaliation against Rand, despite the overwhelming evidence of Rand's violations of the Policy.

235.     Rand's actions including without limitation calling Plaintiff a rapist plainly qualified as sexual harassment-her actions are the equivalent of a male student calling a female student a whore-which would undoubtedly be considered sexual harassment.   Yet, Plaintiff's complaint against Rand was dismissed prior to even proceeding to a hearing.

236.     The Policy also provides under **Section 8.01 Investigation C. Overview of the investigation. "**All investigations are thorough, reliable, impartial, prompt, and fair."

237.     Wofford's investigation of Plaintiff's complaints of harassment were none of those things. The investigation was not thorough, reliable, impartial or fair as the investigators failed to even reinterview Rand and instead repackaged Rand's interview as a complainant.

238.     Additionally, Hammett acknowledged that Rand galivanted all over campus telling numerous individuals on different dates that Plaintiff assaulted her, but Hammett dismissed the complaint without holding a hearing.

239.     Hammett improperly concluded that Rand's actions did not qualify as retaliation but failed to even consider whether Rand's actions constituted sexual harassment.

240.     Section 6.03 of the Policy provides: "The College will make every reasonable effort to ensure that the resolution of a complaint occurs in as timely and efficient a manner as possible."

241.    The investigation was also anything but timely or prompt. The final Report was issued on February 7, 2023, more than *ten months* after Plaintiff's complaint.

242.    The complaint dismissal was issued on March 13, 2023, *over a year* after Plaintiff's initial complaint.

243.    Wofford Policy provides:

> *The College will not share the identity of any individual who has made a report or complaint of harassment, discrimination, or retaliation (Complainant); any individual who has been reported to be the perpetrator of harassment, discrimination, or retaliation (Respondent); or any witness, except as permitted by the Family Educational Rights and Privacy Act (FERPA), as required by law, or to carry out the purposes of 34 CFR Part 106, including the conducting of any investigation, hearing, or resolution proceeding arising under these policies and procedures.*

244.    Wofford was in direct violation of its own Policy and federal law when it responded to media inquiries about Plaintiff and responded in such a way that Wofford indicated the identity of Plaintiff as a respondent in a Title IX matter.

245.    Wofford's actions in allowing Rand to have unrestricted access to a hard copy of the Title IX Report and/or facilitating Rand's copying and dissemination of the Report is in direct violation of numerous provisions of the Policy.

246.    The Policy states in pertinent part:

Section 6.05 Privacy and Disclosure

In order to comply with FERPA, Title IX, and other applicable laws, and to provide an orderly process for the presentation and consideration of relevant information without undue intimidation or pressure, the resolution processes are not open to the general public. Accordingly, documents prepared in anticipation of the facilitated and/or the formal resolution processes (including the Complaint, the investigative report, and notices and communications to or from the Complainant or the Respondent); documents, statements, or other information introduced in interviews and meetings; and outcome letters **may not be disclosed** outside of those processes except as may be required or authorized by law.

Section 6.10 Advisors (F)

Privacy of Records Shared with Advisor. Advisors are expected to maintain the privacy of the records shared with them. **These records may not be shared with third parties, disclosed publicly, or used for purposes not explicitly authorized by the College.**

### Section 8.01 Investigation (E) (page 33/57)

Due to the sensitive nature of the information in this report, neither the parties nor their Advisors may copy, remove, photograph, print, image, record or in any other manner duplicate or remove the information provided. The Complainant and Respondent may not make copies of the draft investigative report. All parties to whom the draft investigative report is distributed pursuant to this Policy must maintain it in confidence (even after the resolution of the complaint); the draft investigative report may only be disclosed as is contemplated by this Policy.

### Section 8.02 (B)

Due to the sensitive nature of the information in this report**, neither the parties nor their Advisors may copy, remove, photograph, print, image, record or in any other manner duplicate or remove the information provided. The Complainant and Respondent may not make copies of the final investigative report. All parties to whom the final investigative report is distributed pursuant to this Policy must maintain it in confidence (even after the resolution of the complaint);** the final investigative report may only be disclosed as is contemplated by this Policy.

### EXHIBIT D: Statement of the Title IX/VAWA Rights of Parties

The right to be informed in advance of any public release of information the allegation(s) or underlying incident(s), whenever possible. The right not to have any personally identifiable information released to the public without consent provided, except to the extent permitted by law. The right to preservation of privacy, to the extent possible and permitted by law. (Emphasis added)

247.    Wofford's Information Technology (IT) Policy provides in pertinent part:

All programs and files within any computer system shall be considered confidential and private and as such may be accessed only by those with a legitimate need to access such information and to whom permission has been granted by the person responsible for its security. All Wofford employees and students must take appropriate steps to safeguard privacy and confidential information.

248.    The IT Policy further provides: "Anyone who has knowledge of an attempt by anyone to violate this policy shall make known this violation to the Chief Information Officer." And further, "Any person guilty of violating the security of any files or programs shall be subject to dismissal from the college and/or criminal charges."

249.    Wofford failed to follow its own policies in allowing Rand to have unfettered access to the confidential Title IX report.

