# EXHIBIT A

# Excerpts and Exhibits from the Deposition of David Hogsed

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION
C.A. No.: 7:23-cv-5467-TMC

GRAHAM BOSWELL,

PLAINTIFF,

VS.

WOFFORD COLLEGE, CATHERINE RAND AND
DAVID HOGSED,

DEFENDANTS.

D E P O S I T I O N

WITNESS:          DAVID HOGSED
DATE:             AUGUST 13, 2025
TIME:             9:29 A.M.
LOCATION:         JACKSON LEWIS, P.C.
                  15 SOUTH MAIN STREET, SUITE 700
                  GREENVILLE, SOUTH CAROLINA 29601
REPORTED BY:      TRACY MARTIN
VIDEOGRAPHER:     RICHARD EDMUND

LEGAL EAGLE
Post Office Box 5682
Greenville, South Carolina 29606
864-467-1373
depos@legaleagleinc.com

**46**

MR. BERNSTEIN: Okay.

MR. SMITH: Stuart, real quick.

MR. BERNSTEIN: Sure.

MR. SMITH: Is what you're saying is that this is -- what you're presenting is a -- more condensed copies? You said clear and condensed, so.

MR. BERNSTEIN: When I say condensed, I'm probably using the wrong word. A more -- every document in there is produced somewhere else by Wofford. This was a more chronological. It contains different parts. Meaning -- again, this was from -- this is the documents that a criminal attorney had gotten. So there's no -- you know, potentially from the solicitor -- or discovery. And so this is a more ---

THE WITNESS: You were about to knock your drink over.

MR. BERNSTEIN: --- this is a more complete -- for lack of a better word. Instead of having seven documents here and then 13 documents there and then pulling all those together. This is apparently -- as I found out in prepping for this deposition, is a -- for lack of the only way I can think of -- is a full copy of his investigation file.

MR. SMITH: So you're talking about unredacted? Is that what you're primarily talking about?

**47**

MR. BERNSTEIN: Yes, some of them is unredacted, correct.

MR. SMITH: I can see where you're going.

MR. BERNSTEIN: Right.

MS. KHETARPAL: Maybe I'm just being dense here, but I still don't understand. It seems to me that you took documents and re-Bates stamped them and compiled them. I -- I don't understand what you're saying, but.

MR. BERNSTEIN: Okay. Monica, again.

MS. KHETARPAL: Okay.

MR. BERNSTEIN: I -- I vigorously ---

MS. KHETARPAL: What was the origin?

MR. BERNSTEIN: --- vigorously disregard -- vigorously disagree with that assumption -- and that assertion for the second time. I didn't repeat it. We did not re-Bates stamp anything. This was the criminal -- our criminal attorney's -- Graham's criminal attorney's file that she got from the AG's office.

MS. KHETARPAL: Okay.

MR. BERNSTEIN: Of his investigation file.

MS. KHETARPAL: Okay.

MR. BERNSTEIN: And in prepping for this deposition -- the stuff that you produced is extremely highly redacted and it's produced seven different places. I think Mr. Smith actually produced some also similar

**48**

documents. This is all the same documents that you guys have produced just in one file. One document that should have been produced by you guys respectfully to begin with. Which it wasn't. So we ended up producing it when it became clear in this deposition that this was the best document to use for his deposition because this is what appears to be his file that he had at the preliminary hearing office -- at the preliminary hearing.

MS. KHETARPAL: Okay. I mean, I think that's up to him to say.

MR. BERNSTEIN: And that's what I was going to ask him.

BY MR. BERNSTEIN:

Q. So before I ask you any questions about the document, can you please review it?

A. Sure. All right, sir.

Q. Okay.

A. These are documents that were in the case file, but I didn't produce all of these documents.

Q. When you say you didn't produce all those documents, what do you mean?

A. Some of them were -- I mean, like the incident reports and all that stuff were produced by us. But like the medical records and all that were not.

**49**

Q. You didn't create them?

A. I didn't create them.

Q. Okay.

A. I'm sorry. I said produced. I should have said create them. I apologize.

Q. Okay. So you didn't create them. But this would -- looking at it now, does this appear to be what you would have included -- or what would have been included in your quote -- unquote case file?

A. Yes.

Q. Okay. And again, I -- I don't expect you to tell me that. Is there something -- let me ask you this way. Is there something jumping out at you?

A. What do you mean?

Q. Is there something jumping out at you that's not there? Saying, hey, where is -- you know, going back to my prosecuting days. The DP-5 that the police officer would fill out -- or is there -- is there a missing -- is there a document that's standing out to you that's like, oh, where is some -- some document?

A. Give me an hour and I'll let you know. Because, I mean, there's --- as of right now, no.

Q. Okay. And just -- sir, just -- so for your own edification. If you turn to 001228.

A. 1228, you said?

LEGAL EAGLE
864-467-1373

**50**

Q. Yeah.

A. Okay.

Q. Okay. And in the first paragraph -- if you just read that to yourself, that will -- does that verify that you became the ---

A. Yes.

Q. --- on the 22nd? Okay. So now, when you became the investigating officer on the 22nd -- and what does RO stand for? Is that ---

A. Reporting officer.

Q. Okay. Is there a difference between a reporting officer and the investigating officer?

A. Reporting officer is whoever's writing the report.

Q. Got you. Okay. When you became the investigating officer, is it fair to ---

MR. BERNSTEIN: Withdrawn.

BY MR. BERNSTEIN:

Q. When you became the investigating officer, what if anything, did you do to get up to speed on the investigation?

A. Well, I met with the initial officer -- Len Elder. I think on his -- I think his documents have him as Gregory. And then reviewed the case file. And then what statements that had been obtained thus far.

Q. When you say the case file, are we talking about what's

**51**

Exhibit 3?

A. Well -- well, what would have been produced up to that point. Which would have been the initial incident report, and most of that. The initial incident report, statements, and any property sheets that were -- have been produced.

Q. Perfect. Now, a few minutes ago -- before we took -- before we started talking about this file -- Exhibit 3. You indicated to me that -- and please, forgive me. I don't want to put words in your mouth. You had no knowledge that there was -- that Ms. Rand said that there was blood on her dress, correct?

A. I don't recall that, no.

Q. Okay. Can you turn to 1253? Oh, I'm sorry. Can you turn to 1252? And that appears to be Ms. Rand's statement on February 14th, 2022, correct?

A. Yes.

Q. Okay. Now, if you could turn to Page 2 -- which is 1253. And you look at the fourth sentence. Do you see where she writes (as read) and when I was in there. There was blood all over my dress.

You see that?

A. Yes.

Q. Okay. So on February 14th -- her own statement -- something that would have been in the file. She says

**52**

that there was blood all over her dress, correct?

A. Yes.

Q. Okay. And as of February 22nd, when you became the investigating officer, you said that you reviewed her statement. So you knew on February 22nd that she alleged that there was blood on her dress, correct?

MR. SMITH: I'm going to object. That's not what it says.

MR. BERNSTEIN: Okay.

MR. SMITH: Read the entire statement.

MR. BERNSTEIN: You'll -- you'll have your opportunity to question him. It's clearly what it says. It says ---

MR. SMITH: Dress and body. Dress and body.

MR. BERNSTEIN: Correct.

MR. SMITH: You didn't say that.

BY MR. BERNSTEIN:

Q. Okay. Dress and body. It indicates that there was blood all over her dress and body, correct? Yes, that's what she wrote?

A. That -- that is -- that is correct. That's what she wrote.

Q. Okay. Now, did you take her dress as evidence? Did you try to take her dress as evidence to test for the blood?

A. No.

**53**

Q. Okay. So would this be another mistake that you made? Just like not taking Graham's jeans?

MS. KHETARPAL: Objection.

BY MR. BERNSTEIN:

Q. You can answer.

MS. KHETARPAL: You can answer.

BY MR. BERNSTEIN:

A. I don't see it as a mistake. Because I didn't get this until how many days later? 11?

Q. Okay. But you're the -- you're the investigating officer. You just read that there was blood on her dress. Did you say, wait a second, guys, didn't anyone get her dress? She says there's blood on it.

A. No, I missed that.

Q. Okay. So you -- you agree you missed that?

A. That I missed ---

Q. Okay. Now, let me ask you this. Did you miss it -- well, did you ever find out that her mother destroyed the dress shortly after that weekend?

A. Sir, I have no idea what you're talking about.

Q. Okay. Did you ever ask her where did you -- so is it fair to say that you have no idea that her mother -- that she gave the dress to her mother after the weekend and her mother tried to clean it and then her mother just got rid of the dress?

LEGAL EAGLE
864-467-1373

Deposition of David Hogsed

66

A.   I was friends ---

MS. KHETARPAL: Objection. Go ahead.

BY MR. BERNSTEIN:

A.   --- I was friends with a lot of those students.

Q.   Okay. Now, you had given me some information. And I appreciate it. Regarding the sheriff's office and jurisdiction and things of that matter. As a Wofford Public Safety officer, what rights did you have?

A.   What do you mean?

Q.   Legal rights in terms of arrests -- carrying a gun.

A.   We could do that on Wofford College property.

Q.   Okay. Do you know -- again, I'm not -- do you know where that -- that privilege or that right generated from? Was it a statute? Do you have -- do you have any idea of where that came from?

A.   Actually, I don't. I mean, I'm sure there's a state statute that covers it, but I couldn't tell you what it is.

Q.   Well, putting aside what the statute was. What was your understanding in February of 2022 -- as a Wofford Public Safety officer, what rights you had with regards to arresting people?

A.   That we had as a -- we were classified as state constables. The ones of us that kept up our Class I certifications -- law enforcement certifications. So we

67

had the same arrest powers or whatever -- as was -- like a city police department or a deputy sheriff for that -- on Wofford College property.

Q.   Okay.

A.   Not outside of there.

Q.   Did you -- what's SLED?

A.   South Carolina Law Enforcement Division. They're the state -- I mean, it's a state agency.

Q.   Okay. To your knowledge, what if any, role did SLED have with regards to your ability to make arrests -- if anything on Wofford -- as a Wofford Public Safety officer? Is there any connection between Wofford Public Safety and SLED?

A.   Yes.

Q.   What was that relationship? To your knowledge?

A.   That's who your -- that's who your state constableship is -- is issued through. You have to go through their -- through SLED. They issue state constables certifications and all that. Once you show that you have your approved training and all that stuff -- if that -- if that makes sense.

Q.   Okay.

A.   So they -- they oversee the constable/SLED armed security/unarmed security. SLED oversees all that across the state.

68

Q.   Okay. Okay. What if any, other role -- or connection did SLED have with regards to -- you know, Wofford and -- and any investigations that Wofford Public Safety conducted?

A.   So South Carolina law requires -- at that time, that if an incident such as this was reported, that the agency officers would investigate it with the assistance of the South Carolina Law Enforcement Division.

Q.   Okay. Is it six -- five? I thought the video was five, no?

A.   You did -- you did make the video as an exhibit.

MS. KHETARPAL: The Exhibit 4, yeah. The video's four. This is five.

(Plaintiff's Exhibit No. 5 was marked for identification.)

BY MR. BERNSTEIN:

A.   Thank you.

Q.   Okay. Mr. Hall -- I think we identified him earlier. Is he the head of public safety at Wofford?

A.   He was the Director of Campus Safety at the time.

Q.   All right. And this was an email he sent to you on February 14th -- you as well as Officer Saar and Elder?

A.   Yes.

Q.   Okay.

A.   And Dwayne.

Q.   Oh. Dwayne is different from Saar? Oh. Okay.

69

A.   So he sent it to me, Dwayne Harris -- who was the lieutenant -- or second-in-command -- Ted Saar, and then Len Elder.

Q.   Okay. Were there any other public safety officers besides these individuals listed on this email?

A.   We -- yes.

Q.   Okay. Now, do you see he wrote, (as read) It seems that we're obligated to have SLED involved in a CSC case whether or not we like how they do it.
Do you see that email to you?

A.   I mean, I'm involved in the email, yes.

Q.   Okay. Do you know what he meant?

A.   I haven't -- it wasn't like -- so like I said, I didn't take over until the 22nd. So I think I have an idea, but if I do I may be misspoken.

Q.   Well, when you got this email, did you ---

A.   I don't even remember getting this email because I wasn't involved in the case until -- this is to the four officers that were state constables.

Q.   Right. So do you have any reason to believe -- I mean, this was sent to you. Did you not check your emails every day?

A.   Yes.

Q.   Okay. Is there any reason not to believe that you -- back on February 14, 2022 -- at approximately 4:07 P.M.

18 (Pages 66 to 69)

LEGAL EAGLE
864-467-1373

Deposition of David Hogsed

## 86

Ms. Halford's handling of that case, correct?

A. Correct.

Q. And she dismissed that case?

A. I guess. I mean, yeah, again.

Q. Well, I don't want you to guess, sir.

A. I wasn't involved in that, so.

Q. And I appreciate you weren't, but I'm asking what you heard? What they said?

A. Yes, what I heard was that the case was ---

MS. KHETARPAL: Objection. By the way keep going.

BY MR. BERNSTEIN:

Q. Go ahead.

A. --- was dismissed for whatever reasons -- it was dismissed. I don't know the -- the reasoning why it was dismissed.

Q. And specifically in this case -- in Ms. Rand's case, Mr. Saar's wrote to the solicitor's office to get this case away from Ms. Halford, correct?

A. Apparently.

Q. And this was written on May 9th, 2022. You were still the investigating officer, correct?

A. Correct.

Q. Were you consulted on this?

A. No.

Q. Prior -- did you ever find out that Ted Saars wrote this

## 87

email seeking to have this case taken away from Ms. Halford?

A. When I received a phone call from Solicitor Barnett telling me that he was going to send the case to the AG's office -- Attorney General's office. That was my first knowledge that -- that Ted had done that.

Q. And was the handling -- or the alleged perceived handling by either SLED or the Seventh Circuit Solicitor's Office of sexual assault cases discussed in the Wofford Public Safety Office?

MS. KHETARPAL: Objection.

BY MR. BERNSTEIN:

A. I mean, the only discussion that was had was the fact that -- you know, I had told everybody that until the case -- excuse me. Until the case was presented to the Seventh Circuit Solicitor's Office and it was agreed upon that -- or it was established that probable cause existed and that they would prosecute the case that I wasn't going to charge Mr. Boswell.

MR. BERNSTEIN: I'm sorry, Tracy. Could you repeat that? I didn't follow that answer. I apologize.

THE COURT REPORTER: It says Seventh Circuit Solicitor's Office -- and it was agreed upon that it was extended -- established that probable cause existed and that they would prosecute the case -- that I wasn't

## 88

going to charge Mr. Boswell.

BY MR. BERNSTEIN:

Q. So if I understand -- please correct me.

A. Sure.

Q. That you were not -- as a -- as -- as a public -- as a Wofford Public Safety Officer, you have the right -- if you believe there's probable cause to make an arrest -- irrespective of what the Seventh Circuit Solicitor's Office says, correct?

A. Correct.

Q. But because of the way that their office ---

MR. BERNSTEIN: Withdrawn.

BY MR. BERNSTEIN:

Q. But because of the way Wofford Public Safety perceived the Seventh Circuit Solicitor's Office in handling cases -- you made a decision not to arrest Mr. Boswell until they agreed with you?

A. Correct.

Q. Did you put that in writing anywhere?

A. No, I don't think I did.

Q. Okay. Would you agree with me -- well, you met with the Solicitor's Office at some point, correct?

A. Correct.

Q. And you also met with a judge at some point, correct?

A. Correct.

## 89

Q. Okay. And the decisions both by the Seventh Solicitor and the judge to issue a warrant -- or to agree to prosecute was based on your presentation, correct?

A. Mine and Ms. Johnson with SLED.

Q. Okay. She was at both meetings?

A. Yes.

Q. She was with the judge also?

A. Yes.

Q. Okay. So based upon -- you were the arresting officer, correct?

A. Correct.

Q. You were the one who swore for the -- for the warrant, correct?

A. Correct.

Q. Okay. So their agreement was based upon what evidence you elected to tell them about, correct?

A. Correct.

Q. And if you didn't tell them about certain evidence, they wouldn't have it, correct?

A. Correct. At that time.

Q. And we'll go through that -- you know, a little later -- with regards to your preliminary hearing testimony. And I believe we were at ---

MS. KHETARPAL: Eight.

MR. BERNSTEIN: No. No. I'm sorry. In my head.

23 (Pages 86 to 89)

Deposition of David Hogsed

**98**

Q. They can tell you have at it and leave, correct?

A. Yes, sir.

Q. And they can pick up the phone and call whoever they want, correct?

A. Correct.

Q. Okay. But, in fact -- and I remind you, sir, that when you -- when you executed the search warrant, you had a body cam on, right? Correct?

A. Oh, absolutely.

Q. Okay. And, in fact, when you executed the search warrant, Mr. Boswell went to call his parents, correct?

A. I think he called his dad.

Q. Okay. And, in fact -- on record, you scolded him and said, you're 22 years old. You don't rely on your parents, correct?

A. I did.

Q. Okay. So again, sir, do you want to retract your statement that you had animus against Mr. Boswell because you thought he was this ---

A. I didn't ---

Q. --- you thought that he was this little rich kid relying on his parents, correct?

A. No. I didn't treat Mr. Boswell any differently than I would have told any of those other students on that campus. That you're 22 years old. You're an adult.

**99**

Let's go through this process.

Q. And what makes you -- what gives you the right to do that?

A. It's just the cop in me is all I can say.

Q. Okay. And it's the cop in you who didn't believe he should be in the military, correct?

A. That was just my personal opinion.

MS. KHETARPAL: Objection.

BY MR. BERNSTEIN:

Q. Well, it's your personal opinion that he's 22 years old and he should do it without his parents, correct? That's your personal opinion.

A. That -- that falls back on your street training and all that stuff.

Q. It's not illegal, correct, sir?

A. It's not, no.

Q. If he was -- if he was 57, he could call his wife or his parents if he wanted to, correct?

A. That's correct.

Q. Okay. It's just your perception of Mr. Boswell, correct?

A. No, I would have -- I would have told any student on there -- on that campus the same thing.

Q. Did you tell Ms. Rand anything like that? That she -- she shouldn't be talking to her parents?

**100**

A. Actually, I did.

Q. Okay. Her father played an active role in this investigation. Did he not?

MS. KHETARPAL: Objection.

MR. SMITH: Object.

BY MR. BERNSTEIN:

A. I don't know. The only one I spoke to of the parents was her mother. I never spoke with her father.

Q. You have no knowledge of Catherine Rand's father coming down to Wofford -- in the Title IX office and screaming and yelling that Graham Boswell needs to be arrested?

MS. KHETARPAL: Objection.

MR. SMITH: Objection

MR. BERNSTEIN: What are you objecting?

BY MR. BERNSTEIN:

Q. Do you have any knowledge of that?

A. No.

Q. No? Okay.

MR. BERNSTEIN: Just because you don't like the question doesn't mean there objectionable.

MS. KHETARPAL: That's not the objection. My objection is fully based on the Federal Rules of Civil Procedure.

MR. BERNSTEIN: That?

MS. KHETARPAL: I -- it's not actually under local

**101**

rules. I'm not allowed to get into it with you right here. I place the objection on the record by saying objection and I'm not allowed to say any more. It's a local rule. If you'd like to go into a different room, I can explain it to you.

MR. BERNSTEIN: I have local rules with me and I see no local rule that says whether or not he knew that the complainant's father came down to the office.

MR. SMITH: Move on.

MS. KHETARPAL: I agree. Move on. If you've got a question about my objection, we can go off the record.

MR. BERNSTEIN: No, they're fine. I just -- it just -- it just seems that -- whatever, I'll move on.

MS. KHETARPAL: Yeah, I think so.

BY MR. BERNSTEIN:

Q. So you agree that you scolded him for calling his parents when -- when -- when -- when several armed officers come into his apartment --

A. I'm not denying it.

Q. --- to search it?

A. I'm sorry. I cut you off.

Q. You're not denying it, correct?

A. Yes.

Q. Okay. And, in fact, you told him that he can only call his attorney, correct?

26 (Pages 98 to 101)

Deposition of David Hogsed

114

A. I don't recall this -- ever -- ever seeing this sent to me at Wofford.

Q. But you saw it on all other cases? Just not this one -- or something else?

A. I know they -- I know they exist. I've only sent one -- other case to the solicitor's office. My time there at Wofford.