250.    Wofford further failed to alert the Chief Information Officer about Rand's violations of the IT policy and failed to sanction Rand for said violations.

251.    Wofford also had the right to suspend Rand's access to its network, but failed to do so.

**Plaintiff's Damages**

252.    As a direct and proximate result of Defendants' biased, unlawful, and improper conduct, Plaintiff has suffered and continues to suffer extensive damages.

253.    Due to Defendants' conduct, Plaintiff was publicly arrested in a humiliating manner and thrown in jail without probable cause.

254.    Due to Defendants' conduct, Plaintiff was repeatedly harassed and humiliated, without any protection from, nor any repercussions for the harassers. This unchecked harassment and abuse created a hostile environment, instilling severe fear and anxiety in Plaintiff and precluding him from enjoying the benefits of his enrollment, including living on campus, attending classes, walking to class, eating on campus, and engaging in extracurriculars.

255.    Defendants' conduct interfered with and jeopardized Plaintiff's contract with the US Army, causing his commissioning to be delayed, resulting in a delay to Plaintiff's career and salary.[28]

256.    Due to Defendants' conduct, Plaintiff was prohibited from walking at his graduation or participating in any graduation events, resulting in significant emotional and mental harm.

---

[28] Plaintiff was ultimately commissioned in the Army after a significant delay.

257.    Due to Defendants' conduct, Plaintiff's reputation was ruined, which will permanently impact his future education and career prospects.

258.    As a direct and proximate result of the above conduct, Plaintiff suffered from serious emotional and mental damages, including severe anxiety and depression.

## COUNT ONE: MALICIOUS PROSECUTION
### (Against Rand, Hogsed and Wofford)

259.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

260.    Under South Carolina law, malicious prosecution involves: (1) the institution or continuation of original judicial proceedings; (2) by or at the instance of the defendant; (3) termination of such proceedings in plaintiff's favor; (4) malice in instituting such proceedings; (5) lack of probable cause; and (6) resulting injury or damage.

261.    On April 11, 2022, Plaintiff was arrested and charged with third degree criminal sexual conduct, stemming from his (consensual) sexual encounter with Defendant Rand on February 11, 2022.

262.    Plaintiff's arrest was brought about by, and at the insistence of, Defendants Rand, Hogsed, and Wofford:

a.    Defendant Rand made multiple statements to Wofford College Campus Safety and other members of the South Carolina Law Enforcement Division, falsely accusing Plaintiff of rape/sexual assault and advocating for his arrest.

b.    Defendant Hogsed, in his capacity as Campus Safety Officer at Wofford College, became the lead investigator for Rand's allegations on or about February 22, 2022. On or about April 11, 2022, Hogsed drafted and signed two different affidavits in

support of an arrest warrant for Plaintiff. Plaintiff was ultimately arrested pursuant to the arrest warrant predicated upon Hogsed's affidavit.

c.   On information and belief, Defendant Wofford, as Hogsed's employer, was responsible for assigning Hogsed to the investigation and overseeing his conduct in relation thereto. Further, as Hogsed's employer, Wofford is ultimately responsible for Hogsed's conduct in the course and scope of his employment, including the investigation and arrest of Plaintiff.

263.   The criminal proceedings initiated by Defendants Rand, Hogsed and Wofford were resolved in Plaintiff's favor: the charges were dismissed for lack of evidence on or about August 11, 2022.

264.   Defendants acted with malice in bringing about the unsubstantiated charges against Plaintiff:

a.   Defendant Hogsed made numerous comments indicating a personal animus towards Plaintiff based on his perceived wealth and/or financial support. By way of example, Hogsed told Plaintiff's criminal counsel that Plaintiff did not deserve to be in the military because he received support from his parents.  On another occasion, Hogsed derisively commented that "it must be nice when your parents can buy everything", in reference to Plaintiff's family's donation of targets for the Wofford Rifle Team.

b.   Moreover, Hogsed drafted and executed multiple affidavits in support of an arrest warrant, to maximize the likelihood of Plaintiff ultimately getting arrested, despite knowing the affidavits were deficient, misleading, incomplete, and incompatible with the facts and evidence known at the time. Hogsed drafted one arrest warrant

for the purported offense of "assault causing vaginal bleeding" despite acknowledging that vaginal bleeding alone would not suffice as probable cause for arrest. Hogsed drafted another affidavit purportedly based upon Rand's allegations of incapacitation, yet he had not actually reviewed all of Rand's statements at the time, and knowingly and deliberately withheld documentary evidence undercutting Rand's claims, such as the medical records and ER report noting that Rand repeatedly denied any assault had occurred and that there were no signs of vaginal trauma.

c.  Hogsed also arranged for/executed Plaintiff's arrest on campus, inside a classroom building in the middle of a school day, maximizing the publicity, humiliation, and stigma that Plaintiff would suffer, despite Saar's explicit promise that would not happen and despite Hogsed's knowledge that Plaintiff was represented by counsel and would almost certainly have arranged for a voluntary surrender if they were advised that an arrest warrant had been issued.

d.  Defendant Rand acted with malice in that she knew unequivocally that Plaintiff did not assault her, and that she had initiated the sexual encounter on February 11, 2022, while fully in control of her faculties, yet she made false claims of sexual assault and pursued criminal charges against Plaintiff in order to ensure Plaintiff's arrest and public humiliation.

e.  Defendant Wofford acted with malice in assigning Hogsed to lead the Rand investigation and permitting him to submit false, deficient, and materially misleading affidavits in order to procure the arrest of Plaintiff, a Wofford student. Wofford further acted with malice in permitting Plaintiff to be arrested on campus,

inside a classroom building in the middle of a school day, maximizing the publicity, humiliation, and stigma that Plaintiff would suffer, despite knowing that Plaintiff was represented by counsel and would almost certainly have arranged for a voluntary surrender if they were advised that an arrest warrant had been issued.