Q. So you were at Wofford approximately six years?

A. Yeah, between five and six years.

Q. And you only sent one case to the Solicitor's Office?

A. Yes. One other case.

Q. What happened? Did you -- you didn't make any other arrests in your five -- six years at Wofford?

A. Most of them were done through the judicial process on campus.

Q. Okay. Is that because the Seventh Circuit wouldn't agree with you to process it?

A. No.

Q. And -- and this document -- looking at it, does this document ask for your personal opinions? Correct?

A. I mean, it ask if you would like to be -- what do you mean personal?

Q. Well, it says, (as read) I wish to be present for any plea. I recommend you use your own discretion. Please contact me if you intend to reduce the charges.

115

I mean, so they're asking you for your personal input, correct?

MS. KHETARPAL: Objection.

BY MR. BERNSTEIN:

A. They're asking if you'd like to be present when -- as it goes through the court system.

Q. Okay. And as you sit here today, you don't recall if you have ---

MR. BERNSTEIN: well, withdrawn.

BY MR. BERNSTEIN:

Q. The Seventh -- well, this case was sent to the Seventh Circuit Solicitor, correct?

A. Yes. And then to ---

Q. To the AG's office.

A. Yes, sir.

Q. But as you sit here, you don't recall if you filled any of these out?

A. I don't -- I don't ever recall seeing this sent to me. But if it was -- it -- if it was mailed to me, it wasn't emailed to me that I recall.

Q. If we can turn to your file.

A. Yeah.

Q. Yeah. Okay. Plaintiff 1274 through 1277 -- can you tell me why these -- can you tell me why these pictures are in your file?

116

A. These were photographs of bruises on Mr. Rand that one of the witnesses had taken with their phone and sent to us.

Q. Okay. well, let me ask you this, sir. As someone looking at this file, can you show me -- A. -- how you have any ---

MR. BERNSTEIN: well, withdrawn.

BY MR. BERNSTEIN:

Q. Looking at these photographs, can you first tell me how you know they are of Ms. Rand?

A. We have an affidavit from -- or a statement from an individual that says I took those photos.

Q. Do you have that? Is that in your file?

A. It's either in the file -- or it would have been one of the recorded statements of who I got it from.

Q. Is there any -- these photos -- just looking at these photos. Is there a date on these photos?

A. You would have to get that off the -- if they were done with the telephone -- off the telephone.

Q. Did you ask ---

A. We asked ---

Q. Let me finish, sir.

A. I -- I caught myself. I'm sorry.

Q. You were sent photographs. You're -- you're the

117

investigator in -- in a serious allegation, correct?

A. Yes.

Q. Okay. And someone sends you photographs -- undated -- untimed. That are purportedly related to a specific incident. Isn't it important to document on the photographs themselves when they were taken?

A. You do that through a statement from whomever took them. It's just one of the ways to do it.

Q. Is there another way to ask ---

A. Yes.

Q. --- the person to send you photographs with the date on them? Isn't there a way to ask them for dated photographs?

A. Well, I guess there is -- depending on what type of phone you have.

Q. Okay. So you agree with me -- someone looking at these photos -- having nothing to do with this case -- just looking at these photos. Would have no knowledge -- let alone who they're of. Would know when they were taken, correct?

A. You'd have a witness testify to that in a court of law.

Q. Okay. But does your investigative file have that?

A. I'm sorry. I don't. As far as like a time stamp? No. If that's what you're asking, no.

Q. Did you find anything in your notes that indicate who,

30 (Pages 114 to 117)

LEGAL EAGLE
864-467-1373

Deposition of David Hogsed

**118**

when, where these pictures were taken?

A. I was looking through some of the reports -- not only mine, but the other officers. But I don't see it right yet.

Q. Yeah. Is there any notes of securing those photographs or anything in your file indicating who, what, where, and when?

A. I don't see it thus far, no.

Q. Would you agree that that is not real good police work?

MS. KHETARPAL: Objection. Do you want him to review the whole file?

MR. BERNSTEIN: Sure.

MS. KHETARPAL: It's hundreds of pages.

BY MR. BERNSTEIN:

Q. Let -- let me ask you this question. You reviewed the medical records, correct?

A. I did.

Q. And the medical records -- they in fact said no bruising, correct?

A. Yes.

Q. Okay. So doesn't the light bulb go off in your head, sir -- as a veteran investigator. If the medical records say no bruises, and all of a sudden a friend is giving you undated photographs of someone whose not even -- whose picture's not even in the photographs? Doesn't

**119**

that cause you to say, wait a second. What's going on here? Something like that?

A. Not necessarily.

Q. Okay.

A. May I explain?

Q. Well, sure.

A. Bruising may not even start until like the next day or the day after. Just because an individual -- I could grab you by your arm right now -- squeeze as hard as I could, but you may not bruise until tomorrow.

Q. You would have a mark, no?

A. A red mark. Which by the time she got to the hospital and all that stuff could have possibly diminished.

Q. So now -- you don't have a medical degree. Do you, sir?

A. No.

Q. Okay. So now, it's your opinion that she might have had marks. They might have been red marks when she went to the hospital, but they went away. And then days later became bruises? Is that ---

A. That's not what I'm saying.

Q. --- is that -- is that my understanding of your testimony?

A. You said -- you asked me -- you made a notation that the medical records said there was no bruising.

Q. Correct.

**120**

A. I'm just indicating that with the bruising it could have been several hours later before they appeared. That's all I'm saying.

Q. So she went to -- so you're saying -- but again, the light bulb didn't go off in your head that there were medical records documenting no injuries.

A. No.

Q. And then all of a sudden someone comes and gives you undated photographs of someone's leg.

A. No.

Q. Okay. And is that why there would be no bruising on her legs in the videos, right? Is that the same theory?

A. It'd be hard to see the bruising on the legs in the videos because it's the inner thigh.

Q. But I'm assuming you're saying it would be the same theory that -- they would just have -- bruising won't be there for a day or so anyway, right?

A. There's a possibility. I'm not saying that's how it happened. I'm just saying there's a possibility.

Q. Okay. And it's a possibility that she had no bruising, correct?

A. At the time, yes.

Q. At any time? Did you -- let me ---

MR. BERNSTEIN: Withdrawn.

BY MR. BERNSTEIN:

**121**

A. Did I see them on her? No.

Q. So stop. Hold on. So someone comes forward -- these photographs are in your file, correct?

A. Correct.

Q. Okay. And I'm presuming that they're in the file because you believe they're somehow related to this case, correct?

A. Correct.

Q. Okay. You're an experienced investigator, correct? Correct?

A. That's correct.

Q. Okay. So you have -- you have medical records that show no bruising. You then have pictures that purportedly show bruising. You didn't ask the victim to see the bruises yourself?

A. I don't recall if Agent Johnson asked her during the interview or not. I wasn't in the room.

Q. I didn't ask about Agent Johnson, sir.

A. I didn't, but.

Q. I asked about you. You're the lead investigator. Did you ever say to Ms. Rand?

A. No.

Q. Okay. That's it. Do you think that's good police work, sir? If -- if -- if a victim has bruises -- as the investigating officer -- not to ask to see them?

31 (Pages 118 to 121)

122

MS. KHETARPAL: Objection. Go ahead.

BY MR. BERNSTEIN:

A. It's not good police work. But this is also a split investigation where you had SLED and myself investigating this.

Q. Sir, you're the only one who provided sworn testimony regarding the arrest and prosecution of Graham Boswell, correct?

A. That's correct.

Q. Okay. So if your partner didn't do a good job, then you didn't do a good job, correct?

MS. KHETARPAL: Objection.

BY MR. BERNSTEIN:

A. I'm not going to say yes or no.

Q. Really? Okay.

A. Well, I can agree with that.

Q. You can?

A. Yeah.

Q. Thank you.

A. I'll agree with you.

Q. The buck stops with you in this case?

A. Absolutely.

Q. Okay. If you didn't -- as you're the one who's swearing in front of a judge and in a court -- if you didn't like the way something was done. your name is on it -- you

123

have to change it. correct?

A. Correct.

MS. KHETARPAL: Objection.

BY MR. BERNSTEIN:

Q. And you didn't do that in this case?

A. No.

MR. BERNSTEIN: Okay. Can we go off for a sec?

THE VIDEOGRAPHER: The time is 12:24. We are off the record.

(OFF THE RECORD)

THE VIDEOGRAPHER: The time is 1:29. We are back on the record.

BY MR. BERNSTEIN:

Q. Good morning, sir. Good afternoon, sir. You had an opportunity to get some lunch?

A. Yes, sir.

Q. Okay. And you didn't drink any alcohol, take any drugs that would affect your testimony this afternoon -- now, correct?

A. No.

Q. What about your cholesterol medication? Did you take that or was that at evening?

A. That's a night thing.

Q. Okay.

A. I took it at night.

124

Q. Perfect. Okay. And it is my understanding that a Wofford public safety officer took Ms. Rand to the hospital in the late evening -- or on February 12th -- early morning hours -- on February 12th?

A. Yes, but I don't recall which one.

Q. Okay. But there's no question that a Wofford public safety officer drove them. You've seen the video of that, correct?

A. No, I haven't seen the video.

Q. You've never seen the video of ---

A. Yes, I did.

Q. --- Ms. Rand and her friends in the -- in the car driving?

A. Yes. They took her. They transported her up to the hospital ---

Q. Right.

A. --- instead of calling for EMS.

Q. Right. Sir, I know we've been going a long time and we still have some time. Please let me try to finish the question. Tracy can only take down one at a time. Okay. Thank you.

A. My apologies.

Q. So we can agree that a public safety officer drove Ms. Rand to the hospital, correct?

A. Yes.

125

Q. Okay. And can we agree that he drove Ms. Rand to the hospital as a result of the alleged sexual assault?

A. Correct.

Q. Okay. Typical -- okay. And part of the alleged sexual assault included that Ms. Rand was allegedly intoxicated and incapacitated at the time of the alleged incident, correct?

A. Correct.

Q. Okay. And you've seen the medical records and she went through an examination, correct?

MR. BERNSTEIN: Withdrawn.

BY MS. BERNSTEIN:

Q. She was seen by doctors and nurses ---

A. Yes.

Q. --- and there's a whole chart?

A. Correct.

Q. And blood and urine was taken, correct?

A. Correct.

Q. What was her blood alcohol level at the hospital?

A. I don't think it got ran. I never could find it in the medical records.

Q. Okay. As the investigating officer, did you ascertain why a blood alcohol level was not taken of an alleged incapacitated sexual assault victim when she was taken to the hospital by a Wofford public safety officer?

LEGAL EAGLE
864-467-1373

Deposition of David Hogsed

## 134

Q. Okay. So there's not a single -- you don't know of a single wofford public safety officer who ever told you that she was in such a state, correct?

A. Not the next morning.

Q. Any time?

A. I mean, I was told that she made the allegations that she had passed out -- or was intoxicated within his apartment.

Q. Right. I understand that. And you were told that by her and her friends?

A. And also the campus safety office.

Q. Okay. And a campus safety officer said that's what they told us?

A. Yes.

MR. SMITH: Objection.

BY MR. BERNSTEIN:

Q. No public safety officer ever said to you, hey, Officer Hogsed, if I may -- or David, I saw her. She couldn't stand. She was slurring her words. No one of wofford's public safety ever provided you that information, correct?

A. Correct.

Q. Okay. So how many people were in her apartment before she went to the party? Do you know? When she ---

A. I don't remember the number, but there were ---

## 135

Q. About five?

A. I was going to say four to six, but I don't remember.

Q. Sounds like five. Okay.

MR. SMITH: Sounds like four to six. Objection.

BY MR. BERNSTEIN:

A. I don't remember who was in the apartment.

Q. Well, you have documents that indicate who was in the apartment. Don't we?

A. Right.

Q. Okay. It was A███, J█████, Ms. Rand, E██████, and E█████'s friend, B█████, correct?

A. Again, I don't remember the names.

Q. Okay. Now, let me ask you this question. If you look at pages -- start with 1249 through like 1266. These are the statements, correct?

A. Let me make sure I didn't mess them up when I was thumbing through them, sir. That's the written statements ---

Q. Right.

A. --- that was obtained, yes.

Q. Can you explain -- now, again, as the investigating officer -- when you came in on February 22nd, you reviewed these, correct?

A. Yes.

Q. Can you explain to me why all the statements begin after

## 136

her apartment? Meaning that they start either at the tennis court or at the party? They don't -- these statements don't discuss Ms. Rand's drinking in her apartment. Is there any reason for that? Do you know?

MS. KHETARPAL: Objection.

BY MR. BERNSTEIN:

A. I didn't obtain. No, I don't know. I don't know.

Q. And please look at them. I know there's a couple of pages.

A. I know it says ---

Q. Please make sure that I'm being accurate at the beginning. They all seem to indicate -- I saw her at the tennis courts or I went to the party -- even Ms. Rand's statement. Even Ms. Rand's statement starts at the party.

A. I don't know.

Q. When you reviewed this file as the investigating officer -- and -- as we saw on April 11th. You swore that the reason for this arrest is based on her intoxication and inability to give consent. Did you say -- where's the information about her drinking in these statements? Did you say that to the officers who took these statements?

A. No, because we had brought these people back in for further interviews. They went through the entire night.

Q. Okay.

## 137

A. Well, I don't know if we brought them all in, but we brought them in.

Q. And do you recall who J█████ B█████ is?

A. That was a roommate, I think. Was that a roommate?

Q. Yes. Yes.

MR. BERNSTEIN: Tracy are we on 12?

BY MR. BERNSTEIN:

Q. Okay. So I'm going to show you what is marked as exhibit 12 -- Wofford Hogsed 004103 and then 13 -- which is wofford Hogsed 4108. And I'm sorry. 12 is 4103 through 4110 and 13 is 4108 through 410. That doesn't mix, yeah.

(Plaintiff's Exhibit Nos. 12&13 were marked for identification, respectively.)

BY MR. BERNSTEIN:

Q. Do you see them statements, sir?

A. I see them.

Q. Okay. Do you see them right now? You're looking at them, right?

A. Oh, absolutely.

Q. Okay. And in number 12 -- that's Ms. B█████' statement, correct?

A. Yes.

Q. And Ms. B█████ identified who's -- who's -- who was in the apartment drinking before they went out?

35 (Pages 134 to 137)

LEGAL EAGLE
864-467-1373

Deposition of David Hogsed

### 154

Q. And what does your paperwork say about what this corresponds to?

A. Well, I have 2125. I don't know what it -- was it 21:22. I can't see it right now. But it looks like that's it. If it's at 9:25 -- unless I just hit the wrong number. It'll be them walking to Mr. Boswell's apartment.

MS. KHETARPAL: Were you -- were you able to see the numbers at the top? I just want to make sure.

THE WITNESS: No, I need to get up. Can I get up and go look?

MS. KHETARPAL: Yeah. Because I'm -- I'm ---

THE WITNESS: Because I don't have my glasses on. Yeah.

MS. KHETARPAL: Yeah -- unclip.

BY MR. BERNSTEIN:

A. Can you bring the numbers back up? That's still going to be them walking towards Mr. Boswell's apartment.

Q. Okay. So this would be before the alleged incident?

A. Correct.

Q. And after she potentially became intoxicated at the party?

A. It would be before the incident, yes.

Q. Okay. So let's look at this. And -- and you reviewed this prior to you swearing out Mr. Boswell's arrest

### 155

warrant, correct?

A. Yes.

Q. Well, let's say that you -- I want to make sure. I don't know if you saw the whole thing. Do you see Ms. Rand in that picture?

A. Yes.

Q. And she's on the inside?

A. Yes.

Q. Okay. And she's pointing?

A. Yes.

Q. With her right hand?

A. Yes.

Q. And she has something in her left hand?

A. I can't see that because I don't have my glasses on. Yes, I can see it now.

Q. Okay. And she's not looking at the floor. She's not stumbling. She looks to be walking pretty normal, correct, sir?

A. Correct.

Q. And Mr. Boswell's not holding on to her -- not dragging her?

A. No.

Q. And, in fact, out here (indicating) -- Ms. Rand -- you see -- pulls Mr. Boswell's right hand around her waist?

MR. SMITH: Objection.

### 156

BY MR. BERNSTEIN:

Q. Do you see that? What appears to be that?

A. It appears that they touched hands, yes.

Q. Okay. So based on this video of Ms. Rand going to Mr. Boswell's apartment, does she appear incapacitated by intoxication?

A. Not at that time.

Q. Okay. Are there any allegations that she drank in Mr. Boswell's apartment?

A. Not that I'm aware of.

Q. So based upon these videos that you saw with your own two eyes and in your professional capacity, do you still believe you had probable cause to swear on April 11, 2022 that Ms. Rand was incapacitated and unable to give consent?

MS. KHETARPAL: Objection.

BY MR. BERNSTEIN:

A. Based on her statement, other statements, and my meeting with the solicitor's office -- that decision was made that probable cause was there.

Q. You signed it. So probable cause rests with you, correct, sir?

MR. SMITH: Objection.

BY MR. BERNSTEIN:

A. Yes.

### 157

Q. Okay. So when you say the statement -- you're talking about Ms. Rand's statement, correct?

A. Yes.

Q. And we've seen other statements that contradict her level of intoxication, correct?

MS. KHETARPAL: Objection.

BY MR. BERNSTEIN:

A. At the time of her leaving her apartment, yes.

Q. Okay. You have video of her leaving the party. Going to Mr. Boswell's apartment and leaving Mr. Boswell's apartment after the alleged incident. You have surveillance video of that -- showing that she did not appear to you -- a trained police officer to be intoxicated, correct?

A. Not at the times of the video, correct.

Q. And yet still you believe you had probable cause to swear to a judge that she was intoxicated -- unable to give consent. Yes or no, sir?

A. Yes.

Q. Okay. Did you tell -- did you bring the video with you to the judge?

A. No.

Q. Did you tell the judge -- Judge, just want to let you know Ms. Rand said she was incapacitated. One friend said she was incapacitated, but I have surveillance

40 (Pages 154 to 157)

LEGAL EAGLE
864-467-1373

Deposition of David Hogsed

158

video where she looks ---

MR. SMITH: Objection.

BY MR. BERNSTEIN:

Q. --- where she doesn't look incapacitated. Did you tell the judge that?

A. I don't recall if we brought up the video to the judge or not, sir.

Q. Okay. You're saying you may have brought this video to the judge?

A. We didn't take the video to the judge.

Q. Okay.

A. I just don't know if I told him. That's what I'm saying.

Q. So you think you might have told the judge that?

A. Might have -- I was -- I mean, I don't know.

Q. Did you testify to that at the preliminary hearing?

A. I don't recall.

Q. Did you tell the judge that you didn't have a blood alcohol ---

A. Yes.

Q. --- level?

A. Yes.

Q. You told him that?

A. I told him I didn't have blood alcohol, yes.

Q. Okay. So is it fair to say that your sworn arrest

159

warrant is based upon Ms. Rand's statement and -- and -- and another party's statement?

MS. KHETARPAL: Objection.

BY MR. BERNSTEIN:

Q. I'm sorry. Another witness' statement?

A. Ms. Rand's statement ---

MS. KHETARPAL: Objection. Go ahead.

THE WITNESS: I'm sorry. What?

MS. KHETARPAL: Go ahead.

THE WITNESS: I'm sorry.

BY MR. BERNSTEIN:

A. Ms. Rand's statement and all the other statements obtained of her level of intoxication. The physical evidence of the blood, blood in the apartment. All of that was presented to the Seventh Circuit Solicitor's Office where a decision was -- I mean, basically we were told yes. Probable cause exists -- to be charged with this crime.

Q. But again, did you tell -- did you tell the judge that she denied being sexually assaulted in the hospital?

A. I don't believe I did.

Q. Did you tell the judge that the hospital records had no injuries -- no noted injuries of Ms. Rand?

A. We told the judge that we had her medical records and that there was not a criminal sexual conduct kit -- or

160

CSE kit done.