265.    Defendants lacked probable cause to arrest Plaintiff and charge him with third degree criminal sexual conduct:

    a.    Defendant Rand, as the active, enthusiastic, non-incapacitated instigator of the sexual encounter between herself and Plaintiff, had actual knowledge that no assault occurred.

    b.    Defendant Hogsed admitted under oath that, despite submitting an affidavit for an arrest warrant for "assault causing vaginal bleeding", vaginal bleeding alone was not probable cause for an arrest. Defendant Hogsed further lacked probable cause for charging a sexual assault by incapacitation (which was Rand's claim), in light of (i) surveillance footage showing Rand walking to and from Plaintiff's apartment on the night in question without assistance, in full control of her faculties, showing no signs of impairment, let alone incapacitation, (ii) body-worn video from the officers who spoke with Rand on the night in question, again showing no signs of intoxication nor incapacitation, (iii) medical records from Rand's trip to the hospital on the night in question indicating no signs of trauma, (iv) Rand's own multiple statements denying that any sexual assault occurred, and (v) Boswell's polygraph examination results, confirming that his denials of any assault were truthful.

266.    As a direct and proximate result of Defendants' malicious prosecution of the criminal sexual conduct charge, Plaintiff suffered extensive damages, including but not limited to:

a. public humiliation and destruction of his reputation and future career prospects, from being very publicly arrested on campus and having said arrest reported extensively in the media, then repeated on campus, in classrooms, and on social media;

b. financial damages in having to expend attorneys' fees to defend against the false charges;

c. severe emotional distress and mental harm resulting from being falsely arrested, imprisoned, and publicly labeled as a sexual assailant, despite his actual innocence, manifesting in severe anxiety, depression, social isolation, and fear; and

d. physical harm in being falsely imprisoned as a result of the baseless arrest.

267.    As a result of the foregoing, Defendants Rand, Hogsed, and Wofford are liable to Plaintiff, jointly and severally, for damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT TWO: FALSE ARREST/IMPRISONMENT
### (Against Hogsed and Wofford)

268.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

269.    Under South Carolina law, false imprisonment occurs when: (1) the defendant restrains the plaintiff; (2) the restraint is intentional; and (3) the restraint is unlawful.

270.    Defendant Hogsed arrested Plaintiff on April 11, 2022, in a very public and humiliating fashion, in front of his fellow students and his professor.

271.    Hogsed's restraint of Plaintiff was intentional; he located Plaintiff on campus and planned and executed the public arrest. Plaintiff was then transported by SLED agents to Spartanburg County Penitentiary where he remained until April 12, 2022.

42

272. Hogsed's arrest/restraint of Plaintiff was unlawful, in that it was conducted pursuant to an arrest warrant that was procured by Hogsed based on his own knowingly false, deficient, and/or materially misleading affidavits, in the absence of probable cause.

273. There was no probable cause to arrest Plaintiff, and Hogsed was aware of same. Defendant Hogsed admitted under oath that, despite submitting an affidavit for an arrest warrant for "assault causing vaginal bleeding", vaginal bleeding alone was not probable cause for an arrest. Defendant Hogsed further lacked probable cause for charging a sexual assault by incapacitation (which was Rand's claim), in light of (i) surveillance footage showing Rand walking to and from Plaintiff's apartment on the night in question without assistance, in full control of her faculties, showing no signs of impairment, let alone incapacitation, (ii) body-worn video from the officers who spoke with Rand on the night in question, again showing no signs of intoxication nor incapacitation, (iii) medical records from Rand's trip to the hospital on the night in question indicating no signs of trauma (iv) Rand's own multiple statements denying that any sexual assault occurred, and (v) Boswell's polygraph examination results, confirming that his denials of any assault were truthful.

274. Hogsed was acting in his capacity as a Campus Safety Officer employed by Defendant Wofford when he falsely arrested/falsely imprisoned Plaintiff. On information and belief, Wofford was aware of, approved, supervised, and/or participated in coordinating and helping to effectuate Plaintiff's arrest on campus.

275. As a direct and proximate result of Defendants' false imprisonment of Plaintiff, Plaintiff suffered damages, including but not limited to severe mental and emotional distress, reputational harm, and direct economic losses such as attorneys' fees and the delay/suspension of his commission with the United States Army.

276.    As a result of the foregoing, Defendants Hogsed and Wofford are liable to Plaintiff, jointly and severally, for damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### COUNT THREE: 42 U.S.C. § 1983
**(Against Hogsed)**

277.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

278.    42 U.S.C. § 1983 provides a private cause of action for an individual deprived of a constitutionally secured right by persons acting under color of state law.