Q. I didn't ask that, sir. I asked you if you told the judge that the medical records indicated that there was no -- no -- no ---

A. I can't recall telling that.

Q. --- injuries.

A. I can't recall telling him that.

Q. Do you recall Ms. Rand telling an investigator that a doctor told her that there was a serious tear -- there was a serious injury? Do you remember Ms. Rand saying that to the SLED officer?

A. She told Agent Johnson that.

Q. Right. But the medical records don't back that up, correct?

A. That's my understanding, correct.

Q. Did you ask Ms. Rand about that?

A. I did not interview Ms. Rand.

Q. Did you -- sir, you're ---

A. No. No. No.

Q. --- the lead investigator in this case. Did you ever say, wait a second. She told one officer that a doctor said that there was a serious injury and the medical records say there was nothing. What if anything, did you as the lead investigator do to reconcile that significant difference?

161

A. I did not ask Ms. Rand that.

Q. Did you do anything to rectify that big difference?

A. No, sir.

Q. Did you tell the judge -- say, hey, Judge, Ms. Rand alleges that the doctor told her that there was a big injury, but the medical records don't bear that out. Did you do that?

A. I don't believe we did. I don't recall telling the judge that.

Q. And that's because you ran this investigation with blinders on to only use evidence of alleged guilt of Mr. Boswell, correct?

MS. KHETARPAL: Objection.

BY MR. BERNSTEIN:

A. No.

Q. Well, what -- are you familiar with Brady evidence -- Brady material?

A. Brady motion?

Q. Brady.

A. Tell me about Brady -- I know -- I mean, I've heard the terms Brady motion.

Q. Okay.

A. I don't about Brady evidence.

Q. What does that mean to you?

A. Ain't a Brady motion where like I have to give a defense

41 (Pages 158 to 161)

Deposition of David Hogsed

162

attorney everything that you have -- is that -- or am I thinking of something else?

Q. Exculpatory evidence?

A. There you go. That's the word I was looking for. Thank you.

Q. Did you give the judge any exculpatory evidence? Such as there was no blood on her dress -- although she claimed there was blood. I didn't test blood from Mr. Boswell's pants. The video tells -- shows a completely different story of a picture -- presents a different picture of Ms. Rand's level of intoxication and incapacitation at the time. That several witnesses said she did not appear intoxicated. Did you tell the judge this information, sir?

A. Not that I can think of.

Q. Okay. Is it fair to say you only told the judge information that appeared to support probable cause to arrest Mr. Boswell, correct?

MS. KHETARPAL: Objection.

BY MR. BERNSTEIN:

A. No.

Q. No? What -- what exculpatory evidence did you tell the judge?

A. We told -- we told the judge about Mr. Rand's -- I'm sorry. Mr. Boswell's statement -- informed him of what

163

Mr. Boswell said took place. We told him about the polygraph test that -- that -- Mr. Boswell's polygraph test and the two questions that were asked of him.

Q. Okay. Sir, you just testified under oath today that you told the judge that Mr. Boswell passed a polygraph, correct?

A. Yes.

Q. Okay. And you recall testifying on July 18th, 2022 in front of the judge at the preliminary hearing, correct?

A. I remember testifying, yes.

Q. Okay. And if you turn to page 77.

A. You're talking about the top right-hand corner?

Q. Correct.

A. Of the transcript?

Q. Page 77 of the transcript. If you recall, being asked this question and giving this answer -- the last -- the last line on page 77. Question -- the judge -- answer on page 78 -- (as read) As I cannot sit here and honestly tell you that I told the judge that he passed the polygraph. I can't.

Question ---

(As read) Okay. Why not?

Answer ---

(As read) I just -- I didn't. I mean, if they're not being admissible in a court of law, ma'am. I just

164

didn't bring it. That's the only thing I can tell you.

Do you recall that being those -- being asked those questions and giving those answers?

A. I don't recall the answers, but obviously they're there.

Q. Okay. So you testified today something different. You didn't tell the judge. You didn't bring the judge the polygraph, correct?

A. Well, we didn't take it with us --to the judge's office. We took it to the solicitor's office.

Q. I didn't ask about the solicitor. I asked about the judge.

A. I didn't. That was my answer. I didn't take it to the judge.

Q. And you didn't tell the judge.

A. I guess I did not, sir. I apologize for misspeaking.

Q. So your testimony today was not correct, correct? Under oath?

A. I thought I told the judge, but.

Q. Well, were you telling the truth in the preliminary hearing or were you telling the truth here?

A. I -- it's been over two years. I mean, so.

Q. So your testimony -- so your testimony in 2022, would probably be more ---

A. Correct.

Q. ---- more accurate.

165

A. That's what I was trying to say, yes.

Q. Right. So in 2022, when you told the judge at the preliminary hearing that you didn't bring it to the judge at the warrant. That's probably more accurate, correct?

A. Correct.

Q. Okay. So again, I'll ask you. What exculpatory evidence did you present to the judge in getting the warrant? If any?

A. Other than the fact that -- I can't think of anything else off the top of my head.

Q. Anything else? What did you tell the judge that would exculpate Mr. Boswell?

A. About his statement -- that he was denying all allegations.

Q. Okay. You agreed that you had other evidence. You just didn't give it to the judge, correct?

MS. KHETARPAL: Objection.

BY MR. BERNSTEIN:

A. I don't know what you mean by give it to him.

Q. Tell him.

A. Tell him, no. Apparently, I did not.

Q. But you had -- you had in your possession as of April 11th of 2022 evidence that you could have provided to the judge, correct?

42 (Pages 162 to 165)

## 198

A. Yes.

Q. So he was in the middle of Senior Lab. He was at Senior Seminar. He was in the middle of Senior Seminar -- just changing classrooms when he was arrested, correct?

A. I guess he was.

Q. Okay. So he was arrested in the middle of his Senior Seminar class? Instead of in front of the class. So why did you elect to arrest him in the middle of his class -- in front of the student population? Instead of arresting him at his home with no one else there?

A. The decision was made ---

MS. KHETARPAL: Objection. Go ahead.

BY MR. BERNSTEIN:

A. Okay. The decision was made when we got his class schedule that he was literally in a classroom right outside the campus safety office. It was to just go ahead and do an approach and bring him in.

Q. Who made that decision?

A. It was a collective between me and Johnson. I think Dwayne was in there, too.

Q. And you agree that when you arrest someone you don't know how they're going to react. And you were arresting him in front of numerous people. You don't know how they were going to react. Did you take that into consideration?

## 199

A. We thought about it, but it's not like we walked up -- I mean, we politely asked him to come into the office. Walked him in and explained to him what was going on.

Q. With officers on all sides of the hall making sure that he wasn't allowed to leave, correct?

A. I mean, we were there. I'm not going to say -- but I can't guarantee you that the kids were paying attention to what was going on.

Q. Okay.

A. Or the students. I'm sorry.

Q. But you can't guarantee that they weren't, correct?

A. That's correct.

Q. And you couldn't guarantee -- you couldn't guarantee that they would react adversely to the safety of the officers, correct?

MS. KHETARPAL: Objection.

BY MR. BERNSTEIN:

A. I can't guarantee anything.

Q. Okay. But if you had gone to his house -- with atmost three roommates there, you could have minimized any potential danger to the officers, correct?

MS. KHETARPAL: Objection.

BY MR. BERNSTEIN:

A. I didn't see any danger to the officers.

Q. And if you would have called Ms. Crick, and asked the

## 200

Wofford student -- who has been an upright citizen at Wofford Campus -- to surrender himself as an arrest warrant. You could have minimized any and all embarrassment to Mr. Boswell, correct?

MR. SMITH: Objection.

BY MR. BERNSTEIN:

Q. You could have done that, correct?

A. That was an avenue, yes.

Q. Okay. And you elected not to, correct?

A. I'm not going to say I personally elected not to, but yes.

Q. Okay.

A. It was decided not to.

Q. You -- the decision by wofford -- wofford made the decision to inflict the most possible -- possible punishment to Mr. Boswell as possible, correct?

MS. KHETARPAL: Objection.

BY MR. BERNSTEIN:

A. No.

Q. No? Okay. Do you agree, sir, that in these types of circumstances a college student with an attorney -- who is not a flight danger. Who has not shown any danger. who has cooperated. That the protocol would have been to have him surrender?

MS. KHETARPAL: Objection.

## 201

BY MR. BERNSTEIN:

A. The protocol?

Q. Yeah.

A. I don't think we had anything in writing that was protocol.

Q. Custom and practice?

MS. KHETARPAL: Objection.

BY MR. BERNSTEIN:

A. No. Not that I can ---

Q. The human -- the human thing to do?

MS. KHETARPAL: Objection.

BY MR. BERNSTEIN:

A. I had an arrest warrant. I mean, I guess you could say it might have been -- I don't even like the word human thing. would it have been more appropriate for me?

Q. Yes.

A. I might agree with that.

Q. Okay. You said you had -- right. You had an arrest warrant based on cherry-picked evidence, correct?

MS. KHETARPAL: Objection.

BY MR. BERNSTEIN:

A. No.

Q. You chose what evidence to give the judge and you chose to inflict the most punishment possible and embarrassment to Mr. Boswell, correct?

51 (Pages 198 to 201)

206

videos? Do you think he knew that also?

A. I don't know.

Q. But you didn't have a conversation with him?

A. No.

Q. Okay. Did you actually go to the solicitor's office or the attorney general's office or something else? How did that work?

A. Solicitor's office.

Q. Okay. So you got -- you went to the solicitor's office -- and is it fair to say that you didn't tell the solicitor the same information ---

MR. BERNSTEIN: Withdrawn.

BY MR. BERNSTEIN:

Q. Is it fair to say that you didn't tell the solicitor office the same things you didn't tell the judge? Such as the discrepancies?

A. They were not told about the dress. They were told about -- there was no BAC. There was no sexual assault kit. They were told about his polygraph tests. And I actually took -- well, it wasn't all of this because I didn't -- I mean, there's forms in here that -- like this back page is NCIC. I guess, that's his NCIC report. I didn't have it at the time. This was taken with me -- well, except for the arrest warrant. There wouldn't have been a copy -- it wouldn't have been in

207

there -- to the solicitor's office when we sit down with their meeting.

Q. So they had the medical ---

A. We did.

Q. --- so you're saying you told the solicitor's office that the medical records contradicted Ms. Rand's statement.

A. They were -- they were told about the medical records and her statement that the doctor had made in front of her about -- I think you brought it up earlier that the doctor made a statement that they were tearing, but it wasn't indicated in the medical records.

Q. So you're saying you told the solicitor's office that?

A. Yes.

Q. But you didn't tell the judge that? I think you didn't.

A. No.

Q. Now, there come a time -- well, there come a time that solicitor's office was going to deny prosecution. Is that when Officer Saars wrote that letter to have it transferred to the Attorney General's office, correct?

MS. KHETARPAL: Objection.

BY MR. BERNSTEIN:

A. No.

Q. No?

A. It's my understanding -- again, I didn't even know about

208

Saars' email until I got a phone call from Solicitor Barnett. But it was my understanding that apparently Ted took it upon himself to find out what solicitor had gotten the case assigned to them. And then when he found out it was Ms. -- I'm going to call you Wendy because I don't remember her last name. Is when he wrote the email. Because I questioned him -- why he did that.

Q. And what did he say?

A. That basically whatever problem he had with her on that other case. That he had had a meeting with her and Derrick Bolsa and that Derrick was -- I think, second in command at that time -- of the solicitor's office and Derrick had said that no more cases -- or that there wouldn't be any cases assigned to Wendy. And this is what Ted told me that I recall. And since it was assigned to her, he felt that it needed to be reassigned.

Q. Okay. And so to your knowledge, did the solicitor's office tell you or anyone at Wofford Public Safety that they were going to decline to prosecute the case?

MR. SMITH: Objection.

BY MR. BERNSTEIN:

A. No.

Q. And so Mr. Saars just took it upon himself -- when he

209

found out that Wendy got the case?

A. That's correct.

Q. Because he was unhappy with the way Wendy handled his daughter's case?

A. What's your name again? So I call you Mr. ---

Q. Bernstein.

A. Bernstein. I don't think that was his daughter's case. I think it was another case because his daughter's case was investigated by SLED and SLED alone. And if I recall correctly, that case went straight to the AG's office and then there was a -- Ted had investigated another crime on the campus not involving his daughter.

Q. But it was -- I'm sorry. But it was a sexual assault case.

A. Yeah, I think it was a sexual assault case. But I don't think it was one involving his daughter that was dropped -- or not prosecuted -- or whatever.

Q. So as we saw before -- you got the medical records, I think it was by -- the latest was March 25th, 2022, correct?

A. Correct.

Q. And at that -- prior to getting the medical records, it was your understanding that the doctor had allegedly told Ms. Rand that she had an injury -- had a tear?

A. Correct.

53 (Pages 206 to 209)

Deposition of David Hogsed

226

A. I don't -- I don't remember.

Q. Okay. Do you see it? Do you know ---

MS. KHETARPAL: Do you want to expand that?

MR. BERNSTEIN: Sure.

MS. KHETARPAL: Bottom right.

MR. BERNSTEIN: Yep.

BY MR. BERNSTEIN:

Q. Do you know what we're looking at? What -- what ---

A. Yes. I'm standing outside the campus safety office.

Q. Okay. And is ---

A. And Mr. Boswell will be approached by Craig. And I don't remember Craig's full name and I apologize.

Q. So you're standing outside the office in a hallway. Tell us what's surrounding.

A. That's the hallway of the Campus Life building. This hallway that you see to your left goes to an outside door. So if I'm standing like I'm facing that hallway, the campus safety office door is right here (indicating) to my right.

Q. Okay. But as you say you're -- you're standing -- there looks like on the left-hand side of this like a map type of thing.

A. Yes, that's it.

Q. Okay.

MS. KHETARPAL: Just for the record.

227

BY MR. BERNSTEIN:

Q. It says Campus Legend. Do you see that? It's like a map of campus?

A. Yeah.

Q. Okay.

MS. KHETARPAL: Just for the record, this is your body cam. I don't think we established that.

BY MR. BERNSTEIN:

Q. Is this your body cam to your knowledge?

MS. KHETARPAL: Is the image -- is this a video from the body cam that you're wearing or somebody else?

THE WITNESS: That's going to be mine because I was the one standing at the end of the hallway.

MS. KHETARPAL: Okay. That's fine. I just wanted it for the record.

BY MR. BERNSTEIN:

Q. To the left of where's the campus map -- the map of campus. There's a door.

A. There's the exit door.

Q. Right. So you're standing there specifically to block.

MS. KHETARPAL: Objection.

BY MR. BERNSTEIN:

Q. Why are you standing there?

A. It's right outside our office.

Q. Okay.

228

A. I stepped right outside our office door. It had nothing to do with blocking that exit.

Q. Okay.

(VIDEO PLAYING)

(VIDEO STOPS PLAYING)

BY MR. BERNSTEIN:

Q. And these are all the -- let me go back. These are ---

(VIDEO PLAYING)

(VIDEO PAUSES)

BY MR. BERNSTEIN:

Q. All those people coming out -- coming out of Mr. Boswell's class?

A. Yes, they are. That's an auditorium. That classroom's an auditorium.

Q. Yeah. I see. It's an auditorium. Prior to making arrests, did you find out how many people are in that class?

A. No.

Q. Do you know how many people that auditorium holds?

A. No.

Q. I mean, I've never been there.

A. It's not a big one.

Q. Does it hold 25 people? Does it hold 500 people? Something in between?

A. Yeah, nowhere near 500.

229

Q. Okay.

A. Maybe 100 or less, I guess -- if I had to ---

Q. And you had no idea how many people were in this class?

A. No.

(VIDEO PLAYING)

(VIDEO PAUSES)

BY MR. BERNSTEIN:

Q. Now, who's that?

A. That's Agent Johnson with SLED.

Q. And where's she standing?

A. That's the double doors -- that's in front of her. It's the entrance to Campus Safety.

Q. That's the entrance to Campus Safety?

A. Yes.

Q. And behind is an exit out of the building?

A. Behind me?

Q. Yeah.

A. Yeah.

Q. Okay.

(VIDEO PLAYING)

(VIDEO PAUSES)

BY MR. BERNSTEIN:

Q. Okay. So your body cam picks up after Mr. Boswell -- it doesn't pick up Mr. Boswell being approached, right?

A. Correct.

58 (Pages 226 to 229)

LEGAL EAGLE
864-467-1373

Deposition of David Hogsed

234

placing him under arrest?

A. There's not really a reason for that. That's just the way the process went.

Q. Respectfully, does that seem a little backwards?

A. No, not necessarily.

MS. KHETARPAL: Objection.

BY MR. BERNSTEIN:

Q. Well, once someone's under arrest, don't you -- don't they have less rights than someone that's not under arrest?

A. No, sir.

Q. No? Well, we discussed earlier that the search warrant -- earlier in his apartment -- when he wasn't under arrest, he's allowed to walk, leave, and things of that nature because it's not an arrest warrant, correct?

A. Correct.

Q. So when you're under arrest, you have less rights than when you're not under arrest, correct?

A. Not when it comes to getting your DNA.

(VIDEO PLAYING)

(VIDEO PAUSES)

BY MR. BERNSTEIN:

Q. Okay. Do you know who you were talking to, sir?

A. It would be one of the dispatchers. I don't remember who was working that day.

235

Q. So there was someone else in the -- in the room?

A. They sit inside a room. It's off to our right. There's an office in there.

Q. This was the public safety office?

A. Yeah. Yes, excuse me.

Q. That's your office where you've been working for seven years at this time?

A. (Inaudible).

Q. Six years? From 2016? It's now 2022?

A. Yes.

Q. And you didn't know the address of the building?

A. I knew the address of the campus, but not each individual building.

Q. So you didn't know -- so this has been your office for six years, correct?

A. Correct.

Q. Okay.

(VIDEO PLAYING)

(VIDEO STOPS PLAYING)

BY MR. BERNSTEIN:

Q. What biological evidence did you find in his apartment?

A. Blood.

Q. And how does he know it?

A. He was there when we executed the search warrant.

Q. I understand, but did you announce to him -- oh, we just

236

found blood. Here it is in front of him? Where did you find the blood?

A. It was on the mattress cover>

Q. In his room?

A. Correct.

Q. And if I'm not mistaken -- and we can pull the volume. He was not allowed to go into his room, in fact ---

A. I pulled it out.

Q. You pulled it out of his room.

A. I took it out of the mattress and I took it out.

Q. And said, Graham -- here. We found blood in your -- in your room?

A. Well, he gets a copy of the return.

Q. When was the return done?

A. He would have gotten a copy of the search warrant that day.

Q. The search warrant is before you find the stuff, correct?

A. In the State of South Carolina, when you do the search warrant -- and I execute the search warrant. I have the copy that the judge signs.

Q. Uh-huh.

A. I make a copy. It has a return on it.

Q. Uh-huh.

A. When you execute the search warrant, you write down what

237

you're taking. It's like an inventory ---

Q. Uh-huh.

A. --- on both copies. You either leave a copy of the search -- or it's like -- if he hadn't have been there. And we still went in and did it. We would have left a copy of the search warrant showing what we had taken -- there at the apartment or he would have been given a copy. So he would have actually been physically given a copy of the search warrant on his apartment that day. And it's in the search warrant what we were looking for and why we were there.

Q. If you can go to Page 2 -- 1237.

A. Correct.

Q. Do you see that document?

A. Yes.

Q. Okay. What is that document?

A. It's a property evidence sheet.

Q. Okay. And do you see the top left? That says date and time impounded?

A. March.

Q. March 7th?

A. March 7th.

Q. Does that mean that that's the date that the evidence was obtained?

A. Yes.

290

Q. Well, did you get it just to confirm that Snapchat occurred? Because they both admitted to it, correct?

A. Yes.

Q. So then why would you be getting the search warrant? If they both admitted to it, what was the reason for you getting it only -- only from Mr. Boswell?

A. I don't -- I don't remember the exact reason.

Q. And did you obtain a warrant for Mr. Boswell's phone records?

A. I think that was a part of the warrant. Or was it? No, that was just Snapchat. I don't recall doing one for his phone records. I have to go back. I don't remember doing one for his phone records.