279.    The Fourth Amendment to the U.S. Constitution, applied to state actors by way of the Fourteenth Amendment, secures to all persons the right to be free from unreasonable searches and seizures.

280.    Under Fourth Circuit precedent, malicious prosecution and false arrest/false imprisonment are considered to be unreasonable seizures prohibited by the Fourth and Fourteenth Amendments, making such conduct actionable under § 1983.

281.    At all times relevant hereto, Hogsed, as a Wofford Campus Safety Officer, acted under color of state law, using the authority vested in him as an officer certified by the South Carolina Law Enforcement Division (SLED), when he maliciously prosecuted, wrongfully arrested, and wrongfully imprisoned Plaintiff.

282.    Hogsed worked in conjunction with and under the authority granted by SLED during his investigation and malicious prosecution and false imprisonment of Plaintiff.

283.    Probable cause, for Fourth Amendment purposes, generally requires facts and circumstances within the officer's knowledge, that are sufficient to warrant a prudent person in

believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.

284.    Under Fourth Circuit precedent, an officer's lack of relevant knowledge, or failure to collect/review relevant information at his disposal, may also serve as a basis to establish the absence of probable cause.

285.    Defendant Hogsed *admitted under oath* that he was aware that the basis provided in one of his affidavits (vaginal bleeding), to procure an arrest warrant for Plaintiff for third degree criminal sexual conduct, was not considered probable cause for that offense.

286.    With respect to the second affidavit submitted by Hogsed to procure an arrest warrant for criminal sexual conduct in the third degree, which was purportedly based on Rand's allegations, Hogsed had actual knowledge of, or easy access to, facts and evidence that would preclude a reasonable person from believing that Rand was sexually assaulted while incapacitated by alcohol. By way of example, and not limitation:

    a.    Rand's medical records reflected her *repeated* assertions that no assault had occurred;

    b.    Video surveillance footage showed Rand walking perfectly normally, without assistance or impairment, to and from Plaintiff's apartment immediately before and after the incident, and the items in Rand's hands and her facility in managing them all while also fixing her hair and using her key to enter her apartment, reflected a clear, ordinary thought process in gathering her belongings and navigating her way home;

c. None of the officers who interviewed Rand on the night in question observed any evidence of incapacitation or intoxication, nor did their body camera footage reveal any indications of impairment;

d. Medical records from the night of the incident noted Rand as oriented to time and place and unimpaired;

e. No witnesses at the party immediately preceding the incident reported Rand as appearing to be incapacitated; and

f. Plaintiff's polygraph examination results indicated he was truthful in his description of the encounter as consensual.

287.   Additionally, Hogsed lacked sufficient knowledge concerning the reliability and consistency (or rather, *inconsistency*) of Rand's allegations, as he had not even bothered to review her original recorded interview with another Campus Safety officer before seeking the arrest warrant.

288.   Under the above facts and circumstances, it was abundantly clear that there was no probable cause to arrest Plaintiff for third degree criminal sexual conduct on the basis of incapacitation.

289.   The right to be free from arrest or prosecution in the absence of probable cause is such a clearly-established, bedrock constitutional right that any reasonable officer in Hogsed's position would be fully aware that his conduct in recklessly and/or fraudulently procuring an arrest warrant for Plaintiff (and then effectuating said arrest) for third degree criminal sexual conduct, without probable cause, was unlawful and unconstitutional.

290. Moreover, Hogsed's conduct in attempting to procure an arrest warrant based upon an affidavit *that he knew at the time of submission did not constitute probable cause*, is sufficiently egregious to warrant punitive damages.

291. As a direct and proximate result of Hogsed's conduct, Plaintiff suffered damages, including but not limited to physical harm, severe mental and emotional distress, lost/diminished educational and career opportunities, reputational harm, and direct economic losses such as attorneys' fees and the delay of his commission with the United States Army.

292. As a result of the foregoing, Hogsed is liable to Plaintiff for damages in an amount to be determined at trial, including punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT FOUR: DEFAMATION
### (Against Rand)

293. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

294. Defendant Rand repeatedly defamed Plaintiff when she publicly, falsely accused Plaintiff of rape, with actual knowledge that the claims were false, and without privilege, thereby destroying Plaintiff's reputation and subjecting him to, inter alia, harassment, abuse, shunning, social isolation, ostracization, emotional distress, and mental anguish.

295. On or about February 25, 2022, Rand approached numerous individuals in the Wofford senior apartments and Greek Village and stated that Plaintiff Graham Boswell "raped" and "sexually assaulted" her.

296. On or about February 25, 2022, Rand proclaimed, at a social gathering at Plaintiff's fraternity, that "Graham Boswell . . . raped and sexually assaulted me."

297.    On or about February 28, 2022, Rand approached a fraternity brother of Plaintiff's at a dining hall on campus, and stated she was "taking this shit criminal… about Graham raping me."

298.    On or about February 28, 2022, Rand posted on Instagram multiple times, that she was a sexual assault survivor, and on March 1, 2022 posted on Snapchat: "Fuck graham Boswell – All I gotta say."