Q. You don't remember doing one for his phone records?

A. No, sir.

Q. And I'm not talking about the jail records -- the jail phone records?

A. No, I'm talking about his actual cell phone. I don't remember doing one for his phone records.

Q. You don't remember doing one?

MR. BERNSTEIN: I have no further questions at this point.

E X A M I N A T I O N

BY MR. SMITH:

Q. All right. Mr. Hogsed, it's been a while since we've

291

seen each other; is that right?

A. That's correct.

Q. And have I ever discussed this case with you after the final findings or the charges were dropped?

A. I haven't spoken with you since the preliminary hearing.

Q. There you go. I just want to cover something to start off. Early on about your responsibility as a Wofford Campus police officer. And Mr. Bernstein asked you about receiving a gift from L████ D████. He even asked if you would have some sort of special relationship with her. Is -- is it the role of campus police officers to just investigate crimes or violations of student policy?

A. Absolutely not.

Q. What's the real role of campus police?

A. To get the noticed students and protect them.

Q. There you go. It's safety. Isn't it?

A. Correct.

Q. Try to protect everybody?

A. Correct.

Q. And that means people who are charged with things and people who are the victims of them?

A. Correct.

MR. BERNSTEIN: Objection.

BY MR. SMITH:

292

Q. Thank you. I'm going to ask -- I'm going to pass around a statement. What is that? It's Wofford Hogsed 141. There's another one.

MR. BERNSTEIN: Is it a new exhibit or part of the exhibit?

THE WITNESS: That's what I was wanting to know.

MR. SMITH: I'm sorry? I don't know if it's going to be -- it's already in as exhibit, but I'm just doing this for purposes of him seeing it.

MS. KHETARPAL: Why -- why don't we just mark it separately just to be very clear?

MR. SMITH: That's fine.

MS. KHETARPAL: Let's mark it Exhibit 23.

(Defendant's Exhibit No. 23 marked for identification.)

MR. BERNSTEIN: Do we have -- do we have a copy?

THE WITNESS: This is Mr. Boswell's statement.

MR. SMITH: Here is yours. Here you go.

MS. KHETARPAL: 141 to 146.

MR. SMITH: Yes.

MR. BERNSTEIN: Hold on. Mine -- just one second. I'm sorry.

MR. SMITH: Yeah.

MR. BERNSTEIN: This was -- there was another page on mine.

MR. SMITH: It's off. It just got passed along.

293

It shouldn't be.

MR. BERNSTEIN: Okay. That's what ---

MR. SMITH: What you have in your hand?

MS. KHETARPAL: The exhibit is 141 to 146. It's the statement of Graham Boswell.

BY MR. SMITH:

Q. So Mr. Hogsen.

A. Yes.

Q. Let me just ask you this. When was the first time that you remember seeing that statement from Mr. Boswell?

A. From Cindy Crick.

Q. And when was that, roughly? Well, you can look at -- let me ask you this. It says -- it's dated 4-4. That would be April 4th.

A. Of 2022.

Q. 2022. So you didn't receive it until after that?

A. Correct.

Q. Okay. So you had no knowledge of the content of that -- nor knowledge of any of the representations that Mr. Boswell was making; is that correct?

A. Correct.

MR. BERNSTEIN: Objection.

BY MR. SMITH:

Q. All right. Do -- do you know if anyone -- did anyone ever ask for whether or not there were other drafts of

74 (Pages 290 to 293)

Deposition of David Hogsed

294

that document? It was a typed statement that he prepared, apparently.

A. I never asked. As far as I know, no one else did.

Q. And you don't know if Wofford did?

A. No, sir. I don't.

Q. Okay. All right. All right. Ms. -- Ms. Rand and other witnesses gave statements within days or a week following the assault. Was Mr. Boswell ever contacted by campus police to give a written -- written statement?

A. He had requested an attorney, but I don't remember the date.

Q. Okay. So he never ever gave you any type of formal statement between the time of the incident and that statement in front of you?

A. No. He invoked his constitutional right.

Q. Okay. Do you know if Mr. -- Mr. Boswell's statement there in front of you was made a part of the campus police file?

A. It was.

Q. It was? Okay. Did the campus police provide a copy of its investigation to the solicitor?

A. Correct.

Q. Do you know if that statement was ever provided to any judge? In which you were attempting to get an arrest warrant or a search warrant?

295

A. The judge -- the judge was told of Mr. Boswell's statement and ---

Q. That was a preliminary hearing?

A. Sir?

Q. Was that at the preliminary hearing?

A. No. When we went to get the arrest warrant, the judge that we spoke to was told that Mr. Boswell had provided a written statement.

Q. Okay. Do -- do you know when you went to get that arrest warrant? What the date of that was?

A. February 11th.

Q. Okay. So if this ---

MR. BERNSTEIN: Excuse me.

BY MR. SMITH:

A. No. I'm sorry. That's the date of the incident.

Q. This could not have been a part of that.

MR. BERNSTEIN: April 11th. Just so the record is clear.

THE WITNESS: Yeah, I'm looking at it.

MR. BERNSTEIN: The arrest warrant is April 11th.

THE WITNESS: I'm sorry. You're right. I'm looking at the wrong date. April 11th. I'm sorry.

MR. SMITH: You're not talking about that.

MR. BERNSTEIN: You're asking when he got the arrest warrant. He said February 11th.

296

THE WITNESS: I said I was looking at the date of the incident.

MR. SMITH: Right. Right. That's good.

BY MR. SMITH:

Q. All right. So that was included then at the time in what you provided to the court?

A. Correct.

Q. Do you know if the court read it?

A. I know Solicitor Barnett read it.

Q. Okay. I'm going to -- I'm going to direct you to -- in this document -- 1243 at the bottom.

A. What's the Bate -- number on the very bottom?

Q. 1243 - 1243. I'll tell you what. The reason why is the other one. I'm using the plaintiff's. What's the number on there? It's third page -- third and fourth page is (inaudible).

MS. KHETARPAL: It's 143. It's Wofford Hogsed 143.

MR. SMITH: Okay. Thank you.

BY MR. SMITH:

Q. All right. I want you to go to the bottom of that page. And again, this was Mr. Boswell's typed statement delivered to you -- or provided to you by Ms. Crick on -- I assume, around 4-4-22. The last sentence you see before we start the next page. Can you read that where it says, I again?

297

A. (As read) I again started rubbing the top of Catherine's vagina and inserted one finger inside her vagina.

Q. And the next sentence?

A. (As read) This lasted for only a few minutes. Catherine stated, I want to fuck you so bad. I'm going to give you the best sex of your life.

Q. Did you know Ms. Rand pretty well or did you know who she was?

A. I'd never met her until this incident took place.

Q. From February 11th until you received that, did Mr. Boswell ever tell you that he had digitally penetrated Mrs. Rand's vagina for three minutes?

A. No, sir.

Q. Would that have been helpful in your investigation?

A. Yes, sir.

Q. All right. Did Ms. -- did Ms. Rand cooperate with you throughout the entire process?

A. Yes.

Q. Did she volunteer to give you statements?

A. Correct.

Q. Did the other students that you found -- were somehow involved -- or had some knowledge, did they cooperate and volunteer?

A. Yes, sir.

Q. So everybody volunteered but Graham Boswell; is that

75 (Pages 294 to 297)

310

temperature.

MS. KHETARPAL:  Is it getting hot?

THE WITNESS:  Yeah, it's getting hot again.

MR. SMITH:  You should be sitting in the sun here.

MS. KHETARPAL:  We can lower the blinds if you want.

THE WITNESS:  It's fine.

MS. KHETARPAL:  You can't?

MR. SMITH:  That's all right.

MS. KHETARPAL:  I tried to turn it up yesterday.

MR. SMITH:  Thank you for caring though.  I appreciate it.

THE WITNESS:  Thank you.

MS. KHETARPAL:  I have very little.

MR. BERNSTEIN:  Are you ready?

MS. KHETARPAL:  I'm ready.  Pop it up.

E X A M I N A T I O N

BY MS. KHETARPAL:

Q.  Okay.  So when you expand it -- and I'll tell you when to pause.  Go ahead and play it.

(VIDEO PLAYING)

(VIDEO PAUSES)

BY MS. KHETARPAL:

Q.  Okay.  Stop.  So what did Craig say to Graham Boswell?

A.  I've got to talk to you.

311

Q.  Okay.  That's all he said at this point, right?

A.  Correct.

Q.  Okay.  He didn't say you have to come with me, right?

A.  He did not.

Q.  He didn't say anything that would suggest that he was not free to leave.  Did he?

A.  Not at that time.

Q.  Did he say that he was under arrest at all?

A.  No.

Q.  Did Boswell ever ask if he could leave?

A.  No.

Q.  Was it a concerted decision that Craig would be the one to say that he needed to talk to him?

A.  It was.

Q.  And why was that?

A.  Craig had something to do with the ROTC prior to coming to work for campus safety, but I don't know exactly what his title was with the ROTC, so they knew each other.

Q.  Okay.  And did students at Wofford know Craig as something other than campus safety as well?

A.  I'm sure some of them may have.

MR. BERNSTEIN:  Objection.  Excuse me.

BY MS. KHETARPAL:

A.  But I don't know who all would and who all wouldn't.

Q.  Okay.  Would Boswell have known Craig as somebody other

312

than campus safety in relation to him?

MR. BERNSTEIN:  And/or of ROTC, as he just testified.

MS. KHETARPAL:  Yeah, that's what I mean, ROTC.

BY MS. KHETARPAL:

A.  Yeah.

Q.  Right.

A.  Yes.  Yes.

Q.  If he would have known him, it could have been about ROTC.  Do you know what Craig was wearing during this encounter?

A.  He was in his uniform.

Q.  Okay.  And let's just -- you know, I think Stuart mentioned the reflection of students in the -- in the picture.  And then also the students passing by.  I'd like you to -- as we play it.  Take a look at them and tell me if any of them looked at what was going on or were otherwise indicated -- in your opinion, looking at this.  That whatever was going on was catching their attention at all.  Go ahead and play.

MR. BERNSTEIN:  Note my objection.  The video speaks for itself.

MS. KHETARPAL:  Sure.

(VIDEO PLAYING)

(VIDEO STOPS PLAYING)

313

BY MS. KHETARPAL:

Q.  Okay.  You can stop now.  Did any of them look like they were paying attention to what was going on?

A.  No, ma'am.

MR. BERNSTEIN:  Objection.

BY MS. KHETARPAL:

A.  No, ma'am.

Q.  Okay.

A.  I got to stop answering so fast.

Q.  Did you have any reason to believe there would be any safety issues at the time?  Like surrounding the process of arresting Graham Boswell?

A.  No.

Q.  And at this time, did you believe class had let out -- class was over?

A.  Yes.

Q.  Okay.  Is it your understanding that the others involved Craig, the SLED agent -- also believed that class was over at this point?

A.  Yes.

Q.  Did any of the other officers -- either Craig or the SLED agent -- express any concern that they thought the class may have still been in session?

A.  Nobody expressed that to me.

Q.  Okay.  If you had arrested him at his home -- his home

79 (Pages 310 to 313)

314

was on campus, right?

A. Correct.

Q. And so as you were entering -- as he was exiting, other students could have seen that, right?

A. Correct.

Q. His roommates would have seen it, right?

A. Correct.

Q. Others in the building could have seen it, right? Sort of in the hallways or whatever?

A. Well, they're in apartments, so.

Q. Are there hallways outside the apartments, though?

A. No, not really.

Q. Okay. But as you walked in and out, people could have seen ---

A. Yeah.

Q. --- what was going on?

A. Yes, ma'am. I'm sorry.

Q. And we didn't see you put Graham in handcuffs or -- or anything else. Did you take any steps to protect his privacy after the footage that we have?

A. We did.

MR. BERNSTEIN: Objection.

BY MS. KHETARPAL:

Q. And what did you do?

A. After he was placed under arrest, prior -- we did two

315

things. We told him -- we made arrangements to turn his backpack over to a friend and he chose that friend. And then we pulled a car around back behind the campus safety office and went out a back door from there.

Q. And was that less visible to students as you went out that back door?

A. Yes.

Q. Is it fair to say that his privacy and his feelings were something you took into consideration in deciding how to execute the arrest?

MR. BERNSTEIN: Objection.

BY MS. KHETARPAL:

A. Yes.

Q. And did you do anything else other than what we've talked about in terms of considering his privacy and his feelings? Was there anything else you did?

A. Other than taking him out the back door. And taking him off the other way to campus, so he wouldn't be driven all the way around campus -- through the campus.

Q. And selecting Craig as the ---

A. And having Officer Craig to go with him.

Q. Okay.

A. Or to take him. I guess I should say. Instead of go with him.

Q. Okay. You were asked some questions that sort of

316

insinuated that -- you know, there was some issues with the SLED -- SLED and -- you know, a SLED officer. The first one being reassigned. The SLED officer who was ultimately assigned to the case. Did they have any hesitancy about the prosecution?

A. No.

MR. BERNSTEIN: Objection.

BY MS. KHETARPAL:

Q. And did anyone at the solicitor's office express hesitancy about moving forward?

A. Not on the day that we met with them.

Q. Not prior. Let's put it this way. Prior to the arrest, did anybody at the solicitor's office express hesitancy about proceeding with the arrest?

A. No, ma'am.

MR. BERNSTEIN: Objection.

BY MS. KHETARPAL:

Q. Is it your understanding that Title IX proceedings are confidential while they're underway?

A. That was my understanding.

Q. You were shown pictures that you understood to be of bruising on Catherine's body. Do you remember that?

A. Yes, ma'am.

Q. So were those pictures ever offered into evidence?

A. In court?

317

Q. In court? Yeah.

A. Not at the preliminary hearing, I don't recall them being.

Q. Okay. So you never tried to enter those pictures into evidence -- even though they were given to you and they were in the file ---

MS. BERNSTEIN: Objection.

BY MS. KHETARPAL:

Q. --- but you never tried to offer them into evidence in court; is that right?

MR. BERNSTEIN: Objection. It's not his job. How does he enter into evidence?

BY MS. KHETARPAL:

Q. Did anybody?

A. No.

Q. Okay. They were never offered into -- they were never ---

MR. BERNSTEIN: Objection.

BY MS. KHETARPAL:

Q. --- entered into evidence in a court of law?

A. No, ma'am.

Q. No. That's correct? Is that correct?

A. That's correct, no. Sorry.

Q. You had been shown a LinkedIn summary from Micah Scott. Let's just pull it up real quick. I think it was one of

80 (Pages 314 to 317)

Deposition of David Hogsed

318

the first exhibits. We'll get out of here because it feels hot even to me.

MS. AHRENS: The air turns off at six P.M.

MS. KHETARPAL: Oh, that's why. I was like all of a sudden it got hot. Okay. I have like one minute left.

BY MS. KHETARPAL:

Q. All right. You're looking at the exhibit. It's Plaintiffs 1340, right?

A. Yes, ma'am.

Q. Okay. At the -- while you were working at Wofford, did you have any reason to believe that Micah Scott had any relationship with any of Catherine Rand's attorneys?

A. No, ma'am.

Q. Did you have any reason to suspect that?

A. No, ma'am.

Q. Do you know if Mr. Smith here was Catherine Rand's counsel on or about February 2nd, 2022? I'm sorry. I'm sorry. March 2nd, 2022? That was the date of Micah Scott's statement.

A. No, I didn't know that she even had representation until the day that Johnson interviewed her.

Q. And when was that?

A. I don't remember the dates. I looked at the video. I don't see it written down.

319

Q. Was it -- was it in February, March, or April?

A. It would have been February.

Q. Okay.

A. I don't recall the date that she was interviewed.

Q. Okay. Can you look at the LinkedIn? And if you look at his experience -- his current experience. It says (as read) that he worked at Live Oak Bank and he is currently working there and he's worked there for three years and two months and started -- it looks like in 2022 or 2023.

In any case, this document was printed somewhat recently, right? Based on these dates?

A. Yes.

Q. You kind of count back?

A. Yes, if you count back, yes.

Q. Okay. Do you know if his internship with Mr. Scott's firm was even on his LinkedIn page back in 2022?

A. I have no idea.

MR. BERNSTEIN: It's Mr. Smith.

MS. KHETARPAL: Sorry. Sorry. Smith. Yes, in 2022.

BY MS. KHETARPAL:

A. I have no idea.

Q. Did you know SLED agent Johnson?

A. Personally?

320

Q. I mean, professionally.

A. I mean, I know who she is ---

Q. Yeah.

A. --- because she's a SLED agent, but I mean ---

Q. Did you feel she was competent?

A. Yes.

Q. Okay. And you were showed video of Catherine walking in and then back out of her apartment. And you were asked questions about whether there was blood on the dress. We can pull up the video if we need to -- but hopefully we don't need to because it's getting warm in here. Was that video detailed enough to make a definitive assessment about whether there was blood on the dress?

MR. BERNSTEIN: Objection.

BY MS. KHETARPAL:

A. No.

Q. Could there have been blood on the inside of the dress that you couldn't see from that video?

A. Yes, ma'am.

MR. BERNSTEIN: Objection.

BY MS. KHETARPAL:

Q. You were also asked questions about removing the underwear from the evidence packet. And why did you remove the underwear from the packet?

A. To let it air dry. It was on like a ball. It needed to

321

be laid out and air dried.

Q. Why -- why did it need to be air dried?

A. If -- I hope everybody understands this. It needs to be laid out and air dried and then packaged in paper -- not in a plastic bag. Which it was originally -- if I'm not mistaken -- handed to Logan in a plastic bag.

Q. Why does it need to be packaged in paper?

A. Because -- it's so that air can flow through.

Q. Why is that important?

A. Because if it's in that plastic bag -- and that plastic bag is then sealed closed. It's still going to have air in it.

Q. Uh-huh.

A. And that air -- there may be contaminants in that air that eventually could degrade any DNA that's in the sample.

Q. Okay. And you said that there were discussions about needing to air dry the underwear, right?

A. Right.

Q. Who did you have those discussions with?

A. Logan. Because the morning -- the night/morning this happened I was not there. I came in that following morning and they told me what had happened.

Q. Right.

A. And they told me that they had the bloody underwear.

81 (Pages 318 to 321)

LEGAL EAGLE
864-467-1373

Page 2     ARREST WARRANT

## 2022A4210100577

**STATE OF SOUTH CAROLINA**

[X] County     [ ] Municipality of

Spartanburg

IN-22-02000030

THE STATE
against

Graham Boswell

Address

Phone

Sex    M

Dr. S:

DOB

Prosecuting Agency    Wofford College Police Department
Prosecuting Officer    David W Hogsed - S00389
Offense    Sex / Criminal sexual conduct - Third degree

Offense Code    0162
Code/Ordinance Sec    16-03-0654

This warrant is    CERTIFIED FOR SERVICE    in the
[ ] County    [ ] Municipality of

The accused
[X] to be arrested and brought before me to be
dealt with according to the law

(L.S.)

_____
Signature of Judge

Date

**RETURN**

A copy of this arrest warrant was delivered to
defendant    Graham G. Boswell
on    4/11/22 @ 3:29 pm

_____

RETURN WARRANT TO:
General Sessions
180 Magnolia Street    APR 1 0 2022
P O Box 3483
Spartanburg, SC 29304

ORIGINAL        ORIGINAL

---

STATE OF SOUTH CAROLINA 05/02/2022
[X] County    [ ] Municipality of

Spartanburg

**AFFIDAVIT**

ORIGINAL

Personally appeared before me the affiant    David W Hogsed    who
being duly sworn proposes and says that defendant    Graham Boswell
did within this county and state on or about    2/11/2022
State of South Carolina (or ordinance of    [X] County    [ ] Municipality of    Spartanburg
in the following particulars

DESCRIPTION OF OFFENSE: Sex / Criminal sexual conduct - Third degree

I further state that there is probable cause to believe that the defendant named above did commit the crime set forth and that probable cause is based on the following facts:

That on February 11, 2022 in the city of Spartanburg, one Graham Boswell did, at Wofford College engage in sexual battery in that he engaged in sexual battery with victim, Catherine Rand who was intoxicated and unable to give consent using force and/or coercion to accomplish the battery. The defendant knowing or having reason to know that the victim was mentally defective, mentally incapacitated, or physically helpless. Warrant based upon police investigation. knn

_____
Signature of Affiant

STATE OF SOUTH CAROLINA
[X] County    [ ] Municipality of

Spartanburg

Affiant's Address    429 North Church Street
Spartanburg, SC 29303-
Affiant's Telephone

**ARREST WARRANT**

TO ANY LAW ENFORCEMENT OFFICER OF THIS STATE OR MUNICIPALITY OR ANY CONSTABLE OF THIS COUNTY:

It appearing from the above affidavit that there are reasonable grounds to believe that

on or about    2/11/2022    defendant    Graham Boswell
did violate the criminal laws of the State of South Carolina (or ordinance of
[X] County    [ ] Municipality of    Spartanburg    ) as set forth below

DESCRIPTION OF OFFENSE: Sex / Criminal sexual conduct - Third degree

Having found probable cause and the above affiant having sworn before me, you are empowered and directed to arrest the said defendant and bring him or her before me forthwith to be dealt with according to law. A copy of this Arrest Warrant shall be delivered to the defendant at the time of its execution, or as soon thereafter as is practicable.
Sworn to and subscribed before me
on 4/11/2022

(L.S.)