299.    On information and belief, throughout February and March 2022, Rand continued to attend fraternity parties at Plaintiff's fraternity house and during said parties, would approach Plaintiff's fraternity brothers and falsely claim that Plaintiff "sexually assaulted" or "raped" her. On information and belief, some of these statements were made to fraternity members whom Rand did not even know or had never spoken to before.

300.    Upon information and belief, Rand approached a student in the Wofford mail room, with numerous other students present, and yelled, "guess what, Graham Boswell assaulted me."

301.    On or about March 1, 2022, in a public study area in the Milliken Science Center Rand told another Wofford student that the previous week, she told "too many people" about Plaintiff "sexually assaulting" her.

302.    On or about April 15, 2022, Rand provided information and participated in the development and distribution of the Petition, which was widely disseminated throughout Wofford, including to President Samhat, stating that Plaintiff had a "pattern of violence," "poor character," and had "assaulted another student."

303.    According to one student who was interviewed by Wofford's Title IX investigators on June 14, 2022, Rand made the (false) statement that Plaintiff "raped" her, "everywhere, to anyone."

304.    On or about March 16, 2023, Rand contacted Captain Haskett, the Captain in the U.S. Army who had been conducting an investigation of Plaintiff in relation to Plaintiff's process of commissioning with the army. Rand falsely stated to the Captain that Plaintiff had raped her, and materially misrepresented Wofford's investigation of the assault claim by presenting Captain Haskett with an incomplete copy of the Title IX investigation report, which deliberately excluded all of the exculpatory evidence upon which Plaintiff had been found not responsible.

305.    Rand's statements that Plaintiff "raped" and/or "sexually assaulted" her were completely false, as Rand well knew. Rand was not incapacitated, but rather, was fully in charge of her faculties, when she initiated, continued, and enthusiastically participated in consensual sexual activities with Plaintiff on February 11, 2022, which was the only sexual encounter the two ever had together. Rand expressly verbally consented to the sexual interaction with Plaintiff and repeatedly verbally confirmed that she was not intoxicated (let alone incapacitated). Rand's own medical records and repeated statements to medical professionals on the night in question further confirmed that Rand was not incapacitated and was not sexually assaulted by Plaintiff.

306.    Rand's false statements that Plaintiff raped and/or sexual assaulted her were defamatory per se. *See Kunst v. Loree*, 817 S.E.2d 295, 303 (S.C. Ct. App. 2018) (statements alleging the commission of a crime are actionable per se).

307.    Rand's statements were made with actual malice and reckless disregard for the truth, as she knew at all times that the statements were false.

308.    Rand's statements and presentation of the incomplete, materially misleading Title IX investigative report to the Captain of the U.S. army, were also not subject to any privilege, as Rand's deliberate exclusion of the exculpatory evidence and her withholding of the fact that

Plaintiff was found not responsible for sexual assault on the basis of that same exculpatory evidence, demonstrates that Rand was acting in bad faith.

309.    Rand's repeated false statements accusing Plaintiff of rape and sexual assault were intended to, and did, expose Plaintiff to public contempt, aversion, and disgrace. He was harassed, shunned, and excluded from his social group, fraternity, and school activities including his own graduation, and his property was vandalized. His commission with the U.S. army was also indefinitely delayed.

310.    As a direct and proximate result of Rand's defamatory statements, Plaintiff sustained damages, including but not limited to, emotional distress and mental anguish, reputational harm, social stigma, lost/diminished educational and career opportunities, lost income, and property damage.

311.    Moreover, given Rand's own repeated admissions that Plaintiff did not sexually assault her, and given the medical records, surveillance video, and witness statements all proving that Rand was not intoxicated to incapacitation on the night in question, and given Rand's continuation of her defamatory harassment campaign against Plaintiff even *after* he was found *not responsible* for assault by Wofford's Title IX office, and given the breadth and volume of Rand's knowingly false, horribly damaging assertions that Plaintiff raped her, Rand's conduct was so egregious, malicious, and unjustified as to warrant punitive damages.

312.    As a result of the foregoing, Rand is liable to Plaintiff for damages in an amount to be determined at trial, including punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

**COUNT FIVE: INTENTIONAL INTERFERENCE WITH PROSPECTIVE
CONTRACTUAL RELATIONS/ECONOMIC ADVANTAGE**
**(Against Rand)**

313.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

314.    Under South Carolina law, the elements of intentional interference with prospective economic advantage are: (1) intentional interference with prospective contractual relations/prospective economic advantage; (2) for an improper purpose or by improper methods; (3) resulting in injury.

315.    Beginning in 2018, Plaintiff entered into a prospective contractual relationship with the U.S. Army through his participation in Wofford's ROTC program. The contract anticipated a post-graduation commitment of at least four years of active duty, during which time Plaintiff would serve as a commissioned officer.

316.    Rand was aware of Plaintiff's prospective contractual relationship with the U.S. Army through his participation in the ROTC program.