_____
Charles William Jones
Judge Code    708J

Judge's Address    Spartanburg County Judicial Center
Spartanburg, SC 29306-2335
Judge's Telephone    (864)596-2564

Issuing Court    [X] Magistrate    [ ] Municipal    [ ] Circuit

ORIGINAL     ORIGINAL     ORIGINAL     ORIGINAL     ORIGINAL

PLTF_001218



PLAINTIFF'S
EXHIBIT
3 gm

Detailed Report - Incident #IN-22-02000030                    https://woffordsc.agisent.com/incidentPrint.htm?incidentid=IN015J3...
Page 3                                                        05/02/2022



# Wofford College Campus Safety

Officer Incident Report for Incident # IN-22-02000030

Disposition: **ACTIVE**

| | | | |
|---|---|---|---|
| **Incident Date:** | From 02-11-2022 09:25 pm To 02-11-2022 10:59 pm | **Report Created:** | 02-12-2022 04:40 am GMT -5.00 |
| **Incident Type:** | Sex Offenses, Forcible - Forcible Rape (11A) | **Reported By:** | 652 Elder, Gregory (US0123V600000064) |
| **Origination:** | 911 Call | **Reporting Agency:** | Wofford College Campus Safety |
| **Current Status:** | Open Report, Access Level 1 | **Reported From:** | IP ADDR 199.190.174.73 |
| **Incident Location:** | 180 EVINS STREET SPARTANBURG, SC 29303 US | **Jurisdiction:** | This Jurisdiction |
| | | **Assigned To:** | 659 Hogsed, David (US011MZL0000006W) |
| **Incident Lex #:** | IN015J3U0000059G | **Agency:** | Wofford College Campus Safety |

**Jacket Notes:** Sexual Related

## INCIDENT DESCRIPTOR:

Sexual Assault involving an intoxicated victim

## LOCATION:

| | | | |
|---|---|---|---|
| **Name:** | Village Apartments | **Location Lex #:** | LO014SHD000001J6 |
| **Address:** | 180 EVINS STREET SPARTANBURG, SC 29303 US | **Units Entered:** | |
| | | **Forced Entry:** | No |
| **Latitude / Longitude:** | 34.9599514 / -81.9379977 | **Location Notes:** | |
| **Location Type:** | School-College/University (52) | | |
| **Zone / Beat:** | / | | |

## WEATHER AT TIME OF INCIDENT:

Clear

1 of 14                                                       4/27/2022, 2:52 PM

PLTF_001219

Detailed Report - Incident #IN-22-02000030                    https://woffordsc.agisent.com/incidentPrint.htm?incidentid=IN015J3...
       Page 4                                                  05/02/2022

## REPORTED CRIMINAL ACTIVITY:

- No Gang Involvement **CANNOT be used with J or G** (N)

## INCIDENT OFFENSES:

| off code | offense description | victim | offender | completed | use of force | auto weapon |
|----------|---------------------|--------|----------|-----------|--------------|-------------|
| 11A | Sex Offenses, Forcible - Forcible Rape (11A) | Rand, Catherine English | Boswell, Graham Gerhardt | Y | Y | - |

## ARRESTS / ARREST OFFENSES:

| name | party type | offense code | statute | description | off status |
|------|------------|--------------|---------|-------------|------------|

No arrests associated with this incident.

PLTF_001220

## PARTIES:



| name | party type | arrested | injured | description | DL # | SSN # | lex # |
|---|---|---|---|---|---|---|---|
| Boswell, Graham Gerhardt | Suspect | No | No | White, M, lbs, 0' 0", 22 (at time of incident), DOB: | | | EP013FD6000001RY |
| B████, J████. | Witness | No | No | White, F, lbs, 0' 0", 20 (at time of incident), DOB: | | | EP018ND4000001YM |
| D████, J████. | Witness | No | No | White, M, lbs, 0' 0", 20 (at time of incident), DOB: | | | EP013IKE000004ZW |
| F██ M████ | Witness | No | No | White, F, lbs, 0' 0", 19 (at time of incident), DOB: | | | EP012LE1000004Z5 |
| H████, B████ | Witness | No | No | White, M, lbs, 0' 0", 21 (at time of incident), DOB: | | | EP01BWSG000000RZ |

PLTF_001221

Detailed Report - Incident #IN-22-02000030                    https://woffordsc.agisent.com/incidentPrint.htm?incidentid=IN015J3...

Page 6                                              05/02/2022



| | | | | | |
|---|---|---|---|---|---|
| H____, C____. | Witness | No | No | White, M, lbs, 0' 0", 21 (at time of incident), DOB: | EP014E2X0000029Y |
| M____, W____ | Witness | No | No | White, M, lbs, 0' 0", 19 (at time of incident), DOB: | EP012JRQ000004Z1 |
| N____, E__ | Witness | No | No | White, M, lbs, 0' 0", 20 (at time of incident), DOB: | EP014KH6000001XN |
| P___, S___ | Witness | No | No | Asian, F, lbs, 0' 0", 22 (at time of incident), DOB: | EP017PN4000001LZ |
| Rand, Catherine English | Victim | No | Yes | White, F, lbs, 0' 0", 21 (at time of incident), DOB: | EP01AQ0B000001M4 |
| S____, M____ | Witness | No | No | White, M, lbs, 0' 0", 22 (at time of incident), DOB: | EP014FKU0000021P |

4/27/2022, 2:52 PM

PLTF_001222

Detailed Report - Incident #IN-22-02000030

Page 7

https://woffordsc.agisent.com/incidentPrint.htm?incidentid=IN015J3...

05/02/2022



| | | | | | |
|---|---|---|---|---|---|
| S___, E___ | Witness | No | No | White, M, lbs, 0' 0", 19 (at time of incident), DOB: | EP01BXQR0000028Q |
| S___, A___ | Witness | No | No | White, F, lbs, 0' 0", 20 (at time of incident), DOB: | EP017LJO000001YK |
| T___, J___ | Witness | No | No | White, M, lbs, 0' 0", 21 (at time of incident), DOB: | EP013YOV00000504 |
| W___, F___ | Witness | No | No | White, M, lbs, 0' 0", 21 (at time of incident), DOB: | EP013V78000004YW |

## VEHICLES:

No vehicles specified.

4/27/2022, 2:52 PM

PLTF_001223

Detailed Report - Incident #IN-22-02000030                    https://woffordsc.agisent.com/incidentPrint.htm?incidentid=IN015J3...

Page 8                                              05/02/2022

## NARRATIVE:

02-12-2022 04:42:53 (GMT -5.00)          652 ELDER, GREGORY          US0123V600000064

On February 11, 2022 Campus Safety officers received a phone call about a sexual assault that happened on Campus.

4/27/2022, 2:52 PM

PLTF_001224

Detailed Report - Incident #IN-22-02000030                    https://woffordsc.agisent.com/incidentPrint.htm?incidentid=IN015J3...

Page 9                                          05/02/2022

## SUPPLEMENTAL:

| DATE CREATED | CREATED BY | STATUS | DATE APPROVED | APPROVED BY |
|---|---|---|---|---|
| 02-12-2022 08:04 am | 652 Elder, Gregory | open | - | |

SUPPLEMENTAL TEXT

On February 11 2022 Campus Safety received a call for amnesty for a student. Once officers arrived on scene with the student, we discovered this call is possibly a sexual assault. We found the victim in the area of the tennis courts on campus. The victim was identified as Catherine Rand by her friends that were on scene. I spoke to Ms. Rand and she was very distraught and she stated that she did not want to talk to officers. I told Ms. Rand that if a sexual assault occurred that DNA evidence was vital to our investigation. She told officers that she may would talk to us later but she just was not ready at this time. Ms. Rand was taken back to her dorm room by her friends E███ S██████ and A████ S██████. Ms. S██████ contacted Campus Safety some time after the assault and stated that the victim Ms. Rand was in pain and was bleeding vaginally and she needed medical attention. Ms. F███ is the roommate of the victim. She was able to get the victims under garments to Logan Henson of Campus Safety to keep as evidence. I drove Ms. Rand and her friends to Spartanburg Medical Center so she could receive medical attention.

| DATE CREATED | CREATED BY | STATUS | DATE APPROVED | APPROVED BY |
|---|---|---|---|---|
| 02-15-2022 04:52 am | 665 Saar, Ted | open | - | |

SUPPLEMENTAL TEXT

On 02/14/22 I contacted students Catherine Rand and Graham Boswell at Sgt. Elder's request. I met with both students seperately in the Campus Safety Office. Both students signed No Contact Orders and both students were given copies of the orders.

| DATE CREATED | CREATED BY | STATUS | DATE APPROVED | APPROVED BY |
|---|---|---|---|---|
| 02-16-2022 11:04 pm | 652 Elder, Gregory | open | - | |

SUPPLEMENTAL TEXT

On 2/16/2022 Catherine Rand came into the Wofford Campus Safety office and stated to me on video that she has chosen to take the case to Title IX at this time. Ms. Rand does realize that she can make a criminal case at a later date if she chooses.

| DATE CREATED | CREATED BY | STATUS | DATE APPROVED | APPROVED BY |
|---|---|---|---|---|
| 02-16-2022 11:18 pm | 652 Elder, Gregory | open | - | |

SUPPLEMENTAL TEXT

After all the witness information and investigation, it was determined that the assault took place in Apartment 230 in the Senior Village. The apartment was not searched after the assault took place due to the victim herself not coming forward until Monday February 14th, 2022. The assault occurred on February 11th, 2022. After the interviews the victim decided on February 16th, 2022 to take the case forward to Title IX. Ms. Rand stated that she knew she could later decide to move the case forward to criminal if she chose to do so. Her statement was recorded on BWC and was uploaded to the Campus Safety hard drive. A partial phone call to her friend was also uploaded to the video file.

Detailed Report - Incident #IN-22-02000030                    https://woffordsc.agisent.com/incidentPrint.htm?incidentid=IN015J3...

Page 10                                    05/02/2022

| DATE CREATED | CREATED BY | STATUS | DATE APPROVED | APPROVED BY |
|---|---|---|---|---|
| 03-14-2022 07:42 pm | 655 Henson, Logan | open | - | |

SUPPLEMENTAL TEXT

On February 11th 2022 Campus Safety Received a call for amnesty for a student later identified as Catherine Rand, the caller stated that Ms. Rand had potentially been sexually assaulted. Sgt. Elder, Officer Craig and myself arrived on scene and located the victim in the tennis court area. Ms. Rand was very afraid and she was crying uncontrollably and advising her friends who were also on scene, E███ S███ and A████ S████ that she did not want to speak to Campus Safety at the moment and she repeatedly advised that she was not ready to speak about what happened to her. As Sgt. Elder and Officer Craig collected Ms. S████ and Mr. S████'s information I advised Ms. Rand that if me being a female Officer made her feel more comfortable I would be available to speak with her anytime that she was ready. I offered Ms. Rand my Campus Safety Business card with the Campus Safety phone number along with my personal cell phone number. Ms. Rand handed the card to Ms. S████ to keep and thanked me. Ms. Rand was then taken back to her room by Mr. S████ and Ms. S████.

As Sgt. Elder and I were on patrol shortly after midnight on February 12th 2022, I received a call on my personal cell phone from Ms. S████. Ms. S████ advised that after returning to Ms. Rand's room and calming down she began to state that student Graham Boswell had sexually assaulted her. Since this information was given to me from Ms. S████ and not Ms. Rand personally, we did not interview Mr. Boswell that night. Later that morning Campus Safety received a call from Ms. Rand's roommate, M████ F██ advising that she collected a pair of Ms. Rand's undergarments that had been soaked in blood. I then drove to the Dupree Horseshoe and collected the undergarments from Ms. F██ and Ms. S████ at approximately 0029 hrs. Ms. F██ collected the undergarments and stored them in an orange Ulta shopping bag. The Orange shopping bag was placed carefully into the paper evidence bag by Ms. F██ and driven directly back to the Campus Safety Office. Upon returning to the Campus Safety office I then completed a Chain Of Custody form and placed the evidence bag in an evidence locker and secured the lock.

| DATE CREATED | CREATED BY | STATUS | DATE APPROVED | APPROVED BY |
|---|---|---|---|---|
| 04-10-2022 11:31 am | 659 Hogsed, David | open | - | |

SUPPLEMENTAL TEXT

After obtaining victim statements, witness statements and the collection of physical evidence, this reporting officer (Sgt. David Hogsed) met with members of the Seventh Circuit Solicitor's Office on 04/05/22 and presented the case for review.
Reporting Officer requested that the listed suspect, Graham Gerhardt Boswell, be charged with criminal sexual conduct. It was agreed that probable cause existed to charge Mr. Boswell with CSC 3rd degree.

| DATE CREATED | CREATED BY | STATUS | DATE APPROVED | APPROVED BY |
|---|---|---|---|---|
| 04-27-2022 02:51 pm | 659 Hogsed, David | open | - | |

4/27/2022, 2:52 PM

PLTF_001226

Detailed Report - Incident #IN-22-02000030                    https://woffordsc.agisent.com/incidentPrint.htm?incidentid=IN015J3...
Page 11                                       05/02/2022
SUPPLEMENTAL TEXT

Reporting Officer (R/O) Hogsed was informed of this incident on 02/12/22 being briefed on what took place and that blood-soaked underwear from the victim had been placed into an evidence locker. R/O inquired as to how the item had been packaged based on my crime scene and evidence collection experience. R/O was told that the item was turned over to Campus Safety in an opened plastic bag and that the bag with the item inside was placed into an evidence envelope as is. R/O signed the property sheet taking possession and then placed the item out to air dry in the locked evidence room. Only supervisors have access to the evidence room. R/O was also informed that Sgt. L. Elder would be the lead investigator on this incident once Ms. Rand came forward to file an official report. R/O was informed that Ms. Rand was extremely upset and emotional when officers responded and said that she was not ready to talk about the incident at the time.

On 02/13/22 the air-dried underwear was placed back into the original evidence envelope and submitted to evidence via an evidence locker.

R/O reviewed video footage of cameras around the reported incident location and saved what was observed of Mr. Boswell and Ms. Rand. It should be noted here that the cameras observed are distance / motion sensor activated.

Village 220 Front camera:
2-11-22 @ 9:25pm Mr. Boswell and Ms. Rand walk towards Village Apartments 230.
2-11-22 @ 10:59pm Mr. Boswell and Ms. Rand walk away from apartment 230 towards center Area of apartments.

Dupre Horseshoe South camera:
2-11-22 @ 11:03pm Ms. Rand enters Dupre Residence Hall.
2-11-22 @ 11:08pm Ms. Rand exits Dupre Residence Hall.
(Above is saved as one video clip).
2-11-22 @ 11:55pm Ms. Rand and friends enter Dupre Residence Hall.
2-12-22 @ 1:46am Ms. Rand and friends exit Dupre Residence Hall.
(Above saved as one video clip).

R/O was informed that Ms. Rand, accompanied by witness A. S████, came to the Campus Safety Office on 02/14/22 and spoke to Sgt. Elder giving a video and written statement concerning the incident. At this time Ms. Rand informed Sgt. Elder that she was requesting that the incident be investigated by the Title IX office only. Sgt. Elder informed Ms. Rand that if she changed her mind and wanted a criminal investigation to come back to the Campus Safety Office. Refer to Sgt. Elder's report, video and written statement for details.

Based on additional information obtained from Sgt. Elder about a statement obtained from witness S████ P████ on 02/15/22, R/O reviewed and saved the following video footage.
Village 220 Front camera:
02/12/22 @ 2:23am Mr. Boswell and Ms. P████ walk towards apartment 230.
02/12/22 @ 2:29am student L████ M████ walks toward apartment 230.
02/12/22 @ 2:35am Ms. P████ and Mr. M████ walk away from apartment 230.
02/12/22 @ 2:39am Mr. M████ seen walking around area on his phone and then walks away.
(Above saved as one video clip).

9 of 14                                                                            4/27/2022, 2:52 PM

PLTF_001227

R/O had no other involvement with the incident until 02/22/22 when I was informed that Ms. Rand had come back to the Campus Safety requesting that a criminal investigation be conducted. R/O was also informed that I would be taking over the investigation due to Sgt. Elder leaving employment at Wofford College.

02/27/22 Witness A██ S██████ came to the Campus Safety Office and gave the names of B██ H████ and J████ D██████ as possible witness to this incident. Mr. H████ is the President of the Kappa Sigma fraternity and Mr. D████ is the Vice-President. Ms. S██████ said that these two sat down with her, Ms. Rand and L███ M████ about how the fraternity would proceed with Ms. Rand's allegations.

R/O was also informed that Mr. Boswell's roommate, M████ S████, may have information that could assist with the investigation.

R/O requested that the Campus Safety Office request the assistance from the South Carolina Law Enforcement Division (SLED) asking for a female officer. Agent M. Johnson was assigned to assist.

03/2/22 B██ H████ and J████ D██████ from the Kappa Sig fraternity was interviewed via R/O's body worn camera. It was discovered that Mr. Boswell was suspended from the fraternity until a vote could be done as to his membership within the organization based on statements he had made during their meeting with him. During the interview, H████ and D████ said that when they ask Mr. Boswell who he hooked up with, Mr. Boswell was a little taken a back as if wondering how they knew. They said that Mr. Boswell made a comment something along the lines of since you already ask me that, you know who it was. Said that it appeared Mr. Boswell insinuated that by him and Ms. Rand going back to his apartment was a 'hook up'. Said Boswell talked about Ms. Rand being on her monthly cycle / period and that blood was on them both. Mr. Boswell told them that Ms. Rand was all over him and that Boswell told them that he was in a clear state of mind. Boswell said Ms. Rand was repeatedly ask him if he was drunk and he said no. Said Mr. Boswell told them that Ms. Rand told Mr. Boswell that she was fine and not drunk.

They also said that while speaking with Mr. Boswell he told them that he and Ms. Rand went back to his apartment because she asked him to leave. Said that Mr. Boswell told them that she was bleeding as if on her period and that they stopped and cleaned up. Both said that Mr. Boswell seemed very concerned and was shocked when told of the allegations being made. Said that Mr. Boswell told them that she was bleeding due to probably being on her period. Said that Mr. Boswell told them that she was walked back to the Black and Gold event. H████ and D████ said that couldn't be accurate because she was located at the tennis courts area. Mr. D████ had taken notes during the meeting and provided a copy of those notes to Campus Safety.