317.    Upon information and belief on or about March 16, 2023, Rand intentionally, maliciously, and wrongfully interfered with Plaintiff's prospective relationship with the U.S. army, by falsely reporting to Captain Haskett that Plaintiff had raped her, and presenting a materially misleading and incomplete investigative report in support of her (knowingly false) claims, in which Rand deliberately excluded the exculpatory evidence that disproved her claims and withheld the fact that Wofford had already found Plaintiff not responsible for sexual assault.

318.    Rand's deceitful, dishonest, and unlawful defamatory conduct was committed with the express purpose of damaging or destroying Plaintiff's future with the Army and precluding him from receiving the economic and contractual benefits anticipated through Plaintiff's participation in the ROTC program.

319.    Rand's intentional, unjustified, and unlawful defamatory conduct interfered with Plaintiff's prospective contractual relationship/economic advantage of his membership in the U.S. army, by delaying and causing the temporary suspension of Plaintiff's commission.

320.    As a direct and proximate result of Rand's tortious interference, Plaintiff sustained damages, including but not limited to a 13-month delay of his commission with the U.S. army.

321.    As a result of the foregoing, Rand is liable to Plaintiff for damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

### COUNT SIX: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
**(Against Rand, Hogsed, and Wofford)**

322.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

323.    Under South Carolina law, intentional infliction of emotional distress arises when the defendant, by extreme and outrageous conduct, intentionally or recklessly causes severe emotional distress to the plaintiff.

324.    Under Fourth Circuit precedent, a defamatory communication may be considered sufficiently extreme and outrageous to state a claim for intentional infliction of emotional distress. *Hatfill v. New York Times Co.*, 416 F.3d 320, 336 (4th Cir. 2005).

325.    As set forth above, Rand knowingly and intentionally, falsely accused Plaintiff of "rape" and "sexual assault," and spent nearly a year actively spreading her devastating false claims all over Wofford's campus, among Plaintiff's professional and social associations (such as his fraternity and the ROTC/U.S. army), and to the public at large via social media posts and a publicly-accessible petition which was ultimately submitted to Wofford's administration (and, on information and belief, Wofford alumni).

52

326.     Given Rand's own repeated admissions at the hospital that she was not assaulted, and given that Rand's medical records discredited her claims of incapacitation, and given the documentary video surveillance evidence and police body-camera footage all of which showed Rand to be awake, alert, oriented and in control of her faculties immediately before and after her sexual encounter with Plaintiff, Rand's insistence on publicly accusing Plaintiff of "rape" was malicious, unjustified, and extreme and outrageous.

327.     On information and belief, Rand openly admitted that she engaged in this extended harassment campaign for the purpose of ruining Plaintiff's life, getting him excluded from his fraternity, and attempting to prevent his commission to the US Army – in other words, that Rand absolutely intended to inflict maximal personal damage on Plaintiff, by way of her defamatory harassment campaign.

328.     Moreover, Rand's false accusations ultimately caused Plaintiff to be publicly arrested, on Wofford's campus in the middle of the school day, in the most humiliating and stigmatizing manner possible. The arrest was then picked up by the media and covered extensively, including being discussed during class by a Wofford professor and being broadcast on televisions on Wofford's campus, ensuring that every student at Wofford was aware that Plaintiff was arrested for criminal sexual conduct.

329.     With respect to Plaintiff's arrest, Defendant Hogsed presented incomplete, materially misleading information to a state court judge in order to wrongly procure an arrest warrant without probable cause, and then deliberately effectuated that arrest in the most public, humiliating way possible, despite knowing that Plaintiff was represented by counsel and almost certainly would have voluntarily surrendered had he been notified that a warrant was issued.

330.    Defendant Wofford permitted, sanctioned, and/or assisted in coordinating Hogsed's arrest of Plaintiff on Wofford's campus, during the school day, in front of Plaintiff's professor and classmates, maximizing the public humiliation and stigma.

331.    Wofford also failed to take any measures to remediate the relentless defamatory harassment campaign by Rand, and instead, punished *Plaintiff* by prohibiting him from participating in his own graduation ceremony and activities.

332.    Plaintiff advised Wofford that Rand's harassment campaign was destroying his life and causing him severe anxiety, depression, and fear, yet Wofford took no meaningful action to protect Plaintiff, emboldening Rand to continue/escalate her harmful conduct. Wofford's deliberate indifference to Rand's harassment and the hostile environment it created, even *after Wofford itself concluded that Plaintiff had not assaulted Rand*, was particularly egregious.

333.    Individually and collectively, Defendants' conduct was so extreme and outrageous that it exceeded all possible bounds of decency.

334.    As a direct and proximate result of Defendants' conduct, Plaintiff was falsely arrested/imprisoned without probable cause, publicly shamed and humiliated, shunned and excluded from his social, educational, and professional activities, had his car vandalized, and experienced severe emotional distress and mental anguish, manifested by, inter alia, severe anxiety, depression, and fear.

335.    As a result of the foregoing, Defendants Rand, Hogsed and Wofford are liable to Plaintiff, jointly and severally, for damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT SEVEN: BREACH OF CONTRACT
### (Against Wofford)

336.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

337.     South Carolina courts have recognized an implied contractual relationship between university/college students and their schools, with the school's policies and procedures, inter alia, forming the terms of the contract. The contractual relationship is formed by virtue of the student's enrollment, payment of tuition, pursuit of their degree, and compliance with relevant rules, in exchange for the school's provision of an education culminating in a degree, compliance with its own published policies and procedures, and other related promises and benefits.