03/2/22 M████ S████ was interviewed. Mr. S████ told witness A██ S██████ that Mr. Boswell cleaned the apartment in the event that Boswell brought a female back to the apartment. S████ confirmed that Mr. Boswell did tell him that he didn't have any idea as to who that female would be. Mr. S████ talked about Mr. Boswell's recent break-up with R████ M████ and said that Boswell and M████ spoke in front of him while in the apartment and that he heard the two talking / yelling about Mr. Boswell taking her to the military ball. Mr. S████ said he heard Ms. M████ say something to the effect that she knew he (Boswell) did something because she went to the hospital. Mr. S████ said he thought Ms. M████ was talking about Ms. Rand. Mr. S████ talked about a relationship / time Boswell spent with student C██████ M████ saying this was a short "friends with benefits" type relationship. Mr. S████ talked about how Mr. Boswell verbally abused C██████ H████'s girlfriend. Mr. S████ talked about his dislike

of living with Mr. Boswell saying he drinks alcohol a lot specially to avoid problems. Mr. S███ said that Mr. Boswell will twist everything around to make it seem like nothing is his fault and that Boswell shares his issues with everyone. That he will hold nothing back but will twist things so that it's not his fault. Mr. S███ said that Mr. Boswell approached him and tried to tell him about the situation but that he (S███) didn't want to hear it. Mr. S███ said that he was at the party Ms. Rand and Mr. Boswell attended as well and that he knew Ms. Rand was intoxicated based on something she said to him that she normally wouldn't say. Said Ms. Rand told him that she was drunk and was unstable on her feet. Said that the comment she made would never have been said if Ms. Rand wasn't drunk. Mr. S███ also said that he did not Ms. Rand around Mr. Boswell at the party and that when he left the party he went back to the Black and Gold event. Said that Ms. Rand text him on the night of 02/13/22 and told him of the incident. Mr. S███ said that he and Mr. Boswell had an agreement prior to the incident that Mr. Boswell could eat the pasta mentioned in this incident because the pasta belonged to him (S███). Refer to video recording for complete details.

03/2/22 Mr. L███ M███ was also interviewed via body worn camera footage as well as giving a written statement. Refer to his written statement for content.
On video conversation Mr. M███ said that Ms. Rand is very "quirky" and bounces off the wall as if hyper. He talked about how much Ms. Rand had to drink (referring to alcohol) and how red colored her face was. He talked about being at Ms. P███'s apartment and a discussion came up about going to Mr. Boswell's apartment for pasta. Said that Ms. P███ went to Mr. Boswell's apartment and that a short time later he got a text from Ms. P███ asking him to come over there. Said that when he walked in the apartment P███ and Boswell were sitting about two feet apart on a love sat type sofa. Mr. M███ said that Mr. Boswell seemed shocked that he was there. Said that he sat down on a different sofa and that Mr. Boswell went to the kitchen area dealing with the making of pasta. Mr. M███ said that Ms. P███ then text him 'we gotta go' and then "he just said he thought it was just us". Mr. M███ said he text back "Tell me one of your roommates wants you to go to bed". Mr. M███ provided a screenshot of the exchange between himself and Ms. P███. He said that when this happened, he did not know that anything had happened to Ms. Rand. Refer to his statement related to the above as well as a conversation he had later with Ms. Rand.

03/2/22 B███ T███ was interviewed where it was learned that Mr. T███ shares a restroom with Mr. Boswell. Mr. T███ said that he went back to the apartment on 02/12/22. He said that it did not look as if the restroom had been cleaned. He did not observe any blood in the common area or restroom. Mr. T███ provided Campus Safety with a photograph showing all four roommates together at the party in question on the night of reported incident. Mr. T███ said he saw Ms. Rand at the party and he thought she was acting pretty normal. He did not see Ms. Rand around Mr. Boswell. Said he stayed at the party about two hours and that he also did not see Mr. Boswell nor Ms. Rand at the Black and Gold event. Mr. T███ said that he learned on the following Sunday that Mr. Boswell had been called in to the Kappa Sig Fraternity and that when he asked Mr. Boswell if he was in trouble, Mr. Boswell said not if he talked to the right people. Mr. T███ said that he learned of this incident from Ms. Rand on 02/14/22. Mr. T███ said that he and his other roommates where trying to switch / remove Mr. Boswell from the apartment and that no one was talking about things. Mr. T███ said that they wanted Mr. Boswell removed due to this incident as well as other problems such as a short temper, a hard person to live with and his alcohol consumption. Refer to BWC footage for exact content.

03/03/22 Agent Johnson with SLED interviewed victim, Catherine Rand, in the Campus Safety Office. Refer to the video statement interview as well as Agent Johnson's for details.

Officers had been informed that prior to the witnesses' statements had been obtained from located Ms. Rand on the night of the incident an unknown student had actually found her and stayed with her until Ms. S███ and others got to her location.

R/O identified and located student E. N█████ and interviewed him on 03/03/22 via a video recorded statement. Mr, N█████ said that he was near the tent area of the Black and Gold event and moved away from the crowded area and heard crying in the distance. Said he saw a female sitting on a bench near the tennis courts. He went to check on her because she was by herself. Mr. N█████ said that when he sat down she started asking him not to leave her. He said he told her everything was okay, Mr. N█████ said that he was a good distance away and heard loud crying. He recalled hearing something being said about a sexual assault when Ms. Rand's friends started to arrive and said that he did not hear anyone say a name as to who would have done this. Refer to BWC footage for exact content.

03/03/22 C█████ H█████, who is also a roommate of Mr. Boswell, was interviewed via body worn camera footage. Mr. H███ said he went to the party everyone was at prior to going to the Black and Gold event around 7:30pm and that his girlfriend lives in the apartment where the gathering took place. Said he doesn't know Ms. Rand well. Mr. H███ said that at the party he talked to Mr. Boswell briefly and that Boswell tried to talk to him and his girlfriend but that they brushed him off. H███ said he had no interaction with Ms. Rand at the party. Said he left the party between nine and nine thirty and went back to his apartment to get beer. Found out about the incident on 02/13/22 from M███ S███. Talked about Mr. Boswell being removed from the Kappa Sig Fraternity. H███ said that Mr. Boswell had said that the girl he had over was speaking out against him and that got him removed from Kappa Sig and that the things she was saying were uncomfortable. H███ said that Mr. Boswell told him that Ms. Rand was begging him to do stuff and that Mr. Boswell told him that Ms. Rand was asking for it.

Mr. H███ said that Mr. Boswell always made problems for himself and that Mr. Boswell will not do anything to help himself and that he (H███) was tired of hearing about Boswell's problems. H███ recalled that when he went back to the apartment for beer on the night in question, he observed a phone and ID on a mini-refrigerator and picked it up and saw that it was Ms. Rand's. He said that he heard two people in Mr. Boswell's room but could not tell what was being said or going on within the room.

Mr. H███ said that Mr. Boswell did not say that Ms. Rand was intoxicated but that everyone has said that Ms. Rand was highly intoxicated.

Mr. H███ originally said that he spent the night with his girlfriend but then recalled that he and girlfriend spent Friday night (02/11/22) in his room and Saturday night (02/12/22) at this girlfriend's room. Mr. H███ recalled a female opening his bedroom door on the night in question after he and his girlfriend went to bed and said that it was S███ P███. Said Ms. P███ said hello. Mr. H███ said he later spoke with Ms. P███ and that she had expressed to him how uncomfortable she was while there.

Mr. H███ spoke about how Mr. Boswell cleaned the entire apartment earlier that day and that Mr. Boswell had said he was cleaning in case someone comes back to the apartment. H███ could not tell if the apartment had been cleaned after the incident took place. Mr. H███ said that he did see

PLTF_001230

Detailed Report - Incident #IN-22-02000030                    https://woffordsc.agisent.com/incidentPrint.htm?incidentid=IN015J3...
                    Page 15                                    05/02/2022

Mr. Boswell at the Black and Gold event and explained that he had to have arrived there after the incident took place. H███ said that he did not see Ms. Rand at the Black and Gold Event. H███ said that Mr. Boswell came to him again later and confided about the roommate situation and also ask him to speak with his lawyers (Boswell's) about hearing mumbling within the room. Mr. H███ talked about Mr. Boswell's relationships with two former girlfriends calling them toxic. He talked about how Mr. Boswell lashes out on people when drinking alcohol and described how Mr. Boswell argues with his (H███'s) girlfriend to the point where H███ has to intervene. Refer to BWC footage for exact content.

After the interview of Mr. H███, R/O reviewed video footage from the Village 220 Front camera with the following footage saved:

02/11/22 @ 10:02pm. C███ H███ walks towards his apartment.
02/11/22 @ 10:05pm. C███ H███ walks away from his apartment.
(Above saved as one video clip)
02/12/22 @ 12:38am. C. H███ and his girlfriend walk toward his apartment.

A search warrant was obtained for the apartment of Mr. Boswell by SLED Agent M. Rice-Johnson and was executed on 03/07/22. Mr. Boswell was present and the process was explained. R/O executed with the following items / property taken during the warrant.
Photographs, Blue colored fitted sheet, Blue colored flat sheet, white colored stained t-shirt, and mattress cover.
The mattress cover has a red colored stain on it. This was tested for human blood using a OBTI test kit with a positive reaction for human blood.
R/O's body worn camera was activated during the search and when Mr. Boswell was brought to the Campus Safety Office and informed of his Miranda Warnings. Mr. Boswell had formally requested legal counsel so no questions were asked of him. BWC was also activated when this R/O took Mr. Boswell back to his apartment.

## ADMINISTRATION:

| disposition | reviewed by | review date | cleared by | cleared date |
|---|---|---|---|---|
| Active | | - | | - |

Cover Page Printed: 04-27-2022 02:51 pm GMT -5.00

4/27/2022, 2:52 PM

PLTF_001231

Detailed Report - Incident #IN-22-02000030

Page 16

https://woffordsc.agisent.com/incidentPrint.htm?incidentid=IN015J3...

05/02/2022



4/27/2022, 2:52 PM

PLTF_001232

Page 21                                    05/02/2022

## WOFFORD COLLEGE DEPARTMENT OF PUBLIC SAFETY

| PROPERTY REPORT | | | 1-Status-Check one  ☐ Recovered Property  ☐Evidence  ☐ Found | 2 Case No.  IN-22-02-000030 |
|---|---|---|---|---|

| 3. Date and Time Impounded  3-7-22 @ 10:01 Am | 4. Laboratory Examination  ☐Yes   ☐No   Bin. No | For Prop – Room Use Only  Vault No.      Shelf No. | Property Sec # |
|---|---|---|---|

6. Found or Recovered From  ☐Person  ☐Place

| Name   230-A Village Apartments | 7. Where property was impounded (Give exact location-address)  180 Evins St, Spartanburg, SC |
|---|---|

| 8. Owner's Name  Graham Boswell | 9. Owner's Address | 10. Owner's Telephone No. |
|---|---|---|

| 11. Item No. | 12. Quantity | 13. Description |
|---|---|---|
| 4 | 1 | MATTRESS COVER |
| 5 | 1 | FITTED BED SHEET |
| 6 | 1 | BED SHEET |
| 7 | 1 | WHITE T-SHIRT |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

DISPOSITION OF PROPERTY
AUTHORITY:

| | TIME | TIME | TIME | TIME | TIME | TIME | TIME |
|---|---|---|---|---|---|---|---|
| | DATE | DATE | DATE | DATE | DATE | DATE | DATE |
| | JUDGE | OFFICER | RELEASE TO COURT | RETURNED TO OWNER | SOLD AT PUBLIC AUCTION | DESTROYED | WITNESS |

| 14. I hereby acknowledge that the above lists represent all property taken from my possession and that I have received a copy of this report.  Signature X | 15. Impounding Officer (Print Full Name)  DAVID W. Hansen  17. Signature | 16. Unit No  651 |
|---|---|---|

| 18. Received By  T. Saar | 19. Reason  evidence | 20. Date and Time Received  3/9/22 @ 2000 |
|---|---|---|
| Received By | Reason | Date and Time Received |
| Received By | Reason | Date and Time Received |
| Received By | Reason | Date and Time Received |
| Received By | Reason | Date and Time Received |
| Received By | Reason | Date and Time Received |
| Received By | Reason | Date and Time Received |
| Received By | Reason | Date and Time Received |
| Received By | Reason | Date and Time Received |

PLTF_001237

05/02/2022

## STATEMENT OF GRAHAM BOSWELL

I first heard of Ms. Catherine Rand at a reception held by college president Nayef Samhat on Parents' Weekend at Wofford. I was introduced to Catherine's parents, and they told me that if I saw her I should introduce myself. Catherine was not at this event because she was coming back from a class field trip.

I was T-Shirt Chair of Kappa Sigma fraternity, so my first contact with Catherine was on Feb 18, 2020 when she Venomed me to buy fraternity rush shirt. I requested contact information for Catherine from M████ S████ in order to update her on the status of her t-shirt order on June 22, 2020. Our first time speaking directly to one another was on June 29, 2020 when I texted Catherine about her order.

The first time I recall having an in-person conversation with Catherine was on November 16, 2020 when she came to the Kappa Sigma Fraternity house to pick up her t-shirt order. I was working on a school art project at the time and was somewhat distracted while she tried to engage me in conversation. After these encounters, Catherine and I were in the same art class spring semester 2021. We texted during this time strictly about the class and had no in-person encounters.

**Thurs, Feb 3, 2022 Encounter:**

I arrived at the Kappa Sigma house on Thursday at 10:08pm. Once I arrived, I went to the private brother's room and talked with fraternity brothers until approximately 11:10pm at which point I went to the back porch of the house. I sat in a chair next to Catherine and said "Welcome back to campus" Catherine had been "studying abroad" for the Fall semester 2021 but came back early in late September for reasons unknown to me at the time.

Catherine responded to my comment saying thank you and gave me a hug. She was speaking in a flirtatious tone and repeatedly would lean in very close to my face while speaking. Catherine seemed intoxicated. I then shifted my attention to talk with three friends sitting to the other side of me. I did not have any further contact with Catherine this evening

**Friday, Feb 11, 2022 Encounter:**

At 7:55pm I walked with Ms. N████ L████ to apartment 280 in the Wofford College Greek village to attend a "pre-game" for Wofford's annual "Black and Gold" band party. I had one Sierra Nevada IPA while getting ready. The apartment is lived in by Ms. S████ P████ (ZTA), Ms. A████ C████ (ZTA), Ms. W████ J████ (ZTA) and Ms. S████ C████ (KAT). Upon entering I said hello to my fraternity brothers, friends and apartment "owners". While socializing in the apartment I drank one Sierra Nevada IPA and took a series of pictures with my roommates. I was in the apartment until approximately 8:30pm when I left the building to socialize on the porch. While on the porch, Catherine approached me and initiated a conversation. Her speech was clear and behavior normal and welcoming. As the conversation progressed, she asked how the situation was with my ex-girlfriend R████ M████. I responded that I had moved on, but she had been texting me throughout the day wanting to talk and I hadn't responded. Catherine made a comment about my relationship status and said that she was so

happy to have seen me the past week. I responded that it was great to see her too. Catherine said, "too bad you left with C▮▮▮ and her friends, I wanted to hang out with you." I told Catherine I "had not talked to C▮▮▮ in ages but it was nice to catch up." At this point Catherine began to move closer to me and had an arm around me while talking. J▮▮ Z▮▮ later stated Catherine was all over me to the point where he pointed it out to a friend.

Catherine then told me that because I left with other people last Friday, she wanted to come back to my apartment tonight. I said, "That can certainly be arranged." At this point I left the porch to go back inside the apartment where I grabbed my grocery bag of drinks, opened a beer, and socialized with a few friends before going back outside to the porch. Outside, I saw Catherine standing in the same place she was when I had left a few moments prior. She and I spoke again when I came outside. Her speech was clear and her behavior was flirty, but nothing that would indicate intoxication. She was able to hold a coherent conversation.

Catherine continued to initiate physical contact with me, putting an arm around my waist when I asked, "would you like to go to my apartment now before going to Black and Gold?" She said yes and we began to leave the apartment. At no point during the time when I asked if she would like to come to my apartment to entering the stairwell and then exiting the front porch of the building did any acquaintance of hers or mine attempt to speak with either of us or inhibit us from leaving.

My apartment is on the first floor of a building across the lawn from the "pre-game." We walked on the sidewalk to my front porch, and I held the door for Catherine to enter. She walked into the apartment and turned to me after I sat a half-drank beer on the bar. She then wrapped her hands around the back of my head and started passionately kissing me. I share my apartment with three other roommates and value my privacy so I asked Catherine if she would like to go to my bedroom (cube). She said yes and entered my room. The lights were on in my room when we went in.

Catherine leaned her back against my bed and pulled me in to kiss her. She was holding the back of my head very tightly and running her hands up and down my back; she began to hook her fingers into the back pockets of my jeans while kissing me. I responded by moving my hands down from the small of her back to her buttocks.

Catherine's kissing was forceful and aggressive, repeatedly pushing her tongue into my mouth throughout the whole encounter and holding my body very tight and removing my jacket. At this point she put her hands on the front of my shoulders and leaned back slightly to ask, "are you drunk?" I responded "no" and she asked, "are you sure?" I said, "I have had three beers. I have been drinking but I am not drunk." I asked Catherine the same question. I said, "are you drunk" to which she answered, "I have had a few drinks, but I am not drunk." I asked her again and she said, she, "Yes I promise, I am not drunk." Wanting to be absolutely sure she was comfortable I asked, "So you are you ok with this?" She responded, "Yes I wanted to do this last week but you left, I want to fuck you better than you have ever been fucked before." After hearing that comment, I began to kiss Catherine again.

PLTF_001242

Page 27                                    05/02/2022

Catherine continued to run her hands up and down my body, touching my penis through my jeans, and unbuttoning the top buttons of my shirt. I began kissing her on the neck. Catherine looked up and began to moan very loudly and was yelling "oh fuck Graham," "oh my god Graham," "Graham I want you so bad" repeatedly. The loud moaning became overwhelming, and I asked her to be a little quieter so the neighbors don't think somebody is screaming. She apologized and continued to moan less loudly as I kissed her neck then kissed the top of her breasts. I pulled away from Catherine and we continued to kiss. She began to pull aggressively on the back pockets of my jeans attempting to pull them off and stated, "I want you to fuck me so hard." After hearing this statement, I put my hand on Catherine's waist and slowly turned her around to face the bed.

While Catherine was facing the bed, I kissed the left side of her neck and began to pull up her blue velvet/velour dress. My jeans and white button-down shirt were still on at this time. While I was kissing her neck, Catherine told me she wanted me to be "rough". Having been the first time I had engaged in any physical activity with Catherine I asked clarifying questions as to what this meant. Catherine explicitly mentioned wanting me to do things like spank her. Being nervous to spank or hit a girl, I gently spanked Catherine and she yelled "oh my god yes harder daddy, I want it rough." I was somewhat confused and said, "Do you really?" At this time, with my right hand I rubbed the top of Catherine's vagina through her panties. Her panties were full-coverage, nude in a nylon-like material. At no point before getting in my bed did I digitally penetrate Catherine. She removed her dress and got on top of my bed without getting under the sheets, instructing me to join her. I pulled out my phone, turned on my LED light strip and turned off the overhead lights in my room.

When I got on my bed I leaned over Catherine, kissing her and rubbing her vagina through her panties. Catherine continued moaning and stated, "I want to fuck you so bad." Catherine began to take her panties off. I helped her take her panties off then laid on my back in the bed. Catherine got on top of me and started to kiss my lips and neck aggressively. She occasionally paused to reiterate her desire to have sex with me. While on top of me, Catherine grinded up against my legs, and unknown to me at the time was bleeding on top of my jeans. She aggressively pulled down my jeans by pulling on the back pockets, ripping the corner of both back pockets away from the pants.

Once removing my pants, Catherine got back on top of me and was grinding against my body. I moved my left hand down and rubbed the top of her vagina. Having continued moaning and grinding up against me while kissing my neck Catherine stated again that she wanted me to be rough with her. Still unsure of exactly what she was requesting, I asked for clarification, and she answered that she wanted me to "slap her ass and face." With my right hand I lightly hit her buttocks and she asked me to "slap her ass harder." Slightly harder than the previous time I lightly hit her buttocks again. She became very aroused and kissed my neck very hard while grinding up against me and had me lean forward to take off my shirt which had already been unbuttoned.

While this was going on, I noticed that my legs and stomach felt wet but didn't think much of it as she was very aroused and aggressively grinding up against me. I again started rubbing the top

PLTF_001243

05/02/2022

of Catherine's vagina and inserted one finger inside her vagina. This lasted for only a few minutes. Catherine stated, "I want to fuck you so bad. I'm going to give you the best sex of your life". Catherine then said she "wanted to fuck me but I had to use a condom". I asked her "are you sure" and without hesitation Catherine responded, "Yes I'm going to fuck the shit out of you."