338.     Where a college student identifies a specific promise or contractual provision made by the school, which the school failed to abide by, courts generally permit such terms to be enforced through a breach of contract claim.

339.     At all times relevant hereto, a contractual relationship existed between Plaintiff and Wofford through, inter alia, Plaintiff's enrollment at Wofford, pursuit of his degree, and compliance with Wofford's policies and reliance upon same, and Wofford's dissemination of the policies and procedures governing the student disciplinary system, including but not limited to the Policy, and its implementation and enforcement thereof.

340.     Under South Carolina law, there exists in every contractual relationship, including implied contracts, an enforceable implied covenant of good faith and fair dealing. The covenant of good faith and fair dealing applied to Plaintiff's contractual relationship with Wofford.

341.     The covenant of good faith and fair dealing generally requires each party to perform their obligations under the contract in good faith, and in a manner designed to ensure that each party receives the benefit of the bargain.

342.     Wofford breached its contractual obligations to Plaintiff, as well as the covenant of good faith and fair dealing, when it failed to comply with the express promises set forth in the Policy, and when it applied the Policy in a gender-biased manner through which Plaintiff's complaints against the female student were not taken seriously nor appropriately adjudicated or remedied, whereas the female student's complaint against Plaintiff was pursued swiftly and thoroughly.

343.     Wofford's breaches of its contractual obligations include, but are not limited to:

a.  Failing to provide Plaintiff with "an educational and work environment, including programs and activities, free from discrimination, harassment, and retaliation." Wofford subjected Plaintiff to a hostile educational environment in which he was extensively subjected to discrimination and harassment.

b.  Failing to properly evaluate Plaintiff's complaint by failing to even consider whether Rand's actions qualified as sexual harassment despite the overwhelming evidence that Rand told numerous individuals that Plaintiff assaulted her.

c.  Failing to conduct a "thorough, reliable, impartial, prompt, and fair" investigation of Plaintiff's complaint by the investigators by failing to even reinterview Rand and instead repackaging Rand's interview as a complainant for the investigation report; failing to interview many individuals identified by Plaintiff as witnesses to Rand's defamatory and harassing conduct; the investigation was also far from prompt as the final Report was issued on February 7, 2023, more than ten months after Plaintiff's complaint and the complaint was dismissed on March 13, 2023, over a year after Plaintiff's initial complaint.

d.  Failing to safeguard Plaintiff's personal information, and providing Plaintiff's personal information to media outlets, contrary to the Policy provision providing "[t]he right to be informed in advance of any public release of information the allegation(s) or underlying incident(s), whenever possible. The right not to have any personally identifiable information released to the public without consent provided, except to the extent permitted by law. The right to preservation of privacy, to the extent possible and permitted by law."

e.  Failing to secure the confidentiality of the Title IX report by allowing Rand to have unrestricted access to the report resulting in Rand submitting a falsified version of the report to the U.S. army and failing to sanction Rand for her violations of Wofford's policies.

344.    As a proximate and foreseeable consequence of the foregoing breaches, Plaintiff sustained damages, including, but not limited to, severe emotional distress and mental anguish, lost/diminished educational and career opportunities, lost income, reputational damages, economic injuries and other direct and consequential damages.

345.    As a result of the foregoing, Wofford is liable to Plaintiff for damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT EIGHT: CIVIL CONSPIRACY
### (Against Rand, Hogsed, and Wofford)

346.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

347.    Wofford, Rand and Hogsed agreed and/or combined to engage in a civil conspiracy to defame, harass, maliciously prosecute, and falsely arrest/imprison Plaintiff.

348.   Rand, by making numerous, knowingly false public statements accusing Plaintiff of rape, extensively defamed him, as set forth in Count Four, above. Wofford furthered Rand's unlawful defamation of Plaintiff by refusing to sanction or deter her in any way, despite Plaintiff's repeated requests for help and despite Rand's violation of numerous Wofford policies in the course of her defamatory harassment campaign (including, but not limited to, disclosure of confidential materials and hostile environment sexual harassment). Wofford also furthered the defamation by permitting a professor to incorporate the defamatory allegations into a class discussion. Hogsed furthered the defamation and damages therefrom by intentionally publicly arresting Plaintiff, on school property and during regular school hours, for criminal sexual conduct, thereby lending an air of credibility and legitimacy to Rand's false claims.

349.   Rand, Hogsed, and Wofford combined and/or agreed to injure Plaintiff by malicious prosecuting and falsely arresting/imprisoning him without probable cause, as set forth in Count One and Count Two, above. Specifically, Rand made the knowingly false claim of sexual assault by incapacitation, and Wofford and Hogsed pursued these false claims despite abundant evidence that Rand was fabricating her claims. Hogsed submitted two deficient and/or materially misleading affidavits in order to procure an arrest warrant for Plaintiff, and Wofford permitted and aided Hogsed in arresting Plaintiff on campus, during school hours, in a maximally public and humiliating manner, despite the absence of probable cause.