I leaned over my left shoulder with Catherine still on top of me to grab a condom. Because Catherine being on top of me restricted my movement, I was fumbling trying to grab a condom and Catherine started aggressively kissing my neck. Distracted, I laid back flat on my bed and kissed her back. We kissed for 30-45 seconds, and she again stated that she "Wanted to fuck" and to "grab a condom."

I noticed that from my legs up to my stomach were still very wet. I had not been paying attention or giving much thought to the fact that my body felt unusually wet. However, when I leaned over to grab a condom, I noticed that my hands were covered in a dark, mucus-like blood. I paused for a moment while Catherine continued to kiss my neck and contemplated how best to tell Catherine I thought she had started her period without mortifying her. I put the condom back on the desk, returned to the position I was laying in and said "Catherine, I am so sorry to kill the mood, I don't want you to be embarrassed but I believe you just started your period." Catherine was shocked at first and said, "Oh my god Graham I am so embarrassed. I am so sorry."

Catherine was so embarrassed that I believed she was on the verge of tears. She put her hands over her face in embarrassment and smeared blood on her cheeks. I felt terrible for the situation too and began to console her. During this entire conversation Catherine stayed on top of me and continued to kiss me on the lips and on the neck. Now being aware of why my body was wet I looked down and noticed that my sheets were beginning to get soaked and was confused why Catherine was still on top of me and trying to kiss me. She repeatedly said how embarrassed she was, and I responded every time with, "don't worry, this isn't your fault, you can't help when your period starts," "please do not be embarrassed, I'm not worried one bit," or a similar reassuring statement.

Catherine said, "How can I not be embarrassed, your Graham fucking Boswell! I just can't believe I started my period with you of all people." I told her "I am no different than any other guy on this campus, you have absolutely nothing to be embarrassed about." After saying this she kissed me again. I said to Catherine, "Before the night gets away from us I am going to wash up and throw my clothes on, would you like to rinse off or I could get you a towel?" She responded, "A towel would be great thank you." I told her to hang tight for a minute while I got the towel for her.

I went to the shower and rinsed off. This process took a few minutes because the menstrual blood was thick and sticking to by body. When I got out of the shower, I wrapped a towel around me and picked up a new towel for Catherine. Before leaving the bathroom, I dampened half of the towel with warm water so it would be more comfortable for Catherine to clean herself off. I entered my bedroom to find Catherine wearing only her panties franticly taking the sheets off my

05/02/2022

bed. She looked at me and said, "I ruined your sheets where are you going to sleep?" I responded "that should be the least of your worries, seriously. I have my napping couch, a futon, and a hell of a lot of blankets I will be just fine." She said, "What about your sheets?" I told her that I would wash them later and to not worry about it. I handed Catherine the towel and said that I hoped it wasn't cold, I tried to use warm water to wet it.

I dressed myself in jeans and put on my white-button down shirt. I noticed there was a menstrual blood stain on my shirt, so I laughed and said, "whoops looks like I'll have to grab a new shirt, thank goodness I have a ton of white shirts." After putting on a new shirt, I told Catherine that I would let her get cleaned up and dressed then left the room to give her some privacy. I hadn't had dinner yet, so I ate a chick fil a sandwich and finished the half full beer that I set on my bar when I entered the apartment.

Thinking this would be enough time to get dressed I re-entered my bedroom where Catherine was standing, and she immediately started apologizing again. Once again, I reassured her that everything was ok and asked her to "do a spin" to make sure she was cleaned up. She still had menstrual blood on her face from when she placed her hands on her cheeks and also had small menstrual blood spots on her leg. I took the towel and asked if I could get the spots she missed, and she said yes. I wiped off any visible spots. She said, "this is humiliating I can't believe I just started my period with you of all people" I again tried to reassure her that it was not a big deal. I told her I understand the feeling of embarrassment, and this is not one of those things she needed to be embarrassed about. I told her anything and everything that happened behind this door was just between her and me. Catherine laughed, gave me a hug, and kissed me on the lips.

At this point I heard the front door of my apartment open and heard the voices of J▮▮▮ Z▮▮ and C▮▮▮▮ H▮▮▮, who entered the apartment to pick up beer. While they were inside, Catherine and I continued to talk and laugh. I wanted to make sure she was in good spirits before we left. After C▮▮▮▮ and J▮▮ left, Catherine and I started to gather our belongings. I noticed that Catherine had a small stain on her dress. I pointed it out to make sure she knew, and she seemed unbothered. She then smiled and said, "I'm mad I started my period today, next week lets do this again and I will give you the best sex of your life." I responded, "that sounds like a plan" and we left my room.

I held the front door for Catherine and as we were leaving, and she said, "Please don't tell anybody about this I am so embarrassed." I responded, "My lips are sealed I promise." As we walked together through the senior village I asked if she was going back out later in the night. Catherine said, "I am I just need to go freshen up." We arrived at where the tent the party was being held and I asked if she would like me to walk her to her room. Catherine said she was ok and thanked me for walking with her. This was the last contact we had that night.

### Saturday, Feb 12, 2022 Encounters:

My friend Lieutenant Z▮▮ J▮▮▮▮ texted me at 10:36am asking me "what are you doing today?" and asked if I would like to meet his parents and his fiancées parents at the tennis match. That afternoon I walked to the tennis courts to meet Z▮▮. While we were talking at the pavilion above the tennis courts, I saw Catherine and a group of friends walk up the sidewalk. They were

PLTF_001245

Page 30                                          05/02/2022

standing about thirty feet away and then Catherine walked behind us to go to the bathroom. Z███ and I continued to talk, and I heard somebody say hey behind us. Catherine walked towards me and I said, "hey what's up?" She continued to walk towards me. Z███ turned around and Catherine became very excited and ran to give Z██ a hug. Catherine began talking to Z███ about how much she missed him, was excited to see him, and asked how he had been. Catherine then said, "I had no idea it was you at first, I thought you were J███ M█████." Z███ laughed and the conversation continued for probably another 10-15 minutes. Z███ asked Catherine how her night was and she responded that it was good. After the conversation, Catherine said goodbye to me and Z███ and left with her friends.

At around 6:00pm I was sitting on my friend B███ F███'s porch, and I received a snap-text from Catherine. The text was asking me if I knew Z███ was coming today. I responded that he texted me this morning and I went to meet him. She responded that she loves him, and she has known him for a very long time. I responded something along the lines of "he's a great guy and one of my best friends." The last snap-text I received from Catherine was a screenshot that I do not remember content. All I remember of the picture was that I didn't feel it was applicable or relevant to our conversation and I opened and didn't respond.

_(signature)_ 04/04/2022

PLTF_001246

Page 31                                                                05/02/2022

## E█████ S█████ STATEMENT

I am a Freshman at Wofford College. I know both Graham Boswell and Catherine Rand. The first time I distinctly remember having a full conversation with Graham was February 11th, the night of the Black and Gold Ball. He was coherent, pleasant, and respectful. At the time the alleged sexual assault occurred I was close friends with Catherine Rand, so I am familiar with the situation.

I saw Catherine earlier in the evening the night of the Black and Gold event. She was drinking alcohol but was still able to walk, was not stumbling or slurring her speech, and was having coherent conversations. The same was true after she left Black and Gold. She contacted me during Black and Gold and asked me to come to the tennis courts. Both she and Graham came back to Black and Gold later in the night. I did not see Catherine there, but she told me on the phone she showed up then left about 15 to 20 minutes later. She seemed to be in the middle of some sort of breakdown when she called me.

I walked over to the tennis courts. There were other people there with Catherine when I arrived, and she was crying. I am not sure why she was at the tennis courts, but it was pretty close to where Black and Gold was held. She just kept saying he raped me, he raped me, but did not give any details. She called campus police who responded to the tennis courts. Campus PD drove me, Catherine, her roommate J█████, and A███ S█████ to the hospital together. A guy named L██ M█████ met us at the hospital, too.

I was sitting in hospital waiting room while Catherine went back to the exam room. Her roommate J█████ went back to the exam room with her. I was later told by J█████ that Catherine declined to do the rape exam while at the hospital. J█████ did not say why.

I have no clue why Catherine wanted so many people to go to the hospital with her or why she told so many people. Some people know more than I do about what she said happened. A███ S█████ and L██ M█████ both used to be close with Catherine, but I don't think they talk anymore. Both were at the hospital with Catherine that night. Catherine did not talk about what happened on the ride to the hospital. It was mostly Officer Elders talking. Dean Hurley drove all of us back to campus from the hospital, but I am not sure why. Catherine did not talk about it on way back.

I was hesitant to cast judgment on Graham, but I also wanted to take care of someone who I considered to be a friend at the time. I was there in the hospital trying to be supportive. When I found out later Catherine refused to take a rape kit, I realized something was weird. I do know Catherine loves attention. She has admitted that to people. I know she has since been untruthful about other things and other people. I find it odd that Catherine has been going up to people around campus saying she got raped. Sometimes these are not even people she knows well. I am not sure why she would talk to strangers about a rape.

Shortly after she made the rape allegation, Catherine got very obsessed with me. She was calling me five to eight times a day and texting nonstop. If she got no response, she got mad at me. On one occasion, she spoke to my roommate and found out I was not on campus at the time. She then broke into my room. After that I went to Matthew Hammett and requested a no contact order against Catherine. I know he met with her and she agreed to back off, so I do not think the no

Page 32                                    05/02/2022

contact order ever actually went into effect. I was relieved she stopped contacting me after that meeting with Mr. Hammett.

This is my true statement.

_____

E███ S███

PLTF_001248

| Name Page 33 | Statement Date 2/12/22 | Time 1.12 | 05/02/2022 | Data of Birth | Cell Phone Number |
|---|---|---|---|---|---|
| Add | | | SC | | Page 1 of Pages |

I FOUND CATHERINE AT THE TENNIS COURTS CRYING

AND CLAIMING SHE WAS RAPED. SHE SAID SHE WOKE

UP IN A BED WITH SOMEONE WALKING OUT OF

THE ROOM. I CALLED CAMPO TO COME HELP.

WHEN I GOT BACK TO HER ROOM, SHE WAS

IN THE RESTROOM BLEEDING A LOT. SHE SAID

SHE WAS IN A GREAT DEAL OF PAIN. WE THEN

GOT A HOLD OF HER UNDERWEAR & GAVE IT TO

OFFICER LOGAN HENSON WHILE WHEN WE CAME

BACK, SHE & HER ROOMATE, J⬛ B⬛, WENT

TO THE BATHROOM AND E⬛ S⬛ SAID

SHE SAID GRAHAMN ROSWELL WAS THE PERSON

TAHT DID THIS. E⬛ SAID HE WOULD COME

GIVE A STATEMENT WHEN SHE GOES TO SLEEP OR

TOMORROW (2/12/22 IN THE MORNING)

_End of Statement_

Sworn Before me on the __12__ day of __Feb__ 20 __22__ at __1:11__ am~~/pm~~

Witnessed by ⬛⬛⬛⬛   Signed ⬛⬛⬛



PLTF_001249

| Name | | Statement Date | Time | Date of birth | |
|---|---|---|---|---|---|
| A███████ S██████ | | 2/13/22 | 7:14 PM | 05/02/2022 | |
| Address ███████████████████ | | | | Page ___ of ___ Pages | |

TONIGHT, CATHERINE RAND TEXTED US (M███ F███ ¿ 1)

SAYING "I REMEMBER EVERYTHING." SHE SAID SHE WENT UP

TO GRAHAM BOSWELL ¿ HER ROOMMATE. SAYING SHE

WAS HUNGRY. HE THEN SAID HE HAD PASTA IN

HIS APARTMENT. SO ≠ THEY LEFT TOGETHER SHE

WALKED WITH HIM AND. THE NEXT THING SHE

KNEW...SHE WAST WEARING ANY CLOTHES. SHE.

THE ASKED HIM TO USE PROTECTION AND HE

SAID "WHY, YOU LIKED IT THE FIRST TIME." THEN

SHE USED THE RESTROOM TO CLEAN HERSELF

UP. SHE WENT BACK INTO THE ROOM ¿ HE

WOULDN'T LET HER LEAVE ¿. INSTEAD...▨

SHOWED HER HIS "SHOE COLLECTION." THEN AS

THEY WERE LEAVING, SHE ASKED ABOUT PASTA ¿

HE SAID "I WAS KIDDING ABOUT THE PASTA." THIS INFORMATION

WAS TOLD TO MADI FICE AND I BY CATHERINE RAND REGARDING

~~THE NIGHT SHE SAID SHE WAS RAPED. IT WAS ALT~~

Sworn Before me on the _13_ day of _Feb_ 20_22_ at _7:28_ am, pm ✓

Witnessed by _[signature]_     Signed _████████_

PLTF_001250

| Name | | Statement Date | Time | Date of minu | |
|------|------|------|------|------|------|
| Address | Page 25 | | | 05/02/2022 | Page of Pages |

THE NIGHT SHE WAS RAPED, IT WAS EVIDENT TO US AND HER FRIENDS HOW DRUNK SHE WAS AND BY HER STORY, SHE HAD FEW TIMES OF NOT REMEMBERING THINGS THROUGHOUT THE NIGHT.

End of Statement

Sworn Before me on the __13__ day of _Feb_ 20_22_ at _7:28_ am _pm_

Witnessed by _____  Signed _____

PLTF_001251

Page 36                                05/02/2022

## WOFFORD COLLEGE CAMPUS SAFETY VOLUNTARY STATEMENT

| Name Catherine Rond | Statement Date 2/14/22 | Time 2:35 | ██████ | Cell Phone Number ██████ |
|---|---|---|---|---|
| Addr ██████████████████ | | | | Page 1 of 1 Pages |

I went to a friend's apartment for her birthday.
and I walked outside on the porch while
he was talking to my roommate about how
I wanted food. He (Graham) offered to go back
to his apartment so he could fix me pasta.
I went with him back to his apartment
and I blacked out until I woke up
naked in his bed. At that point it was
too late for me to do anything or I
asked multiple times for him to use
protection and said "well you liked it already."
And he then he said, "Get on your knees"
about three times and I kept saying
no and then he said "well you
already liked it five minutes ago." So,
there are various moments where I don't

Sworn Before me on the __14th__ day of __February__ 20 __22__ at __4pr__ am __pm__

Witnessed by __Officer Elder__ ██████ Signed _____

Page 37                                05/02/2022

## WOFFORD COLLEGE CAMPUS SAFETY VOLUNTARY STATEMENT

| Name CAtherine Round | Statement Date | Time | Date of Birth | Cell Phone Number |
|---|---|---|---|---|
| Address | | | | Page 2 of 2 Pages |

remember what was going on. After everything was over, I asked him if I could go to the bathroom to wash up, and when I was in there, there was blood all over my dress and body. As I was back in his case telling to myself "I'm so embarrassed I'm so embarrassed" and he said "well I'll show you something more embarrassing" and continued to show me his shoe collection. Afterwards I asked if we could have the pasta and so he said "I was kidding about that." Then we left, and I went to Apre while he just went back to Black and said.

Sworn Before me on the 14 day of Feb 2022 at 4 am pm

Witnessed by _____ Signed _____

PLTF_001253



| Name Page 38 | | Statement Date 2/12/22 | Time 7:45 05/02/2022 | Date of Birth | Cell Phone Number |
|---|---|---|---|---|---|
| Address | | | | | Page    of    Pages |

At around 11:30 pm last night, I got a call from Catherine and she told me to come to the tennis courts. I found her crying with Abby and through her crying she kept saying "he ruped me". At that time there was no names mentioned. After we talked with camps, we walked back to dupre and I talked to Catherine alone in her room and during that conversation the only detail I got was the name braham Boswell and she stated that he was the guy who ruped her.

End of statement

Sworn Before me on the __12__ day of _Feb_ 2/12/2025 at _1:55_ am __ pm X

Witnessed by _____ Signed ▬▬▬▬▬▬

PLTF_001254

Page 39                                    05/02/2022

## WOFFORD COLLEGE CAMPUS SAFETY VOLUNTARY STATEMENT

| Name ▇ W ▇ | Statement Date | Time | Date of Birth | ▇▇▇ |
|---|---|---|---|---|
| Address ▇▇▇ | | | | Page 1 of 2 Pages |

Mr. Boswell and I had our first convo after the Kappa Sigma fraternity had suspended him. He was visibly confused & flustered. In my apartment He and I spoke where he made it clear he had done nothing that was not consential he made it clear that he & Ms. Rand had some form of intimacy, he did not tell. me if they had intercourse. What he made clear to me That every thing was conential.

About 3-4 days later Mr. Boswell and I took a 15 min drive. I explaine to him that I am concerned about his health, I am worried Boswell is ~~suicia~~ suicidal and may kill himself. He assure me he was alright and That he B confused as to why he

Sworn Before me on the __16__ day of __March__ 20 22 at __11:21__ am ✓ pm

Witnessed by ▇     Signed ▇

PLTF_001255

Page 40                                    05/02/2022

## WOFFORD COLLEGE CAMPUS SAFETY VOLUNTARY STATEMENT

| Name ███████ | Statement Date | Time | Date of Birth | Cell Phone Number |
|---|---|---|---|---|
| Address █████ | | | | Page 2 of 2 Pages |

is in trouble. I encouraged him to seek legal advise as on the friday before this conversation Ms. Kohl informed me that "Graham sucks, he needs to be in jail", I asked her why and she said "He did something wrong". Again my conversations on this matter are and have been focused on making sure Graham is not going to kill himself. In my most recent conversation, last week tuesday I believe, he informed me that his room had been searched and he had recieved legal advise. I told him my concerns about his mental health, he assured me that he is fine because he has done nothing wrong.

Sworn Before me on the ___16___ day of ___March___ 20 22 at 11:21 am/pm

Witnessed by _____      Signed ███████



| Name ██ ██ | B | Statement Date 2/14/22 | Time 3:2? 5/02/2022 | Date of Birth ████ | Cell Phone Number ████ |
| Address ████ | | | | | Page 1 of 3 Pages |

At 11:20 pm Friday 2/11/22 I recieved a text from K██ M██ that Catherine Rand wasn't okay. She told me that Catherine was on the tennis cart so I left the black and gold ball to find her. I found her on the tennis cart with campus safety, A██ S██, M██ F██ and E██ S██. She was sobbing, seemed freaked out and out of it and seemed scared. She ♀♀♀ wanted to go back to our room in Dypre so we ████ took her back. She was sitting down on the couch crying and shaking. She needed to go to the bathroom so I went with her because she didn't want to be alone. When she was sitting on the toilet she couldn't

Sworn Before me on the ___14___ day of ___Feb___ 20_22_ at _4_ am_ pm

Witnessed by _[signature]_   Signed ████

PLTF_001257

| Name ▊ B ▊ | | Statement Date | Time 05/02/2022 | Date of Birth | Cell Phone Number |
|---|---|---|---|---|---|
| Address | | | | | Page 2 of 3 Pages |

pee because it hurt so much and. I was
standing next to her and peeked in
the toilet that was filled with blood.
This is the moment I became truly
frightened and realized something
truly bad had happened. We sat in our
room for abou an av, eating and
quietly talking. Catherine was pretty quiet.
I convinced her to go to the hospital
by telling her that her blood loss wasn't
safe. officer Len picked us up and drove
us to the hospital and we went in. I
stayed with Catherine the whole time.
She was very scared and was bleeding
so much, and it wasn't stopping.
She didn't want to get a rape test because

Sworn Before me on the __14__ day of __Feb__ 20_22_ at __4__ am_ pm ✓

Witnessed by _____ Signed ▊

PLTF_001258



| Name | B | | Statement Date | Time 05/02/2022 | Date of Birth | Cell Phone Number |
|---|---|---|---|---|---|---|
| Address | | | | | | Page 3 of 3 Pages |

she wasn't ready. We stayed at the hospital for a while and she told me that the man who raped her was Graham Boswell. This frightened me, as he is prominent on campus, but out of everyone it wasn't the most surprising. Graham has always been flirty with girls and has a reputation of jumping from one girlfriend to another. After the hospital Catherine was still scared and pretty much just in shock. The amount of blood that was coming out of her, and the bruises on her thighs really proved that this was a forceful, violent act.