350.   As the direct and proximate result of Defendants' conduct, Plaintiff suffered damages, including but not limited to: exclusion from educational activities, programs, and/or benefits; reputational harm; diminished educational and career opportunities, loss of income/future income; severe emotional distress and mental anguish, manifesting in anxiety and depression; and physical harm/damage to property (Plaintiff's vandalized car).

351.    As a result of the foregoing, Defendants Rand, Hogsed, and Wofford are liable to Plaintiff, jointly and severally, for damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

### COUNT NINE: RESPONDEAT SUPERIOR
**(Against Wofford)**

352.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

353.    Under the principles of respondeat superior, an employer may be held liable for both the negligent and intentional torts committed by an employee within the scope of his employment. *See Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 756 (1998).

354.    At all relevant times herein, Hogsed was employed by Defendant Wofford College as a Campus Safety Officer.

355.    As the Campus Safety Officer assigned to handle/lead the investigation into Rand's sexual assault claim against Plaintiff, Defendant Hogsed was acting within the scope of his employment when he maliciously prosecuted, unlawfully imprisoned, and intentionally inflicted emotional distress upon Plaintiff, as described in Count One, Count Two, and Count Six, above.

356.    As a direct and proximate result of Hogsed's conduct, Plaintiff suffered damages, including but not limited to physical harm, severe mental and emotional distress, lost/diminished educational and career opportunities, reputational harm, and direct economic losses such as attorneys' fees and the delay/suspension of his commission with the United States Army.

357.    Under principles of respondeat superior, Wofford college is vicariously liable for Hogsed's misconduct and the damages resulting therefrom.

358.    As a result of the foregoing, Defendant Wofford is liable to Plaintiff for damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests this Court grant the following relief:

a. On the first cause of action for malicious prosecution, a judgment in favor of Plaintiff and against Rand, Hogsed, and Wofford, jointly and severally, awarding damages in an amount to be determined at trial (including but not limited to damages to emotional distress, mental anguish, physical well-being, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects), plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

b. On the second cause of action for false arrest/imprisonment, a judgment in favor of Plaintiff and against Hogsed and Wofford, jointly and severally, awarding damages in an amount to be determined at trial (including but not limited to damages to emotional distress, mental anguish, physical well-being, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects), plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

c. On the third cause of action for deprivation of constitutional rights under 42 U.S.C. § 1983, a judgment in favor of Plaintiff and against Hogsed awarding damages in an amount to be determined at trial (including but not limited to damages to emotional distress, mental anguish, physical well-being, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects), plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

d. On the fourth cause of action for defamation, a judgment in favor of Plaintiff and against Rand, awarding damages in an amount to be determined at trial (including but not limited to damages to emotional distress, mental anguish, physical well-being, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, and punitive damages), plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

e. On the fifth cause of action for intentional interference with prospective contractual relations/economic advantage, a judgment in favor of Plaintiff and against Rand, awarding damages in an amount to be determined at trial (including but not limited to damages to emotional distress, mental anguish,

physical well-being, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements ;

f.   On the sixth cause of action for intentional infliction of emotional distress, a judgment in favor of Plaintiff and against Rand, Hogsed and Wofford, jointly and severally, awarding damages in an amount to be determined at trial (including but not limited to damages to emotional distress, mental anguish, physical well-being, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects), plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

g.   On the seventh cause of action for breach of contract, a judgment in favor of Plaintiff and against Wofford, awarding damages in an amount to be determined at trial (including but not limited to damages to emotional distress, mental anguish, physical well-being, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects), plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

h.   On the eighth cause of action for civil conspiracy, a judgment in favor of Plaintiff and against Rand, Hogsed and Wofford, jointly and severally, awarding damages in an amount to be determined at trial (including but not limited to damages to emotional distress, mental anguish, physical well-being, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects), plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

i.   On the ninth cause of action for respondeat superior, a judgment in favor of Plaintiff and against Wofford, awarding damages in an amount to be determined at trial (including but not limited to damages to emotional distress, mental anguish, physical well-being, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects), plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

j.   On each and every count, such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38, Plaintiff hereby demands a trial by jury on all claims/issues so triable in this matter.

Respectfully submitted,

*Attorneys for Plaintiff Graham Boswell*

**NESENOFF & MILTENBERG, LLP**

**Andrew T. Miltenberg, Esq. (*pro hac vice forthcoming*)**
**Stuart Bernstein, Esq. (*pro hac vice forthcoming*)**
**Helen Setton, Esq. (*pro hac vice forthcoming*)**
**363  Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**
**amiltenberg@nmllplaw.com**
**sbernstein@nmllplaw.com**
**hsetton@nmllplaw.com**

**-and-**

**CINDY CRICK LAW LLC**

**By: */s/ Cindy Crick*_____**
**Cindy Crick, Esq. (SC#70233, Fed. #13076)**
**416 East North Street, Second Floor**
**Greenville, SC 29601**
**(864) 775-5788**
**cindy@cindycricklaw.com**

This 27th day of October, 2023.