End of Statement

Sworn Before me on the 14 day of Feb 20 22 at 4 am pm

Witnessed by _____ Signed _____

PLTF_001259



| Name Page 44 | | Statement Date 7/12/22 | Time 7:30 PM | Date of Birth | Cell Phone Number |
|---|---|---|---|---|---|
| M █ F █ | | | | | Page 1 of 1 Pages |

Catherine Band texted me multiple times at 10:57 saying "I need you right now". I then called her and A███ S███ multiple times to try and locate them. I then found them by the tennis courts. I then called campus safety at 11:37 p.m. I stayed with Catherine till they arrived and stayed with her for the remainder of the night. I left Catherine's room around 1:20 a.m., but then I went back to Catherine's room and we proceeded to the nurse's aide where we were picked up by Officer Elder and he took us to the ER. I stayed with Catherine at the ER until around 2:15 a.m. then Officer Elder took A██ S███ and I back to campus. This all took place on Friday February 11. On February 12, Catherine, A███ and I were at the tennis match and Graham Boswell was there. Catherine is very good friends with his older brother.

Sworn Before me on the ___12___ day of February 20_22_ at _7:30_ am __ pm ✓

Witnessed by _[signature]_ Signed █████████



| Name | Page 45 | | Statement Date | Time | | Date of Birth | Cell Phone Number |
|---|---|---|---|---|---|---|---|
| N█ | █ | █ | 2/12/22 | 7:36 | 2/02/2022 | | |
| █ | | | | | | Page 2 of 2 Pages | |

so she approached his brother as well as Graham. █ and I watched them interact and even talk to each other. After this conversation, Cameline And I went to the bathroom. As we were walking I asked her if she was okay and why she was talking with him. She then told me that "he was acting very normal but I think it's because he knows he fucked up last night". This then confirmed to me that it was Graham who had harmed her. After that she had laughed about it and changed the subject.

End of Statement.

Sworn Before me on the __17__ day of __February__ 20 22 at __7:30__ am_ pm ✓

Witnessed by _____ Signed █

PLTF_001261

| Name | | | Statement Date | Time | Date of Birth | Cell Phone Number |
|---|---|---|---|---|---|---|
| | | | 2/15/22 | 10:45 | 05/02/2022 | |
| Address | | | | | Page 1 of 2 Pages | |

'In Friday evening or very early saturday around like 1 or 2 am Graham, Boswell walked into my apartment w/ two other people. All my roommates were sleeping so he suggested all 4 of us go to his apartment and get food. We left and it only ended up being me and him. He told me I could put something on Netflix then came and sat very close to me on the couch. I put my hand in front of his face and told him I wasn't over to 'hook-up' with him. He just said I know then walked back to the kitchen. After he went to the kitchen I contacted one of the other guys that was with us in my apt. to come over bc I was very uncomfortable. When the third person walked in Graham texted me saying he thought it was only going to be us. That made me very uncomfortable so when he got up off the couch again

Sworn Before me on the _____ day of _____ 20____ at _____ am___ pm___

Witnessed by _____  Signed _____

PLTF_001262

| Name Page 47 | | Statement Date | Time | Date of Birth | Cell Phone Number |
|---|---|---|---|---|---|
| | | 2 15 22 | 10:52 | 05/02/2022 | |
| | | | | | Page 2 of 2 Pages |

I texted the third party and asked them to take me home. The third party then made up an excuse and walked me back to my apartment. The Next morning Graham acted like nothing had happened and everything was Normal.

\* I was under the influence so some of the details aren't as clear to me.

Sworn Before me on the _____ day of _____ 20___ at _____ am_ pm_

Witnessed by _____  Signed _____

PLTF_001263



PLTF_001264



| Name: [redacted] M | Statement Date 03/02/22 | Time 12:00 05/02/2022 | [redacted] | [redacted] |
| Address: [redacted] | | | | Page 2 of 3 Pages |

with Graham's feet proped up on the table. When I walked in he seemed shocked that I was there. All he said was that "What's up Light". Then I sit down on the other couch as he gets up and walks to the kitchen to start making the pasta. [redacted] then texts to me "we gotta go", then texting again "He thought it was only us two". I then tell her to say one of her roommates is sick and needs her help. She does and he asks if he needs to come as well. She says no & [redacted] is there and he can help. We then leave and she tells me that he texted her when I walked into the apartment that he said "I thought it was only us two." this while I was in the room, not saying this out loud but over the phone. She believed that he wanted something sexually and she was very off-put by it. I then walk her back and leave the apartment. I did not know of anything that happened to Catherine before this at all. I found out she was in the hospital but did not know why. I am good friends w/ her so I then wanted to be there for her I was told what happened on the way there. When I have talked to her about what happened, she

Sworn Before me on the _____ day of ___March___ 20_22_ at _12:31_ pm ✓

Witnessed by [signature]                Signed [redacted]

PLTF_001265



WOFFORD COLLEGE

| Name | | Statement Date 03/02/22 | Time 12:24 AM 05/02/2022 | | Cell Phone Number |
| Address | | | | | Page 3 of 3 Pages |

said she asks for food at the party, then walks with him to his apartment
also said school pass. When they walk in, they immediately go to his personal w/km
room. Next thing she remembers is him on top of her. She asks him to
use protection and he then said "You already liked it before, it's to
w/km
late now". He then asks her to get on her knees, and she says no. He
then says you have already done it before. She was in shock and she
does not do that. She then goes to the bathroom to clean herself up
and realizes she is uncomfortably bleeding. She tries to clean herself up and
goes back to him and says can I still get that food. He says "I was just
joking". He then proceeds to tell her about his family, and his shoe collection.
They then leave. She goes back to Dpre and she breaks down into
w/km
hysterics of realizing what just happened. My home

address is ___

END OF STATEMENT

Sworn Before me on the ___ day of __March__ 20 22 at 12:31 am/pm

Witnessed by ___ Signed ___

PLTF_001266

# PLTF_001267-1269

## "CONFIDENTIAL" pursuant to protective order



PLTF_001270



PLTF_001274



PLTF_001275



PLTF_001276



PLTF_001277

Page 70                              05/02/2022                    ✚ **Spartanburg**
                                                                      **Medical Center**

# AFTER VISIT SUMMARY

**Catherine Rand**  MRN: ███████              📅 2/12/2022  📍 SMC Emergency Center 864-560-6222

## Instructions

Return for increased bleeding, passing out or any other new or worsening symptoms

 **Read the attached information**
Uterine Bleeding, Understanding (English)

 **Call Your OB/GYN on 2/14/2022**

## What's Next

You currently have no upcoming appointments scheduled.

### MyChart Sign-Up

Send messages to your doctor, view your test results, renew your prescriptions, schedule appointments, and more.

Go to https://mychart.spartanburgregional.com/MyChart/, click "Sign Up Now", and enter your personal activation code: 8ZH8Q-C2TK6-ZC8KP. Activation code expires 2/26/2022.

**You are allergic to the following**       Date Reviewed: Feb 12, 2022
No active allergies

**You were seen by**
You were seen by: Brian Stogner, MD

**Your Medication List**
You have not been prescribed any medications.

---

## Today's Visit

You were seen by Brian Stogner, MD

**Reason for Visit**
Vaginal Bleeding

**Diagnosis**
Vaginal bleeding problems

### Lab Tests Completed
CBC auto differential
Comprehensive metabolic panel
Magnesium
Pregnancy, urine
Urinalysis with microscopic
Wet prep, genital

### Lab Tests in Progress
GC/Chlamydia

### Done Today
Set up pelvic exam

| Blood Pressure | Temperature (Oral) |
|---|---|
| 118/71 | 98.1 °F |
| Pulse | Respiration |
| 116 | 18 |
| Oxygen Saturation | |
| 96% | |

---

Catherine Rand (MRN: █████ ) • Printed at 2/12/2022 5:04 AM              Page 1 of 3   **Epic**

PLTF_001286

Healthcare System

Page 80

Main Campus
101 E Wood St 05/02/2022
Spartanburg SC 29303-3040

Rund, Catherine

MRN: ███████, DOB: ███████ Sex: F
Acct #: ███████
Adm: 2/12/2022, D/C: 2/12/2022

## 02/12/2022 - ED in SMC Emergency Center
### Encounter Facesheet (continued)

### 02/12/2022 - ED in SMC Emergency Center (continued)

### All ED Notes

02/12/2022

ED Triage Notes by Adrienne Valencia, RN at 2/12/2022 0221

| | | |
|---|---|---|
| Author: Adrienne Valencia, RN | Service: — | Author Type: Registered Nurse |
| Filed: 2/12/2022 2:22 AM | Date of Service: 2/12/2022 2:21 AM | Creation Time: 2/12/2022 2:21 AM |
| Status: Signed | Editor: Adrienne Valencia, RN (Registered Nurse) | |

Pt presents to EC with reports of heavy vaginal bleeding. Pt requesting forensic exam. [AV.1M]

Electronically signed by Adrienne Valencia, RN at 2/12/2022 2:22 AM

**Attribution Key**

AV.1 - Adrienne Valencia, RN on 2/12/2022 2:21 AM
M - Manual

PLTF_001296

〒 Healthcare System

Page 81

Spartanburg Medical Center -
Main Campus 05/02/2022
101 E Wood St
Spartanburg SC 29303-3040

Rand, Catherine
MRN: ▮▮▮▮ , DOB: ▮▮▮▮ Sex: F
Acct #: ▮▮▮▮
Adm: 2/12/2022, D/C: 2/12/2022

02/12/2022 - ED in SMC Emergency Center (continued)

### All ED Notes (continued)

#### ED Triage Notes by Adrienne Valencia, RN at 2/12/2022 0227

| | | |
|---|---|---|
| Author: Adrienne Valencia, RN | Service: — | Author Type: Registered Nurse |
| Filed: 2/12/2022 2:29 AM | Date of Service: 2/12/2022 2:27 AM | Creation Time: 2/12/2022 2:27 AM |
| Status: Signed | Editor: Adrienne Valencia, RN (Registered Nurse) | |

Pt states they were unsure of need for forensic exam but denies any sexual assault. Pt states they started having excessive vaginal bleeding two hours ago without any pain. [AV.1M]

Electronically signed by Adrienne Valencia, RN at 2/12/2022 2:29 AM

**Attribution Key**

AV.1 - Adrienne Valencia, RN on 2/12/2022 2:27 AM
M - Manual

inted on 3/14/22 7:42 AM

Page 4

PLTF_001297

Healthcare System     Spartanburg Medical Center – Main Campus     Rand, Catherine

Page 82     101 E Wood St   05/02/2022     MRN: ▮▮▮▮ , DOB: ▮▮▮▮   Sex: F

Spartanburg SC 29303-3040     Acct #: ▮▮▮▮     Adm: 2/12/2022, D/C: 2/12/2022

**02/12/2022 - ED in SMC Emergency Center (continued)**

**All ED Notes (continued)**

### ED Provider Notes by Brian Stogner, MD at 2/12/2022 0250

Author: Brian Stogner, MD     Service: —     Author Type: Physician

Filed: 2/18/2022 10:07 PM     Date of Service: 2/12/2022 2:50 AM     Creation Time: 2/12/2022 2:50 AM

Status: Signed     Editor: Brian Stogner, MD (Physician)

#### MEDICAL DECISION MAKING

**MDM:** [BS.1T] DDX includes pregnancy, ectopic, miscarriage, dysfunctional uterine bleeding, trauma, etc. Initially patient apparently reports on possible sexual assault to the triage nurse. As such the SANE nurse was called for some evaluation as well. Will screen for STIs, urine tract infection, vaginitis with the below work-up. Also assess her platelet level and hemoglobin level. [BS.2M]

**ORDERS INCLUDE** (all reviewed by myself personally. See ED course): [BS.1T]
Orders Placed This Encounter
Procedures
- GC/Chlamydia
- Wet prep, genital
- CBC auto differential
- Comprehensive metabolic panel
- Magnesium
- Urinalysis with microscopic
- Pregnancy, urine
- Set up pelvic exam [BS.3T]

**RELEVANT SCORES** (if Indicated):

#### IMPRESSION AND DISPOSITION

**CLINICAL IMPRESSION** [BS.1T]
Vaginal bleeding [BS.3T]

Disposition: [BS.1T] **Discharge** [BS.3T]

Discussed with the patient (or caregiver when indicated) and all questioned fully answered. [BS.1T] She [BS.3T] (or family when appropriate) will call the ED or 911 if any problems arise after discharge.

#### HISTORY OF PRESENT ILLNESS

**Chief Complaint:** [BS.1T] Vaginal Bleeding [BS.3T]

**HPI:** [BS.1T] Catherine Rand [BS.3T] is a [BS.3T] 21 y.o. female [BS.3T] who presents with [BS.1T] vaginal bleeding. Onset around 2 h ago. Notes moderate mild vaginal bleeding but heavier than a period. Several concern for some possible sexual assault based on what she mentioned to the triage nurse. Patient denies to me however, SANE nurse was consulted for some further evaluation. Patient denies any abdominal pain, nausea, vomiting, syncope. Denies any trauma to the area but did have sexual intercourse for the first time recently. Denies any dysuria, urgency, frequency, urinary bleeding or rectal bleeding. [BS.2M]

No other aggravating or relieving factors noted. Denies any other associated provoking factors. Denies any other treatments tried prior to arrival. Onset as above otherwise patient unaware. Provocation as above otherwise patient unaware.

#### REVIEW OF SYSTEMS

Printed on 3/14/22 7:42 AM

PLTF_001298

Healthcare System

Page 83

Spartanburg Medical Center -
Main Campus
101 E Wood St 05/02/2022
Spartanburg SC 29303-3040

Rand, Catherine
MRN: ████ DOB: ████ Sex: F
Acct #: ████
Adm: 2/12/2022, D/C: 2/12/2022

**02/12/2022 - ED in SMC Emergency Center (continued)**

All ED Notes (continued)

Complete ROS preformed and negative except as noted above

**PAST HISTORY** [BS.1T]

**Medical Hx:** As in HPI, otherwise patient denies

**Surgical Hx:** As in HPI, otherwise patient denies

**Family Hx:** As in HPI, otherwise patient denies

**Social Hx:** As in HPI, otherwise patient denies

**Medications:** Reviewed with patient. Relevant medications listed next or in HPI. [BS.2T]

**Allergies:** [BS.1T] has No Known Allergies. [BS.3T]

**PHYSICAL EXAM**

**Vital Signs:** [BS.1T] Blood pressure 127/81, pulse 99, temperature 98.1 °F (36.7 °C), temperature source Oral, resp. rate 18, height 5' 4" (1.626 m), weight 70.3 kg (155 lb), SpO2 98 %. [BS.3T]

**Constitutional:** Well developed, well nourished. Awake & alert. No acute distress. Nontoxic
**Head:** Atraumatic. Normocephalic.
**Eyes:** PERRL, EOMI. Conjunctivae are not pale.
**ENT:** Mucous membranes are moist and intact. No nasal discharge. Voice normal. Tolerating secretions w/o issue.
**Neck:** Supple. Full ROM. No JVD. No lymphadenopathy.
**Cardiovascular:** Regular rate. Regular rhythm. No murmurs, rubs, or gallops. Distal pulses are 2+ and symmetric.
**Pulmonary:** No evidence of respiratory distress. Clear to auscultation bilaterally. No wheezing, rales, or rhonchi.
**Chest Wall:** No tenderness to palpation. Normal AP diameter
**Abdominal:** Soft and non-distended. There is no tenderness. No rebound, guarding, or rigidity.
**Back:** No CVA tenderness. Normal ROM grossly
**Lymphatic:** No edema. No petechia/purpura/excessive ecchymosis
**Extremities:** Full ROM in all extremities. No calf tenderness. No deformity
**Skin:** Skin is warm and dry. No visible rashes present.
**Neurological:** Alert, awake, and oriented to person, place, time, and situation. Normal speech. Strength 5/5 in all extremities and sensation intact in all extremities.
**Psychiatric:** Good eye contact. Normal interaction, affect, and behavior. Not reacting to internal stimuli. [BS.2T]
**GU:** External exam normal. Internal exam shows no current bleeding, no signs of trauma. Closed cervix. No discharge. No adnexal tenderness. (GU exam conducted in conjunction with the SANE nurse) [BS.2M]

**RESULTS** [BS.1T]

Labs Reviewed
**CBC AUTO DIFFERENTIAL - Abnormal**

| Result | Value |
|---|---|
| White Blood Cells | 14.0 (*) |
| RBC | 4.21 |
| Hemoglobin | 12.8 |
| Hematocrit | 37.2 |
| MCV | 88.5 |
| MCH | 30.5 |
| MCHC | 34.5 |
| RDW | 13.2 |

PLTF_001299

Page 103
STATE OF SOUTH CAROLINA
        05/02/2022

COUNTY OF SPARTANBURG

}

**SEARCH WARRANT**

TO ANY BONDED LAW ENFORCEMENT OFFICER OF THIS STATE OR COUNTY OR OF THE MUNICIPALITY OF <u>THE COUNTY OF SPARTANBURG</u>

    It appears from the attached affidavit that there are reasonable grounds to believe that certain property subject to seizure under provisions of Section 17-13-140, 1976 Code of Laws of South Carolina, as amended, is located on the following premises:

### DESCRIPTION OF PREMISES (PERSON, PLACE, OR THING) TO BE SEARCHED

180 Evins Street Spartanburg, SC Apartment 230-A Village Apartments. This is a two-story blue colored apartment with white trim apartment located on the campus of Wofford College. Apartment A is located on the lower portion of the apartment building. The rooms to be searched are the restroom within the apartment and the sleeping area (cube) occupied be resident Graham Boswell.

Now, therefore, you are hereby authorized to search the subject premises for the property described below and to seize such property if found:

### DESCRIPTION OF PROPERTY

Any and all evidence pertaining to the sexual of the victim, Catherine Rand, to include but not limited to body fluids, blood, sweat, saliva, semen, and vaginal fluids. Other evidence that would yield DNA such as fingerprints, hair, mattress, fabric fibers, bed linen, wash cloths, towels (paper or cloth) and any and all evidence that would aid in investigating the alleged sexual assault

    This Search warrant shall not be valid for more than ten days from the date of issuance.

    A written inventory of all property seized pursuant to this Search Warrant shall be made to

<u>ANY SPARTANBURG COUNTY MAGISTRATE</u> within ten days from the date of this warrant, such inventory to be signed by the officer executing this warrant, and a copy of such inventory shall be furnished to the person whose premises are searched if demand for such copy is made.

    A copy of this Search Warrant shall be delivered to the person in charge of the premises searched at the time of such search if practicable, and, if not, to such person as soon thereafter as is practicable; in the event the identity of the person in charge is not known or if such person cannot be found after reasonable diligence in attempting to locate the person, a copy shall be attached to a prominent place on such premises.

*SPARTANBURG, S.C.*

*MARCH 08, 2022*

_____ (L.S.)
Signature of Judge

9:24 Am

PLTF_001319

Page 104                                    05/02/2022 **RETURN**

I received the attached Search Warrant March 7, 20 22, and have executed it as follows:

On March 7, 2022 at 10:01 o'clock A M, I searched (the person) described in the warrant and (the premises)

I left a copy of the warrant with Graham Boswell
Name of person searched or "at the place of search" with.
Together with a receipt for the items seized.

The following is an inventory of property taken pursuant to the warrant:
- photographs (bedroom)
- (1) Blue (light navy) fitted sheet
- (1) mattress cover (white)
- (1) white stained T-shirt (hanging on wardrobe)
- (1) blue (light navy) flat sheet

Bathroom:

- photographs

This inventory was made in the presence of S/A M. Johnson (SLED)

AND Lt. D. Harris (Wofford College Campus safety)

I swear that this Inventory is a true and detailed account of all the property taken by me on the warrant.

SWORN to before me this 8th

day of March, 20 22                    }

_____ (L.S.)
Signature of Judge

2:05pm

(Signature of Officer Executing Warrant)

PLTF_001320

# EXHIBIT 4 TO THE DEPOSITION OF DAVID HOGSED

## NON-STANDARD ITEM TO BE FILED WITH THE COURT

# EXHIBIT 14 TO THE DEPOSITION
# OF DAVID HOGSED

## *NON-STANDARD ITEM TO BE FILED WITH THE COURT*

# EXHIBIT 15 TO THE DEPOSITION
# OF DAVID HOGSED

## *NON-STANDARD ITEM TO BE FILED WITH THE COURT*