**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**SPARTANBURG DIVISION**

| | |
|---|---|
| **GRAHAM BOSWELL,** | **Civil Action No: 7:23-cv-5467-JDA** |
| *Plaintiff,* | |
| v. | |
| **WOFFORD COLLEGE, CATHERINE RAND, and DAVID HOGSED,** | |
| *Defendants.* | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

**DEBORAH B. BARBIER, LLC**
**Deborah B. Barbier, Esq.**
**1811 Pickens Street**
**Columbia, South Carolina 29201**
**(803) 730-6290**

**NESENOFF & MILTENBERG, LLP**
**Andrew T. Miltenberg, Esq.**
**Stuart Bernstein, Esq.**
**Helen J. Setton, Esq.**
**363 Seventh Ave, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**

*Attorneys for Plaintiff*

[Type here]

**PRELIMINARY STATEMENT**

Plaintiff Graham Boswell ("Plaintiff" or "Boswell") by and through his undersigned counsel submit this Memorandum in Opposition to Defendants Wofford College ("Wofford") and David Hogsed's ("Hogsed") Motion for Summary Judgment pursuant to Rule 56.1(b).

This action arises from an alleged sexual assault and Defendants' subsequent woefully deficient investigation, as well as their reckless disregard for Plaintiff's rights, which resulted in his unlawful arrest for sexual assault without probable cause. Despite ignoring evidence that contradicted the allegations, Plaintiff ultimately demonstrated that the accusations were false, and all charges against him were dismissed. Defendants also effectively disregarded Plaintiff's complaints of harassment and a campus environment so hostile that he was forced to move off campus. Plaintiff has asserted causes of action for malicious prosecution, false imprisonment, violations of 42 U.S.C. § 1983 under the Fourth Amendment, intentional infliction of emotional distress, and civil conspiracy. The evidence—including Defendants' deposition testimony, medical records, and other documentary evidence—demonstrates the existence of numerous genuine issues of material fact that preclude summary judgment. Accordingly, Defendants' motion should be denied in its entirety.

**Legal Standard on Summary Judgment**

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law," and a genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aleman v. City of Charlotte*, 80 F.4th 264, 283 (4th Cir. 2023) *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment "we may not credit [Defendants'] evidence, weigh the evidence, or

1

resolve factual disputes in ... [D]efendants' favor." *Knibbs v Momphard*, 30 F4th 200, 207 [4th Cir 2022] quoting *Hensley ex rel. North Carolina v. Price*, 876 F.3d 573, 579 (4th Cir. 2017). All reasonable inferences must be drawn in Plaintiff's favor at summary judgment, *Knibbs v. Momphard*, 30 F.4th 200, 213 (4th Cir. 2022).

## ARGUMENT

### I.     Defendants Lacked Probable Cause to Arrest Plaintiff

The facts demonstrate that Defendants clearly lacked probable cause to arrest Plaintiff. As described below, the objective evidence including without limitation surveillance footage and hospital records plainly contradicted Rand's claim that she had been incapacitated and assaulted. Instead of presenting all of the evidence to the Magistrate, Defendants chose to only present specific evidence withholding anything exculpatory when they sought the arrest warrant. Accordingly, the issuance of the warrant is not evidence that there was probable cause to arrest Plaintiff. Moreover, the arresting officer continued to withhold exculpatory evidence even through the preliminary hearing. Therefore, it is evident that Plaintiff's arrest was the result of malice.

Defendants also seek to confound the standard for a search warrant with an arrest warrant[1]. Here, while there was a want of probable cause for both warrants Plaintiff has not challenged the search warrant and Defendants' arguments to that point are irrelevant.

### A. Legal Standards for Probable Cause Determinations

---

[1] "[W]hile an arrest warrant and a search warrant both serve to subject the probable-cause determination of the police to judicial review, the interests protected by the two warrants differ. An arrest warrant is issued by a magistrate upon a showing that probable cause exists to believe that the subject of the warrant has committed an offense and thus the warrant primarily serves to protect an individual from an unreasonable seizure. A search warrant, in contrast, is issued upon a showing of probable cause to believe that the legitimate object of a search is located in a particular place, and therefore safeguards an individual's interest in the privacy of his home and possessions against the unjustified intrusion of the police."*Steagald v. United States*, 451 U.S. 204, 212-13, 101 S. Ct. 1642, 1648 (1981).

The question of whether probable cause exists is ordinarily a jury question unless the evidence yields but one conclusion as a matter of law. *Law v. S.C. Dept of Corr*, 368 S.C. 424, 441, 629 S.E. 2d 642, 651 (2008). Probable cause is defined as a good faith belief that a person is guilty of a crime when this belief effects on such grounds as would induce an ordinary prudent and cautions man under the circumstances, to believe likewise. *State v. George*, 323 S.C. 496 (1996). Here, when considering the mountain of evidence demonstrating that Rand was not incapacitated and that any sexual activity between them was consensual an ordinary prudent and cautious man could not believe in good faith that Plaintiff sexually assaulted Rand while she was incapacitated.

"[A]n officer may not "deliberately[,] or with a 'reckless disregard for the truth[,]' ma[k]e material false statements in his affidavit, or omit[ ] from that affidavit 'material facts with the intent to make, or with reckless disregard of whether they thereby made, the affidavit misleading.' " *Miller v. Prince George's Cnty.*, 475 F.3d at 627 (quoting *Franks*, 438 U.S. at 171 and *Colkley*, 899 F.2d at 300). Here, Hogsed's affidavit stated that: "Plaintiff engaged in sexual battery with [Rand] who was intoxicated and unable to give consent using force and/or coercion to accomplish the battery, knowing...[Rand] was mentally defective, mentally incapacitated or physically helpless." Wofford/Hogsed 607. As set forth below, Hogsed repeatedly admitted both at the preliminary hearing and during his deposition that he withheld all or nearly all exculpatory evidence from the judge who signed the arrest warrant therefore making the affidavit false. See e.g. Hogsed Dep. 162:3-15, PLTF 111.

"'Reckless disregard' can be established by evidence that an officer acted 'with a high degree of awareness of [a statement's] probable falsity,' that is, 'when viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.' " *Miller v. Prince George's Cnty., MD*, 475 F.3d 621, 627 (4th Cir. 2007)(quoting *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000)).

With respect to omissions, "reckless disregard" can be established by evidence that a police officer "failed to inform the judicial officer of facts [he] knew would negate probable cause." *Miller v. Prince George's Cnty., MD*, 475 F.3d 621, 627 (4th Cir. 2007) "Such false statements or omissions are "material" if correcting the false statements and including the omitted facts would have defeated probable cause." *Jackson v. Carin*, 646 F. Supp. 3d 656, 666 (D. Md. 2022), aff'd, 128 F.4th 525 (4th Cir. 2025) quoting *Miller*, 475 F.3d at 627. Here, as described below, there can be no doubt that the overwhelming amount of exculpatory evidence that was withheld from the Magistrate would have defeated probable cause.

Although "South Carolina has long embraced the rule that a true bill of indictment is prima facie evidence of probable cause in an action for malicious prosecution," *Kinton v. Mobile Home Indus., Inc.,* 274 S.C. 179, 182 (1980), it is only prima facie evidence and not conclusive. *See* 54 C.J.S. *Malicious Prosecution* § 34 at 555 (1987) (stating that "where the result of the preliminary examination before a magistrate or other judicial officer is unfavorable to the accused, and he is held, or committed...this is prima facie evidence of probable cause, but not conclusive."). *Canzater v. City of Columbia*, No. 2004-UP-054, 2004 WL 6248833, at *2 (S.C. Ct. App. Jan. 22, 2004). The South Carolina Court of Appeals ruled in *Canzater* that: "The trial court, therefore, erred in dismissing Canzater's claim for malicious prosecution because the existence of an arrest warrant does not conclusively establish probable cause for prosecution." Id. In *Melton v. Williams,* 281 S.C. 182 (Ct. App. 1984), the South Carolina Court of Appeals concluded that, even though an arrest warrant was issued, "[u]nder the circumstances it was for the jury to say whether or not there was probable cause for the swearing out of the warrant by William's."

"The question is whether a reasonably well-trained officer in petitioner's position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant. If such was the case, the application for the warrant was not objectively reasonable,

4

because it created the unnecessary danger of an unlawful arrest." *Malley v. Briggs*, 475 U.S. 335, 336, 106 S. Ct. 1092, 1094, (1986). See *Torchinsky v Siwinski*, 942 F2d 257, 262 [4th Cir 1991]("Of course, obtaining an arrest warrant does not provide per se evidence of objective reasonableness.. The presumption of reasonableness attached to obtaining a warrant can be rebutted where "a reasonably well-trained officer in [the] position would have known that his [application] failed to establish probable cause and that he should not have applied for the warrant." *Citing Malley,* 475 U.S. at 345–46. *See White v. City of N. Charleston,* No. 2017-001930, 2020 WL 4516091, at *3 (S.C. Ct. App. Aug. 5, 2020)(South Carolina Appeals Court reversed lower Court's grant of summary judgment on Plaintiff's false arrest claims as Plaintiff's evidence "demonstrate[d] at least a scintilla of evidence that probable cause did not exist." )

### B. Defendants Have Demonstrated that There Are Issues of Fact Regarding Probable Cause Precluding Summary Judgment

Defendants' table of facts "supporting and opposing probable cause," rather than support their motion for summary judgment defeats it. [Def. MOL p. 5-7] The mere fact that Defendants acknowledge that there was evidence opposing probable cause demonstrates that the existence of probable cause is a question of fact for the jury particularly because Hogsed admitted that he did not present any of those exculpatory facts to the Magistrate Judge. See *Melton v. Williams*, 314 S.E.2d 612, 615 (S.C.App.,1984) (conflicting testimony created factual considerations for jury). Hogsed Dep.: 165:16-166:18.

Moreover, many of the "facts" included by Defendants allegedly supporting probable cause are either not facts at all, are irrelevant, or demonstrate that Defendants utterly failed to diligently investigate the matter.

| Defendants' Facts Allegedly Supporting Probable Cause | Plaintiff's Response/Explanation |
|---|---|
| Plaintiff had cleaned his apartment before the evening in question began in case he brought someone back with him. Hogsed SOMF ¶ 22(a) | This claim is demonstrably false. Plaintiff's roommate texted Plaintiff and their other roommate on February 11, 2022 at 7:32AM to tidy up the apartment because he had family coming. Wofford/Hogsed 295. Declaration of Graham Boswell ("Boswell Decl.")¶6.  Even if |

5

| | assuming purely arguendo that Defendants' statement were true, it is completely irrelevant in considering whether Plaintiff sexually assaulted Rand. |
|---|---|
| Rand left a party with Plaintiff after he offered to make her food. Hogsed SOMF ¶ 22(b) | Plaintiff denied offering to make Rand food. Boswell Decl. ¶8. Moreover, whether Plaintiff offered to make Rand food is irrelevant to whether he assaulted her. |
| Prior to leaving with Plaintiff, Rand had consumed approximately 30 oz of vodka, three White Claws, and some amount of THC before arriving at the Black and Gold event and left with Plaintiff to go to his apartment. Hogsed SOMF¶ 22(b)-(c) | A number of the "facts" allegedly supporting probable cause demonstrate that Defendants failed to critically analyze the information.  According to the National Institute of Health a standard drink serving size for 80 proof distilled spirits is 1.5 ounces[2]. Accordingly, Rand would have had the equivalent of **33 drinks** if she were being truthful about the amount of alcohol she consumed. If Rand consumed even close to that amount of alcohol she would have been dead[3]. Rand further inflated these figures when she told the Title IX investigators that she drank 2/3 of a bottle of Deep Eddy Vodka, seven White Claws, and two Jell-O shots. Wofford/Hogsed 314-315. Defendants should have, but failed to consider Rand's conflicting reports as facts opposing probable cause. |
| Three witnesses reported on her level of intoxication during the night, indicating that she was "red in the face from alcohol," "drunk and unstable on her feet," and it was "evident . . . how drunk she was." Hogsed SOMF¶22(d). | Defendants acknowledge that at least two witnesses reported that Rand did not seem drunk. One of Rand's friends who later accompanied her to the hospital described her: "as not stumbling or slurring her speech, and was having coherent conversations." PLTF 1247. Defendant failed to acknowledge that none of the trained officers or hospital personnel who interacted with Rand observed Rand being drunk or alcohol on her breath or any other signs of Rand being incapacitated or even intoxicated.  Hogsed Dep.133:3-5, 134:17-22. One witness stated Rand was red in the face, which they assumed was from alcohol but could have easily been from being outside on a chilly February evening. |
| Hogsed could not gauge when the alcohol had fully affected Rand's system because she and Plaintiff were in Plaintiff's apartment for approximately 1.5 hours, and because no blood alcohol content test was taken when Rand was at the hospital. Hogsed SOMF¶22(f). | The responding officers could have but failed to administer a breathalyzer test to Rand immediately. Wofford's officers also could have but failed to request that a blood alcohol test be administered at the hospital, Hogsed admitted at his deposition that this failure was a mistake and that the information would have been very important to know. Hogsed Dep. 125:1-127:21. The hospital took blood and urine samples from Rand and could have tested for BAC. Wofford 801-803. Additionally, the surveillance footage shows Rand as coherent, walking and carrying multiple items independently, and none of the responding officers noted any signs of intoxication, nor did their body worn cameras capture any evidence to the contrary. Hogsed Dep. 157:9-15. 132:10-24. Hogsed admitted that not a single Wofford officer documented or noted any signs of Rand's incapacitation or |

---

[2] https://rethinkingdrinking.niaaa.nih.gov/tools/calculators/alcohol-drink-size-calculator
[3] https://aod.wellbeing.wfu.edu/resources/blood-alcohol-calculator/

6

| | |
|---|---|
| | even intoxication. Id. Hogsed Dep.133:3-5, 134:17-22. |
| Rand could not remember much of what happened on the night in question because she was intoxicated, but after she entered the apartment, the next thing she remembered was that she woke up naked with Plaintiff on top of her, asked him to use protection, and Plaintiff indicated they had already 6ad sex. Hogsed SOMF ¶ 22(h). | Rand's contradictory statements demonstrate a lack of credibility. Rand allegedly stated she could not remember much but also allegedly texted her friend "I remember everything" Wofford/Hogsed 150. Rand also remembered Plaintiff's shoe collection and pictures of his family. Wofford/Hogsed 309. |
| Plaintiff admitted to having a sexual encounter and admitted to digitally penetrating Rand. Deposition of Graham Boswell (hereinafter "Boswell Dep.") (attached hereto as Exhibit A)344:8-21. | Plaintiff admitted to briefly digitally penetrating Rand's vagina with her consent. Plaintiff's two roommates provided statements that they heard Plaintiff and Rand in Plaintiff's bedroom speaking in hushed but normal tone with Rand giggling. PLTF 280, 409. Wofford/Hogsed 304, 342-343 |
| Rand began to bleed vaginally during the incident, and there was blood on both her and Plaintiff's body, on Plaintiff's mattress cover, and on the towels they used to clean up. Hogsed SOMF ¶ 22(i). | Rand's bleeding does not support probable cause as Plaintiff repeatedly stated and testified that the blood was from her menstrual cycle. Hogsed failed to even ask Rand about the dates of her menstrual cycle or how regular she was or anything of that nature, if he had he could have concluded that Rand may have had her period on February 11, 2022. Hogsed Dep. 174:18-177:19 Rand's own OBGYN provided a letter which stated that the date of Rand's last menstrual period was April 5, 2022 and counting backward from then would have revealed that Rand may have had her period on February 11, 2022. Wofford/Hogsed 841. |
| While Plaintiff claimed the blood was from Rand's period, Rand reported having had her period a week or two prior to the incident. Hogsed SOMF ¶ 22(j) | The Title IX Hearing Panel properly concluded: "There was evidence that the vaginal bleeding occurred prior to any digital penetration. The Respondent submitted photographs of his jeans with blood, which was consistent with his statement that vaginal bleeding occurred when Complainant was on top of Respondent while Respondent was still clothed and before any digital penetration. Last, the Hearing Panel believed there was evidence Complainant's vaginal bleeding was menstrual bleeding and not evidence of force. The Hearing Panel found there to be inconsistent evidence regarding when Complainant's last period occurred. Complainant claimed it was two weeks prior to the date of the alleged incident, but Complainant's OB/GYN, in her letter of July 8, 2022, said Complainant reported her last period was "the week before the assault." If the OB/GYN's letter is correct that when she saw Complainant, "her LMP was noted to be 4/5/22," and if Complainant is correct about a 28-day cycle, a calendar analysis led the Hearing Panel to consider menstrual bleeding as a possible explanation for Complainant's vaginal bleeding during the encounter with Respondent." Wofford/Hogsed 364, 317. |
| Rand claimed the blood was due to rape, and a pair of Rand's bloody underwear was collected | Rand's underwear could have been bloody from her menstrual period just like Plaintiff's jeans and the fact that the hospital found no |

7

| | |
|---|---|
| as evidence. Hogsed SOMF¶ 22(k). | evidence of trauma undercuts any probative value the bloody underwear would have otherwise had. Wofford/Hogsed 1073-1074. |
| Rand went to her room after the encounter, was there briefly, she called her friends and went to the tennis courts, where she met her friends and campus safety and reported the incident. Hogsed SOMF ¶ 22(m). | Rand meeting her friends at the tennis courts is not evidence supporting probable cause. Rand did not report the incident as Defendants claimed, rather her friend called Campus Safety. PLTF 1249, 1225. Rand did not want to go to the hospital, but her friends convinced her because of blood loss. PLTF 1258. |
| Rand was described by officers and friends as "very distraught," "scared," and "freaked out" at the time of the incident—she was reluctant to discuss what happened in detail and did not want to talk to officers. Hogsed SOMF ¶22(n). | Rand's "fear" could have been due to a number of other causes such as heavier than normal period blood flow, embarrassment from her encounter with Plaintiff etc. Rand's reluctance to speak to the officers should have been considered as a factor opposing probable cause. |
| At Rand's request, she was taken back to her room, she was reported as "shaking" while in the room, and she was accompanied by her roommate when going to the restroom because she reported being unable to urinate due to pain. Rand's roommate reported seeing blood in the water of the toilet Rand was using. Hogsed SOMF ¶ 22(o) | Defendants misquoted Rand's roommate, who stated she accompanied Rand to the bathroom because Rand did not want to be alone, not due to pain. PLTF 1257.Any blood could have been from Rand's menstrual cycle. |
| Because of her pain and vaginal bleeding, Rand was taken to the hospital by Officer Len Elder. Hogsed SOMF ¶ 22(p) | Rand did not want to go to the hospital, but her friends convinced her because of blood loss. PLTF 1258. |
| Rand's roommate stayed with her at the hospital because Rand was still bleeding and appeared scared. Hogsed SOMF¶ 22(q). | Rand's roommate stated that Rand was bleeding so much and it wasn't stopping, the medical records show that her symptoms improved and there was no repeat bleeding since being there. PLTF 1258, Wofford/Hogsed Confidential 1077-1078. |
| While at the hospital, Rand told her roommate that Plaintiff had raped her, and the roommate later stated, "the amount of blood that was coming out of her, and the bruises on her thighs really proved that this was a violent, forceful act." Hogsed SOMF ¶ 22(r)-(s). | Rand's roommate's commentary on the amount of blood or the alleged bruising, when directly contradicted by the hospital records is not evidence supporting probable cause, but rather is evidence that Rand's roommate is not a credible witness. PLTF 1257-1258. Wofford/Hogsed 1074-1078. |
| Hogsed understood pictures he received from Rand's friend to be bruises on Rand's body following the incident, and while he was aware that the medical records did not indicate evidence of trauma, he believed that bruises appear sometime after an injury. Hogsed SOMF ¶ 22(t) | Hogsed had no objective evidence to support who was in the pictures with the thigh bruises when the undated pictures were taken, and he did not have an affidavit or other documentation to support that the pictures were of Rand after the incident. (Hogsed Dep. 117:3-118:8). Hogsed failed to do the least bit of investigating regarding the bruising, such as even asking Rand to look at the bruising. Moreover, the medical records described no bruising or trauma. (Hogsed Dep. 118:18-20) |
| The medical records indicated that (1) Rand reported possible sexual assault to the triage | Rand told the triage nurse that she might need a forensic exam, and later stated she was confused, and that she was not sexually assaulted |

8

| | |
|---|---|
| nurse and a SANE nurse was consequently summoned for an evaluation, where Rand was screened for STIs. The medical records, while not indicating evidence of trauma, also reported vaginal bleeding that was "heavier thana period." Hogsed SOMF ¶ 22(u)-(v) | and denied having consensual or non-consensual sex that night. (Wofford/Hogsed Confidential 1080; 1120). Defendants misrepresent the hospital records, which state that *Rand* reported the bleeding as mild moderate and heavier than her period. 1074. |
| Rand told SLED Agent Johnson that she had a pelvic exam at the hospital and that the doctor said he observed tearing. Hogsed SOMF ¶ 22(w) | Rand's report to Agent Johnson that the doctor observed tearing actually opposes probable cause because that is clearly contradicted by the hospital records and (along with her report of her inter alia her alcohol intake) again underscores how unreliable of a witness Rand is. Wofford/Hogsed Confidential 1075-1077 |
| Rand ultimately declined a forensic exam at the hospital  because she was scared, distraught, and upset, because she was not ready for such an exam, and because the doctors and nurses were using terms she did not understand. Hogsed SOMF ¶ 22(x). | The SANE Nurse noted that Rand stated she did not need a forensic exam because she was not sexually assaulted and denied having consensual or non-consensual intercourse that night. (Wofford/Hogsed Confidential 1180; 1120).  The attending doctor at the hospital also specifically noted that Rand denied being sexually assaulted and "continued to deny any sexual assault." Id. 1075, 1077. |
| Very late on the evening of February 11 or early on February12, Plaintiff invited Shaina Patel to his apartment to get food, and when they were alone, he sat very close to her and acted in a manner that made her very uncomfortable. Hogsed SOMF ¶ 22(y) | Plaintiff allegedly inviting a girl to his apartment after the alleged incident with Rand is entirely irrelevant. Moreover, SP stated that Plaintiff moved away from her when she advised him she didn't want to "hook up", the opposite of forcing himself on her. Wofford/Hogsed 1253. |
| Patel's statement also indicated that Plaintiff texted her privately when someone else walked into the room, indicating to Patel that he thought that he would be alone with Patel in the apartment. After receiving this text, Patel left Plaintiff's apartment. Hogsed SOMF ¶ 22(z)-(aa). | See above response, entirely irrelevant. |
| During these events, Patel told William McNiel that she was going to Plaintiff's apartment for food, and McNeil was the individual who arrived at the apartment to Plaintiff's displeasure. McNiel provided text messages to corroborate Patel's account of the events in question, and these messages also show that Patel texted McNiel to suggest they leave Plaintiff's apartment. Hogsed SOMF ¶ 22(aa). | See above response, entirely irrelevant. |

9

| | |
|---|---|
| Rand's account of the evening in the separate interview she had with SLED Agent Johnson was consistent with what she told Campus Safety. Namely: Rand had been drinking before leaving with Plaintiff, Rand immediately reported sexual assault to her friends and Campus Safety, she visited the emergency room because she was bleeding heavily, the doctor at the emergency room said that there was evidence of vaginal tearing, and that there was blood on Plaintiff's mattress cover. Preliminary Hearing Transcript (attached hereto as Exhibit B) at 12:13-19, 13:5-22, 22:15-23:19, 27:17-28:19; 78:14-19 | The hospital records entirely discredit Rand's claims re assault or incapacitation. The hospital records note that Rand: "Denies sexual assault" and "denies trauma to the area." Wofford/Hogsed 1073-1074. Hospital records described Rand as "Awake & alert no acute distress, nontoxic." Wofford/Hogsed 801. The exams showed no bruises "Alert, awake, and oriented to person, place, time, and situation. Normal speech…**GU**: External exam normal. Internal exam shows no current bleeding, no signs of trauma. Closed cervix. No discharge. Wofford/Hogsed 1075. The hospital records indicate no sperm found on genitourinary exam. Wofford/Hogsed 1075-1077 "Patient remained resting comfortably while here...Patient continued to deny any sexual assault including speaking with SANE nurse. Offered trial of OCPs for patient to some dysfunctional uterine bleeding. Patient denies this point as symptoms seem to improve and she said no repeat bleeding since being here." Id. 804 1077-1078. |

As described above, aside from Rand's statements, which were demonstrated to be not credible and directly contradicted by documentary evidence, there was not a single fact to support probable cause sufficient for an arrest warrant. Defendants' claim that an ordinarily prudent and caution person would be concerned if law enforcement did not seek charges against Plaintiff in this matter is shocking, Hogsed knew that Rand repeatedly denied being sexually assaulted at the hospital and that the medical records showed no damage to Rand and no sperm. Hogsed Dep. 159:19-160: 2-7. Hogsed admitted that not a single Wofford public safety officer ever noted any signs that Rand was very intoxicated or at all incapacitated. Hogsed Dep.133:3-5, 134:17-22. Hogsed testified that on the surveillance video showing Rand both before and after the alleged assault in his opinion as a police officer with many years of experience that Rand did not appear to be intoxicated and that she was able to walk briskly on her own unassisted. Hogsed Dep. 150:15-151: 5, 155:16-19, 157: 9-15. [Exhibit 4, 14, 15 to Hogsed's Deposition Wofford/Hogsed Confidential 1398, 1402, 1400].

The facts presented to the Magistrate here were at best intentionally misleading, if not demonstrably false. Defendants' self-serving assertion that Hogsed did not withhold all exculpatory evidence is plainly contradicted by Hogsed's own testimony. The record is replete with critical

admissions from Hogsed (both at the preliminary hearing and during his deposition) of omissions and/or misstatements, which he knew or at minimum should have known would negate probable cause. Defendants cannot rely on the Magistrate Judge's finding of probable cause for an arrest warrant as sufficient evidence for summary judgment when Hogsed admitted that the Judge's decision to issue an arrest warrant and the Solicitor's agreement to prosecute were based solely on the evidence that Hogsed elected to provide them with and that if he did not provide them with certain evidence they would not have it. Hogsed Dep. 89: 2-20.

Hogsed admitted to withholding exculpatory evidence from the Judge in requesting that the Judge sign the arrest warrant for Boswell including, without limitation: a) the surveillance video contradicting Rand's statement about incapacitation[4]; [Id. 158:10] [Id. 166:6-7]; b) Rand's medical records which contradicted her statements regarding assault and intoxication. [Id. 161:4-9] [207:15-16]; c) blood on Boswell's jeans, [id. 165:7-166:1]; d) Boswell's polygraph test [Id. 166:2-3]; e) That there was no blood on Rand's dress; and [166:6-16] f) a copy of Boswell's statement [PLTF 116 PH 81:14-16].

Hogsed repeatedly admitted that he did not present to the Magistrate Judge any of the exculpatory evidence he had: "I'm not going to sit here and deny any of that" Hogsed Dep. 165:16-166: 18. "Q. Because you didn't tell the judge all the exculpatory evidence about Mr. Boswell correct? A. Again, as I testified earlier, I did not tell the judge that." Hogsed Dep. 184:7-10.

> Q. Did you give the judge any exculpatory evidence? Such as there was no blood on her dress -- although she claimed there was blood. I didn't test blood from Mr. Boswell's pants. The video tells -- shows a completely different story of a picture -- presents a different picture of Ms. Rand's level of intoxication and incapacitation at the time. That several witnesses said she did not appear intoxicated. Did you tell the judge this information, sir?
> A. Not that I can think of. Hogsed Dep. 162:3-15

Contrary to Defendants' argument, Hogsed's self-serving declaration that he brought the medical

---

[4] See eg. Exhibit 4, 14, 15 to Hogsed's Deposition Wofford/Hogsed Confidential 1398, 1402, 1400

records with him to the judge, but did not show them to him, does not excuse any of the aforementioned glaring omissions Defendants made in applying for Plaintiff's arrest warrant. Such self-serving evidence is simply legally insufficient *See Pfaller v. Amonette*, 55 F.4th 436, 450 (2022) (Self-serving affidavits are patently insufficient evidence to support a motion for summary judgment in the Fourth Circuit.) Even assuming arguendo that Hogsed had the records with him, Hogsed admitted that he did not tell the judge about all of the critically exculpatory evidence within the medical records.  Hogsed did not tell the judge that Rand denied being sexually assaulted at the hospital p. 159 ln. 19-21. Hogsed did not tell the judge that the medical records indicated that Rand did not have any injuries. Hogsed Dep. 160: 2-7. "I'll admit it wholeheartedly, and I'll take the hit for this. I don't – I did not tell the Judge [who he requested sign Boswell's arrest warrant] that there was no damage to her." PLTF 111 PH 75:3-6.

> Q. Did you tell the judge…Ms. Rand alleges that the doctor told her that there was a big injury, but the medical records don't bear that out. Did you do that?
> A. I don't believe we did. I don't recall telling the judge that. Hogsed Dep. 161: 4-9.
> ***
> Q Did you tell the Judge that she told three people she was not sexual assaulted?
> A No, ma'am. I did not – PLTF 111 PH 76:7-9.

Moreover, while Defendants predictably try to shield themselves from liability by stating that the Solicitor's Office and SLED Agent Johnson believed there was probable cause, Hogsed admitted that it was his responsibility to inform the judge about the exculpatory evidence. Hogsed gave the following testimony:

Q. You picked yourself. You chose the specific evidence to provide the judge, correct?
A. I provided the judge with the evidence…Now, I will not sit here and lie to you-- and I will not sit here and lie to…Mr. Boswell. Did I miss some things? Absolutely. Hogsed Dep. 185:4-12

Q. Do you think that's good police work sir? If -- if -- if a victim has bruises -- as the investigating officer -- not to ask to see them? p. 121 ln. 23
A. It's not good police work…
Q. Sir, you're the only one who provided sworn testimony regarding the arrest and prosecution of Graham Boswell, correct?
A. That's correct.
Q. Okay. So if your partner didn't do a good job, then you didn't do a good job, correct?

12

***

A. Well, I can agree with that.
Q. You can?
A. Yeah.
Q. Thank you.
A. I'll agree with you.
**Q. The buck stops with you in this case?**
**A. Absolutely.**
Q. Okay. If you didn't -- as you're the one who's swearing in front of a judge and in a court -- if you didn't like the way something was done, your name is on it – you have to change it, correct?
A. Correct.

***

Q. And you didn't do that in this case?
A. No. Hogsed Dep. 122:3-25-123:1-6. (emphasis supplied)

Q. The judge signed the warrant only based on what you told him?
A. Yes.
Q. Okay. He doesn't have a crystal ball, correct?
A. Correct.
Q. He can only rely upon and make a legal decision based on the information you provided him, correct?
A. Correct.
Q. And if you didn't tell him exculpatory evidence, he can't be expected to know that, correct?
A. Correct. Hogsed Dep. 186:16-23

Accordingly, Defendants' claim that there were three independent assessments of the facts, which determined probable cause is quite simply false.

Further, Defendants' reliance on *Daly v. Zobel*, No. C/A 2:06-1733-DCN, 2007 U.S. Dist. LEXIS 41984, at *24-25 (D.S.C. June 8, 2007) is misleading and misplaced. The *Daly* Court did not, as Defendants' claim find that the preliminary hearing judge's finding of probable cause was a "persuasive indicator" rather it was considered prima facie evidence. Moreover, *Daly* is easily distinguishable from the case at bar because there "The record is replete with statements, from Zobel herself to Hinson to the children in the room to even plaintiff's wife, that plaintiff was "angry," "screaming," "yelling," "flung" open a door, and even "reacted violently" at the school, in the presence of students and staff. Clearly, this is sufficient evidence of probable cause to support a charge of disrupting schools or public disorderly conduct." Conversely here, the record is replete with Hogsed's admissions that the exculpatory evidence was not presented to the judges.

13

Hogsed further admitted that there was other evidence that should have at minimum been investigated, but was not. Campus Safety failed to request BAC at hospital. Hogsed Dep.: 126: 10-22. Rand advised Agent Johnson that a doctor told her there was a serious tear, but as Hogsed admitted the medical records do not support that claim and Hogsed did nothing to reconcile that difference. Hogsed Dep. 160:8-161:3. Hogsed could have but failed to interview either the ER doctor or SANE nurse who examined Rand on February 11/12, 2022. Hogsed Dep. 211:19-212:2, 275: 5-16. Campus Safety failed to get a search warrant for Plaintiff's jeans despite Plaintiff stating Rand bled on them and photos showing the same. Hogsed Dep. 42:13-23. Campus Safety failed to collect Rand's dress as evidence despite her statement she bled all over it and the surveillance video showing no blood. Hogsed Dep. 52: 18-53:23, 57:13-25. Hogsed could have but failed to interview Rand himself at all even after becoming the lead investigating officer. Hogsed Dep. 62: 3-13. Hogsed did not challenge Rand on her claim there was a "tear". Hogsed Dep. 160:8- 161:3. Hogsed failed to even ask Rand about the dates of her menstrual cycle or how regular she was or anything of that nature, if he had he could have concluded that Rand may have had her period on February 11, 2022[5]. Hogsed Dep. 174:18-177:19. Hogsed admitted that the photographs allegedly showing bruising on Rand's legs were undated and Rand's face was not visible in the photos. Hogsed Dep. 117: 3-20. Hogsed further admitted that the medical records showed no bruising on Rand, but he still did not ask Rand to see the bruises himself. Hogsed Dep.121:12-19.

II.    **Defendants Have Failed to Demonstrate a Prima Facie Entitlement to Summary Judgment on Plaintiff's First Cause of Action for Malicious Prosecution**

Under South Carolina law, "[T]o maintain an action for malicious prosecution, a plaintiff must establish: (1) the institution or continuation of original judicial proceedings;[4] (2) by or at the

---

[5] Rand's own OBGYN provided a letter which stated that the date of Rand's last menstrual period was April 5, 2022 and counting backward from then would have revealed that Rand may have had her period on February 11, 2022. Wofford/Hogsed 841, 317.

14

instance of the defendant; (3) termination of such proceedings in [the] plaintiff's favor; (4) malice in instituting such proceedings; (5) lack of probable cause; and (6) resulting injury or damage." *Law v. S.C. Dep't of Corr.,* 368 S.C. 424, 435, 629 S.E.2d 642, 648 (2006) (first alteration in original) (citations omitted).

"Malice is defined as 'the deliberate[,] intentional doing of an act without just cause or excuse.' " *Id.* at 437, 629 S.E.2d at 649 (quoting *Eaves v. Broad River Elec. Coop., Inc.,* 277 S.C. 475, 479, (1982)). "Malice does not necessarily mean a defendant acted out of spite, revenge, or with a malignant disposition, although such an attitude certainly may indicate malice." *Id.* "In an action for malicious prosecution, malice may be inferred from a lack of probable cause to institute the prosecution." *Id.* Here, there is abundant evidence of both animus towards Plaintiff and a lack of probable cause from Wofford and Hogsed.  Defendants downplay Hogsed's clear spitefulness as "a few stray comments," (Def. MOL p. 14) when in reality they are clear evidence of a malignant disposition to Plaintiff, which resulted in publicly arresting Plaintiff in a manner meant to and which did inflict maximum damage and humiliation to Plaintiff.

After initially denying it, Hogsed was forced to admit at his deposition that (as he had testified at the preliminary hearing) he believed that Plaintiff had no business being in the military because he relied on his parents. Hogsed Dep. 95:11-19. Hogsed agreed that his opinion about Boswell's lack of qualification for the military "could be perceived as [negative]." Hogsed Dep. 96:1-3. When Hogsed executed the search warrant Boswell called his father and (as captured on his body-cam) Hogsed scolded him and said, "you're 22 years old. You don't rely on your parents." P. 98 ln. 10-16. Hogsed went so far as to tell Boswell that he could only call his attorney and not his parents, which he knows was not accurate. Hogsed Dep. 101:24-102:1-5. Further Wofford's Campus Safety Officers "did away with" Rand's parking tickets because she had "been through enough already," which Hogsed conceded was improper. Hogsed Dep.105: 20-25.

15

As set forth above, Defendant Hogsed presented incomplete, materially misleading information to a state court judge in order to wrongly procure an arrest warrant without probable cause, and then deliberately effectuated that arrest in the most public, humiliating way possible, despite knowing that Boswell was represented by counsel and almost certainly would have voluntarily surrendered had he been notified that a warrant was issued. Hogsed Dep.198-201. Defendant Wofford permitted, sanctioned, and/or assisted in coordinating Hogsed's arrest of Boswell on Wofford's campus, during the school day, in front of Boswell's professor and classmates, maximizing the public humiliation and stigma. Boswell Decl. ¶23. Exhibits 19-20 of Hogsed's Deposition Video Body Cam 2022_0412_031722_001/2022_0411_145632_001.

As described by Hogsed, Campus Safety obtained Boswell's class schedule and arrested him in the hallway in front of his peers in the middle of his Senior Seminar while they were changing classrooms. Hogsed Dep.194: 8-16, 198:2-5. Exhibit 19 to Hogsed's Deposition. Video Body Cam Bates 2022-4012. Hogsed admitted that he could have arrested Boswell at his apartment, which would have been safer for his officers or even asked that he voluntarily surrender, which according to Hogsed would have been more appropriate. Hogsed Dep.198-201.

Wofford also failed to take any measures to remediate the relentless defamatory harassment campaign by Rand, and instead, punished *Boswell* by prohibiting him from participating in his own graduation ceremony and activities. (Hammett Dep.207:14 -209 :25) (Boswell Dep. 44:16-25; P. 46:13-16, 60: 7-25196: 8-18, 197: 10-15) Boswell advised Wofford that Rand's harassment campaign was destroying his life and causing him severe anxiety, depression, and fear, yet Wofford took no meaningful action to protect Boswell, emboldening Rand to continue/escalate her harmful conduct. See eg. Plaintiff's email to Hammett on March 1, 2022 complaining about the harassment he suffered. Exhibit 3 to Hammett Dep. Wofford/Hogsed 0059. Hammett admitted that he took no action after Boswell's initial complaint. Hammet Dep. P. 27 1-6.  Plaintiff's counsel also reported

16

the Petition immediately and followed up with a six-page letter detailing Plaintiff's complaints to Hammett. Wofford/Hogsed 15-20. Wofford finally partially investigated Plaintiff's Complaint, failed to even interview Rand as a respondent and instead regurgitated Rand's interview as complainant to include as evidence in the Investigation Report and delayed adjudication of the complaint until after its adjudication of Rand's complaint. WOFFORD/HOGSED 597-601. (PLTF 00213). Wofford prevented Plaintiff from participating in any graduation events or activities, later stating that it was for Plaintiff's own safety. While Hammett cited "safety concerns" as the reason for the decision Wofford failed to take any remedial measures against the individuals causing Boswell to fear for his safety and instead sought punitive measures against Boswell. (Hammett Dep. 207 :14, 209 :25) (Boswell Dep. 44:16-25; P. 46:13-16). Accordingly, the utter lack of probable cause coupled with Defendants' displays of a malignant disposition toward Plaintiff from arresting him in a public maximally humiliating fashion, to ignoring then mishandling investigation of Plaintiff's complaints against Rand and barring Plaintiff from participating in graduation activities invoke issues of fact regarding whether Defendants acted with malice in arresting Plaintiff. See *Pallares v Seinar*, 407 SC 359, 366-67 [2014].

III. **Defendants Have Failed to Demonstrate Entitlement to Summary Judgment on Plaintiff's Cause of Action for False Arrest and Imprisonment**

"To establish a cause of action for false imprisonment, a plaintiff must prove the following elements: "(1) the defendant restrained the plaintiff, (2) the restraint was intentional, and (3) the restraint was unlawful." *Valencia v Doe Officers, Greenville County Police Dept., 613CV00634MGLJDA, 2017 WL 3503381, at \*7* [DSC July 27, 2017], report and recommendation adopted, 2017 WL 3498675 [DSC Aug. 15, 2017]. It is undisputed that Defendants intentionally restrained the Plaintiff. Hogsed on behalf Wofford arrested Boswell on April 11, 2022, in a very public and humiliating fashion, in the middle of his Senior Seminar in front of his fellow students and his professor. Hogsed's restraint of Boswell was intentional; he located Boswell on campus and

planned and executed the public arrest. Boswell was then transported by SLED agents to Spartanburg County Penitentiary where he remained until April 12, 2022. Hogsed Dep.194: 8-16, 198-201. Exhibit 19 to Hogsed's Deposition. Video Body Cam Bates 2022-4012.

The fundamental issue in determining the lawfulness of an arrest is whether there was probable cause to make the arrest. *Parrott v. Plowden Motor Co.*, 246 S.C. 318 (1965). *See Gist v. Berkley County Sheriff's Dep't,* 336 S.C. 611, 616, (Ct. App. 1999) (finding error in a trial court's grant of summary judgment in an action for false imprisonment because the arrest warrant was insufficient and did not establish probable cause).

As described above, there was no probable cause to arrest Boswell, Defendant Hogsed repeatedly admitted under oath to withholding exculpatory information from the Magistrate: (i) surveillance footage showing Rand walking to and from Boswell's apartment on the night in question without assistance, in full control of her faculties, showing no signs of impairment, let alone incapacitation, (ii) body-worn video from the officers who spoke with Rand on the night in question, again showing no signs of intoxication nor incapacitation, (iii) medical records from Rand's trip to the hospital on the night in question indicating no signs of trauma (iv) Rand's own multiple statements denying that any sexual assault occurred, and (v) Boswell's polygraph examination results, confirming that his denials of any assault were truthful. 274. Hogsed was acting in his capacity as a Campus Safety Officer employed by Defendant Wofford when he falsely arrested/falsely imprisoned Boswell. Hogsed Dep. 161-166.

## IV.     Plaintiff's § 1983 Claim Does Not Fail Under Fourth Circuit Law

Defendants contend that Plaintiff's § 1983 claim fails as a matter of law because Plaintiff was arrested pursuant to a facially valid warrant supported by probable cause. That argument misstates controlling Fourth Circuit law and ignores Hogsed's sworn testimony establishing that the Magistrate was not provided with material exculpatory information at the time the warrant issued.

18

### A. A Fourth Amendment Claim Lies Where Legal Process Is Initiated Without Probable Cause

The Fourth Circuit has long recognized that a plaintiff states a claim under § 1983 for an unreasonable seizure where the seizure is effected pursuant to legal process that is unsupported by probable cause. *Brooks v. City of Winston-Salem*, 85 F.3d 178, 181–82 (4th Cir. 1996). Such claims are analyzed under the Fourth Amendment and are analogous to malicious prosecution. *Id.*

Although the existence of probable cause is generally a question of fact, summary judgment is appropriate only where the evidence supports but one conclusion. *Cox v. Centerra Grp., LLC*, No. 1:15-CV-04608-JMC, 2018 WL 3912950, at *4 (D.S.C. Aug. 16, 2018). Where the record reflects disputed facts concerning what information was known to the officer—and what was presented to the magistrate—probable cause cannot be resolved as a matter of law.

The Supreme Court confirmed in *Manuel v. City of Joliet* that the Fourth Amendment governs claims challenging pretrial detention following the initiation of legal process. 580 U.S. 357, 365–67 (2017). Consistent with *Manuel*, the Fourth Circuit requires a plaintiff to show that the defendant caused a seizure pursuant to legal process that was unsupported by probable cause and that the criminal proceedings terminated in the plaintiff's favor. *Humbert v. Mayor & City Council of Baltimore*, 866 F.3d 546, 555 (4th Cir. 2017). Here, Defendants do not dispute that Plaintiff was seized pursuant to legal process or that the criminal proceedings terminated in his favor. The dispute centers on probable cause—a dispute that cannot be resolved on this record.

### B. An Officer Violates the Fourth Amendment by Recklessly Omitting Material Exculpatory Facts

An officer violates the Fourth Amendment when he procures a warrant through materially false statements or material omissions that are necessary to the finding of probable cause. *Miller v. Prince George's Cnty.*, 475 F.3d 621, 627–28 (4th Cir. 2007); *Unus v. Kane*, 565 F.3d 103, 124 (4th Cir. 2009). Omissions are treated no differently than affirmative misrepresentations. *Miller*, 475 F.3d

at 627. While an affiant is not required to include all potentially exculpatory evidence in a warrant affidavit, he may not deliberately—or with reckless disregard for the truth—omit material facts with the intent to make, or with reckless disregard of whether he thereby made, the affidavit misleading. *Id.* (citing *Franks v. Delaware*, 438 U.S. 154 (1978); *United States v. Colkley*, 899 F.2d 297 (4th Cir. 1990).

"Reckless disregard" exists where an officer acts with a high degree of awareness of a statement's probable falsity or where he had obvious reasons to doubt the accuracy of the information reported. *Miller*, 475 F.3d at 627–28. If such a misrepresentation or omission is shown, the Court must assess materiality by excising the misleading omissions and inserting the omitted facts, then determining whether the "corrected" affidavit would still establish probable cause. *Id.* at 628; *Unus*, 565 F.3d at 124. An omission is material if it was necessary to the finding of probable cause. *Colkley*, 899 F.2d at 301.

### C. Hogsed Admitted He Withheld Material Exculpatory Evidence From the Magistrate

Hogsed's deposition testimony places this case squarely within *Miller*. When asked what exculpatory evidence he presented to the magistrate in obtaining the arrest warrant, Hogsed admitted that other than Plaintiff's denial he could not identify any exculpatory evidence he disclosed:

Q. Okay. So again, I'll ask you. What exculpatory evidence did you present to the judge in getting the warrant? If any?
A. Other than the fact that — I can't think of anything else off the top of my head.
Q. Anything else? What did you tell the judge that would exculpate Mr. Boswell?
A. About his statement — that he was denying all allegations.
Q. You agreed that you had other evidence. You just didn't give it to the judge, correct?
A. Tell him, no. Apparently, I did not. (Hogsed Dep. 165:7–22.)

Hogsed further conceded that, as of the warrant application, he possessed additional exculpatory evidence that he could have provided to the magistrate—but did not—including the polygraph:

Q. But you had — you had in your possession as of April 11th of 2022 evidence that you could have provided to the judge, correct?
A. I mean, I can't deny that I missed the jeans, so.
Q. And the polygraph?
A. Yes. (Hogsed Dep. 165:23–166:3.)

These admissions alone create a genuine dispute of material fact as to whether Hogsed recklessly omitted information bearing directly on probable cause.

### D.  Hogsed's Sworn Testimony Rebuts Defendants' Claim That He "Told the Judge"

Defendants repeatedly assert that Hogsed informed the magistrate of exculpatory evidence or brought it with him. Hogsed's sworn testimony directly contradicts that assertion. Although Hogsed initially suggested he believed he told the judge about certain evidence, he ultimately acknowledged that he did not tell the judge about the polygraph or bring it to the warrant hearing:

Q. Okay. So you testified today something different. You didn't tell the judge. You didn't bring the judge the polygraph, correct?
A. Well, we didn't take it with us — to the judge's office. We took it to the solicitor's office.
Q. I didn't ask about the solicitor. I asked about the judge.
A. I didn't. That was my answer. I didn't take it to the judge.
Q. And you didn't tell the judge.
A. I guess I did not, sir. I apologize for misspeaking. (Hogsed Dep. 164:5–25.)

Hogsed further acknowledged that his testimony closer in time to the warrant application was more accurate: "Q. So your testimony in 2022 would probably be more accurate? A. Correct. (Hogsed Dep. 165:1–11.)"A reasonable jury could conclude from this testimony that the magistrate was presented with a materially incomplete—and therefore misleading—account of the evidence.

### E.     The Magistrate Was Not Provided With Evidence That Undermined Probable Cause

Hogsed's testimony establishes that the magistrate was not informed of multiple categories of exculpatory evidence known to Hogsed at the time the warrant application was submitted, including:

21

- medical records reflecting no evidence of trauma, despite allegations of sexual assault (Hogsed Dep. 167:7–16);
- statements to medical personnel in which the complainant denied sexual assault (Hogsed Dep. 159:19–25; 160:1–7);
- video evidence contradicting claims of incapacitation (Hogsed Dep. 126:15–25; 127:1–21); and
- polygraph results in Hogsed's possession that were not disclosed to the magistrate (Hogsed Dep. 163:8–25; 164:1–24).

Whether inclusion of this information would have defeated probable cause is a classic jury question.

*Miller*, 475 F.3d at 632.

### F. The Existence of a Warrant Does Not Immunize an Officer Who Misleads the Magistrate

Defendants argue that the existence of a facially valid warrant ends the Fourth Amendment inquiry. That argument is foreclosed by Fourth Circuit precedent. A warrant does not shield an officer from liability where the officer procured it by omitting material exculpatory facts. *Miller*, 475 F.3d at 628; *Smith v. Munday*, 848 F.3d 248, 253–54 (4th Cir. 2017). Later prosecutorial or judicial determinations do not retroactively cure a Fourth Amendment violation where the initiation of legal process was tainted. *Humbert*, 866 F.3d at 561–62. The relevant inquiry is what the magistrate knew at the time the warrant issued—not what later actors concluded after reviewing a fuller record.

### E. There is a Question of Material Fact as to Whether Hogsed has Established a Good-Faith Defense

Defendants briefly address in a footnote whether Hogsed as a private individual is entitled to summary judgment on a good-faith defense to the §1983 claim. (Defs.' MOL at 19 n.11) (citing *Akers v. Md. State Educ. Ass'n*, 990 F.3d 375, 380 (4th Cir. 2021) (holding that private parties are entitled to assert good-faith defense to liability under § 1983 if their conduct constitutes good faith in adhering to constitutional guarantees)). Defendants also cite a California case, *Cornejo v. Tumlin*, 2024 WL 1836506, *12 (N.D. Cal. Apr. 25, 2024), for the proposition that summary judgment should be granted because the defendants "did [their] best to follow the law and had no reason to suspect that there would be a constitutional challenge to [their] actions." However, no Fourth Circuit case

has used this standard. In any event, here, as discussed above, there is evidence of Defendant Hogsed's bad faith precluding the grant of summary judgment.

Viewing the evidence in the light most favorable to Plaintiff—and crediting Hogsed's sworn admissions—a reasonable jury could conclude that Hogsed did not act in good faith and caused Plaintiff's seizure pursuant to legal process by recklessly omitting material exculpatory evidence from the warrant application. Defendants are therefore not entitled to summary judgment on Plaintiff's § 1983 claim.

## V.     There are genuine issues of material facts in dispute that preclude granting summary judgment on Plaintiff's IIED claim.

To recover for intentional infliction of emotional distress ("IIED"), a plaintiff must establish:

> (1) the defendant intentionally or recklessly inflicted severe emotional distress, or was certain, or substantially certain, that such distress would result from his conduct; (2) the conduct was so "extreme and outrageous" so as to exceed "all possible bounds of decency" and must be regarded as "atrocious, and utterly intolerable in a civilized community;" (3) the actions of the defendant caused plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was "severe" such that "no reasonable man could be expected to endure it."

*Hansson v. Scalise Builders of S.C.*, 374 S.C. 352, 357, (S.C. 2007) (quoting *Ford v. Hutson*, 276 S.C. 157 (1981)).

South Carolina courts have acknowledged that there is no magic formula in determining whether conduct is extreme or outrageous. *Todd v. South Carolina Farm Bureau Mut. Ins. Co.*, 283 S.C. 155, 171, (Ct. App. 1984) (rev'd on other grounds, 287 S.C. 190 (1985)). A defamatory communication could be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency" and thus considered sufficiently extreme and outrageous to state a claim for intentional infliction of emotional distress. *See Hatfill v. New York Times Co.*, 416 F.3d 320, 336 (4th Cir. 2005) Where the parties dispute the conclusions to be drawn from undisputed facts, summary judgment is improper. *Tupper v. Dorchester Cty.*, 326 S.C. 318, 325, (1997).

23

Defendants contend that the Court should dismiss Plaintiff's IIED claim with prejudice because the wrongful conduct which Boswell alleges falls "short of being extreme, outrageous, and exceeding all possible bounds of decency." (Def. MOL p. 22). While South Carolina courts have expressed that IIED claims must not become "a panacea for wounded feelings rather than reprehensible conduct," *Hansson*, 650 S.E.2d at 70, this case is not even close to one simply about wounded feelings. Boswell was subjected to an extremely public and humiliating arrest without probable cause based on a false claim that he committed a heinous crime with severe consequences, both immediate and long-term. Boswell Decl. ¶23. Boswell was just shy of graduation and commissioning to the U.S. Army. His commission was delayed by over a year, which delayed his training and placed him behind his peers. (Boswell Dep. 212:3-16).

Boswell endured a criminal prosecution with the possibility of a conviction and a lengthy sentence and constant threats and bullying, ostracization, isolation, embarrassment, and humiliation. Boswell Decl. ¶23-28. He was the subject of a relentless harassment campaign, which included violent messages and threats posted on social media (Boswell Dep. 73:12-74:12); fliers regarding a campus protest posted on professors' doors with direct references to Boswell's bond hearing (Boswell Dep. 67:14-68:18); his car being vandalized while parked on campus, and a petition signed by hundreds of people (faculty and students) was circulated that called for his removal from campus and described him as having a pattern of violence. (Boswell Dep. 69:15-71:5). Boswell became so unwelcomed on campus that even his fraternity advisor, a Wofford professor, refused to associate with him or meet with him on campus. (Boswell Dep. 72:12-73:11). Boswell reported the harassment multiple times (Boswell Dep. 85) and Wofford was aware that Rand was disparaging Boswell's character and attempting to influence testimony. However, Wofford failed to take any meaningful action to stop or curtail any of the threats or harassment. (Boswell Dep. 76:16-77:1, 62:10-12; 73:16-

24

74:22). When Boswell reported that his car had been vandalized to Campus Police, he was told to park in a different lot. (Boswell Dep. 74:15-22).

Boswell was shamed by a public arrest on campus during class which Hogsed admitted could have been avoided if Defendants opted for the more appropriate option of allowing Boswell to voluntarily surrender. (Hogsed Dep. 200:20-17). The arrest was picked up by the media and covered extensively and broadcast on televisions on Wofford's campus, ensuring every Wofford student and the public were aware that Boswell was arrested for criminal sexual conduct. His arrest was incorporated into a class discussion by a Wofford professor. (Boswell Dep. 215:1-216:2).

Moreover, Hogsed admitted that he purposely excluded the exculpatory evidence when seeking Plaintiff's arrest warrant. Hogsed did not tell the judge that Rand denied being sexually assaulted at the hospital p. 159 ln. 19-21. Hogsed did not tell the judge that the medical records indicated that Rand did not have any injuries. Hogsed Dep. 160: 2-7. "I'll admit it wholeheartedly, and I'll take the hit for this. I don't – I did not tell the Judge [who he requested sign Boswell's arrest warrant] that there was no damage to her." PLTF 111 PH 75:3-6. "

Q. Did you give the judge any exculpatory evidence? Such as…The video tells -- shows a completely different story of a picture -- presents a different picture of Ms. Rand's level of intoxication and incapacitation at the time..?
A. Not that I can think of. Hogsed Dep. 162:3-15
***
Q Did you tell the Judge that she told three people she was not sexual assaulted?
A No, ma'am. I did not – PLTF 111 PH 76:7-9.

The ramifications negatively impacted every aspect of Bowell's life from his education and career to his personal and professional reputation and will continue to do so in the future. (Boswell Dep. 183:6-14). He is permanently stigmatized and forever linked to the false accusations that he is a rapist. To this day, a simple internet search of Boswell's name produces numerous news articles and social media posts repeating the false accusations against Bowell, thus labeling him as a sexual predator for life. (Boswell Dep. 151:10-12) ("You can't Google my name without [the rape

25

accusations] being the first thing that comes up."). Boswell testified that he sees a therapist and suffers from debilitative panic attacks, fear, and psychological trauma[6]. (Boswell Dep. 183:6-14; 187:20-188:4).

Defendants' argument that Boswell's arrest could have been even more humiliating is not a reasonable defense to his claim of IIED. As described by Hogsed, Campus Safety obtained Boswell's class schedule and arrested him in the hallway in front of his peers in the middle of his Senior Seminar while they were changing classrooms. Hogsed Dep.194: 8-16, 198:2-5. Ex. 19 to Hogsed's Dep. Video Body Cam Bates 2022-4012. Hogsed admitted that he could have asked that Boswell voluntarily surrender, which would have been more appropriate. Hogsed Dep.198-201.

Moreover, Plaintiff disputed Defendants' characterization of the manner of the arrest. Selecting someone known to Boswell to initially approach him does not lessen the humiliation from a very public arrest during class in front of other students. Boswell was approached by multiple officers in a public setting while changing classrooms in front of his professors and peers and brought to the Campus Safety Office to be handcuffed. (Boswell Dep. 133:16-21; 157:6-8; 157:19-158:3). Boswell felt he was under arrest as he left the classroom and that he was not free to leave (Boswell Dep. 388:24-389:11; 389:22-390:1; Hogsed Dep. 195:13-17; 257:15-21). Students were standing behind Boswell when Officer Craig stopped him and walked Boswell past these people. (Hogsed Dep. 256:24-257:9). (Boswell Dep. 124:13-17).

Additionally, Wofford prohibited Boswell from participating in any graduation ceremonies on the false premise of his "safety". (Compl ¶ 331). Boswell testified that it would not be reasonable

---

[6] Defendants cite *Doe v. Erskine College*, No. 8:04-cv-23001-RBH, 2006 WL1473853 (D.S.C. May 25, 2006), is "being exactly this case." However, *Erskine* is factually inapposite. There the court granted summary judgment for defendants on a female student's IIED claim based on the college's inaction and inadequate investigation of an alleged sexual assault holding that their alleged failures fell short of the extreme and outrageous standard. *Erskine* did not involve false accusations of a sexual assault resulting in a public arrest and criminal prosecution.

for campus security to be concerned about tension surrounding the Rand incident to spill over into graduation ceremony. (Boswell Dep. 194: 7-19, 195:18-20). Rand was a junior and not graduating at that time. Boswell Decl. ¶29. Boswell testified that his safety concerns were "closer to my arrest," but he was "ready a thousand percent" to walk at graduation. (Boswell Dep. 194:21-195:20). When Hammett was asked if he considered other measures to protect Boswell's safety at graduation short of barring Boswell from attendance Hammett testified that "I can't give you specific examples" and "I don't recall what specific ones." (Hammett Dep. 210: 6-9, 215: 23- 216:3). When asked at his deposition why he was in charge of making the decision about whether Plaintiff could attend his graduation as opposed to Campus Safety, Hammett testified: "I don't know." (Hammett Dep. 217: 24-218:1). Boswell testified that prohibiting him from attending graduation caused him to suffer emotionally from extreme loss of pride, self-confidence and anxiety. (Boswell Dep. 196: 8-18, 197: 10-15). Further, Boswell testified that while he was mailed his diploma, Wofford withheld his official transcript. (Boswell Dep. 17-22).

Finally, Defendants falsely claim that they investigated and adjudicated all of Plaintiff's concerns. (Defs.' MOL p. 23). Hammett admitted that he took no action after Boswell's initial March 1, 2022 complaint, Hammet Dep. 27:1-6. Wofford failed to properly address Plaintiff's complaints and did not even consider whether Plaintiff had endured sexual harassment or a hostile environment. Hammett Dep. 160:9-16. Hammett further admitted that it would have been appropriate to investigate whether Boswell suffered from sexual harassment, although Wofford did not do so even though he testified that it was not the complainant's job to identify policy violations. Hammet Dep. 164:13-20, 167:10-17. Boswell felt so threatened from the severe and pervasive sexual harassment that he moved off campus to a nearby hotel. Boswell Decl. ¶26.

In *Ford*, the parties were involved in a real estate transaction and the purchaser repeatedly verbally harassed his realtor over an extended period of time. The harassment included "orally

27

accost[ing] [the realtor] with insulting and/or profane remarks" on several occasions and entering the realtor's home without invitation and directing profanity at Plaintiff in public places. 276 S.C. at , 276 S.E.2d at 77. The South Carolina Supreme Court found this evidence "susceptible of the inference that the conduct complained of…was not a mere complaint by a dissatisfied homeowner, but was instead a continuing pattern of highly questionable conduct over a period of almost two years[,]" which supported submission of the IIED claim to the jury. *Id.* at 780.

Likewise, here, viewing the evidence and inferences in Plaintiffs' favor, there is abundant evidence from which the jury could find that he suffered severe emotional distress that no reasonable person would be expected to endure. *See also McSwain v. Shei*, 304 S.C. 25 (1991), overruled on other grounds by *Sabb v. South Carolina State Univ.*, 350 S.C. 416 (2002), (holding that jury could find outrageous and intolerable the conduct of an employer who forced employee to perform exercises that exposed her incontinence problem to others); *Turner v. ABC Jalousie Co. of N.C.*, 160 S.E.2d 528, 530 (S.C. 1968) (holding plaintiff stated IIED claim where she alleged having suffered a nervous breakdown after defendant had used vile, profane, and abusive language); *Amisi v. Riverside Reg'l Jail Auth.*, 555 F. Supp. 3d 244, 265–67 (E.D. Va. 2021) (holding plaintiff's IIED claim based on her being erroneously strip searched survived summary judgment because "a jury could reasonably find that continuing to strip search an innocent citizen, knowing that no legal authorization existed to perform the strip search rises to the level of outrageousness contemplated by such a claim" and plaintiff had presented evidence of severe emotional distress, as she "has become increasingly wary of others, especially law enforcement officers, and prefers to stay in her home where she feels safest"), *aff'd by Amisi v. Brooks*, 93 F.4th 659 (4th Cir. 2024). Accordingly, summary judgment should be denied as to the IIED claim.

**VI.     Viewing the evidence in the light most favorable to Plaintiff, there are genuine issues of material fact in dispute that preclude granting summary judgment on Plaintiff's Civil Conspiracy Claim**

28

To successfully assert a civil conspiracy claim, the plaintiff must show "(1) the combination or agreement of two or more persons, (2) to commit an unlawful act or a lawful act by unlawful means, (3) together with the commission of an overt act in furtherance of the agreement, and (4) damages proximately resulting to the plaintiff." *Paradis v. Charleston Cnty. Sch. Dist.*, 433 S.C. 562, 574, (2021) "Conspiracy may be inferred from the nature of the acts committed, the relationship of the parties, the interests of the alleged conspirators, and other relevant circumstances." *Moore v. Weinberg*, 373 S.C. 209, 228, (Ct. App. 2007), aff'd, 383 S.C. 583, (2009)). Because civil conspiracy is "by its very nature covert and clandestine," it is usually not provable by direct evidence. *Id.* Under South Carolina law, plaintiffs are allowed to rely on circumstantial evidence to prove that two or more persons have joined together in a conspiracy for the purpose of injuring the plaintiffs. *S. Holdings, Inc. v. Horry Cnty., S.C.*, No.4:02-cv-1859-RBH, 2005 WL 8144891, at *15 (D.S.C. July 14, 2005).

Defendants contend that the civil conspiracy claim fails because 1) the intra-corporate doctrine precludes a conspiracy claim; 2) Defendants Hogsed and Wofford did not commit an unlawful act; and 3) the conspiracy claim is duplicative of his other allegations alleged to support Boswell's other claims. Addressing each in turn, Defendants' arguments are without merit.

Under the intra-corporate doctrine, "a corporation cannot conspire with its agent because the agents' acts are the corporation's own." *McClain v. Pactiv. Corp.*, 360 S.C. 480, 486, (S.C. Ct. App. 2004)). "[A]lthough a corporation cannot conspire with itself, 'the agents of a corporation are legally capable, as individuals, of conspiracy among themselves or with third parties.'" *Pridgen v. Ward*, 391 S.C. 238, 244, (Ct. App. 2010) (internal citations omitted). Plaintiff asserts a conspiracy claim against Defendants and alleges that others, including numerous third parties were involved. (Boswell Dep. 199:3-7). Thus, the intra-corporate doctrine would not bar this claim.

29

Defendants also argue that there is no viable claim that they engaged in any unlawful activities, or a lawful act by unlawful means because no reasonable jury could conclude that Wofford or Hogsed engaged in malicious prosecution, false arrest, a § 1983 violation premised around the Fourth Amendment, IIED, or even breach of contract. Based upon all the evidence before this Honorable Court Defendants' self-serving statement runs hollow and is without merit. Moreover, an action for civil conspiracy may exist even though the defendant committed no unlawful act and no unlawful means were used. *Lamotte v. Punch Line of Columbia, Inc.,* 296 S.C. 66 (S.C. 1988). "Lawful acts may become actionable as a civil conspiracy when the object is to ruin or damage the business of another." *Gynecology Clinic, Inc., v. Cloer*, 334 S.C. 555, 556, (1999).

Finally, Defendants contend that Boswell failed to identify an independent act of wrongdoing to support his conspiracy claim and that he has affirmatively admitted that all of the actions alleged in support of the civil conspiracy are the same as those that support his other claims. (Defs.' MOL p. 35). While Boswell has alleged some similar facts in his conspiracy claim as his other causes of action, this is because all the causes of action arose from the same events. As noted above, Boswell's civil conspiracy claim is premised upon Defendants' alleged conspiracy with each other and other persons, including persons who were not Wofford employees. (Boswell Dep. 199:1-7). The conspiracy claim seeks to hold Defendants liable for their actions in prompting others to act in a concerted manner. Numerous professors, administrators, and others were encouraged to treat Boswell improperly, including emails requesting that Boswell be removed from a presidential seminar class which resulted in him being told that he did not need to return to the class. (Boswell Dep. 197:25-198:25). Accordingly, there is a genuine issue of material fact as to the civil conspiracy claim which precludes summary judgment.

VII.    **A contract existed between Boswell and Wofford by virtue of Boswell's enrollment and payment of tuition and fees and in exchange Wofford made binding promises in its various policies.**

30

"The elements for a breach of contract are the existence of the contract, its breach, and the damages caused by such breach." *S. Glass & Plastics Co. v. Kemper,* 732 S.E.2d 205, 209 (App.2012). Under South Carolina law, formation of a valid contract requires an offer, the acceptance of the offer, and valid consideration. *Sauner v. Public Serv. Authority of S.C.,* 581 S.E.2d 161, 166 (2003).

In South Carolina, Plaintiff's status as a student at Wofford was in the nature of a contractual relationship. *Pampu v. Wingo*, 446 S.C. 236, 250 (Ct. App. 2025) (citing *Carter v. Univ. of S.C.*, 360 S.C. 428, 432 n.4 (Ct. App. 2004) ("It is commonly held that a contract exists between a university and its students.")). A contract existed between Boswell and Wofford by virtue of his enrollment and payment of tuition and fees in exchange for which Wofford made binding promises in its policies, as discussed more in depth below.

Wofford's argument that there could not be a meeting of the minds because Boswell testified that he had not read the policies is both a misrepresentation of Plaintiff's testimony and contrary to basic contract law.  Plaintiff was asked at his deposition if he reviewed any particular written materials from Wofford that influenced his decision to attend there and he responded: "I don't believe so." (Boswell Dep. 35:5-9). He also stated that he reviewed all contracts that were on the online portal. Boswell took these documents into account when deciding to enroll at Wofford. He expected that Wofford would strive to maintain an educational environment free from discrimination, harassment, and retaliation. Unfortunately, Wofford repeatedly failed to follow its own policies and allowed Boswell to be harassed, discriminated against and subject to a hostile environment. See Boswell Decl.¶33-35.

"Each party to a contract is charged with full knowledge of its complete contents, regardless of whether they actually read the contract." *Phillips & Jordan, Inc. v. McCarthy Improvement Co.*, No. 5:18-cv-00559-JMC, 2020 WL 579337, *18 (D.S.C. Sept. 29, 2020). *First Baptist Church of*

*Timmonsville v. George A. Creed & Son, Inc.*, 276 S.C. 597, 599 (1981) ("[I]n the absence of a showing of fraud, mistake, unfair dealing or the like, a party to a contract incorporating an arbitration provision cannot escape the obligation of such a provision by simply declaring: "But I did not read the whole agreement."). If Boswell failed to pay his tuition and Wofford brought suit, Boswell could not claim there was no contract based upon his alleged failure to read certain provisions.

Wofford contends that, as to general policy statements, South Carolina law establishes that such statements are enforceable as contracts only if they are "definitive in nature, promising specific treatment in specific situations.'" citing *King v. Marriott Int'l, Inc.*, 520 F. Supp. 2d 748, 756–57 (D.S.C. 2007)). In *King*, the court addressed Marriott's general promise that "there will be no discrimination or recrimination" against an employee who asserts a complaint against the Company. This simply is inapplicable to Wofford's specific policies which are at issue in this case. Here, Wofford's policies did not just set forth a general policy—they set forth how Wofford would handle specific situations. See Compl. ¶226, 231, 233, 240, 243, 236, 246, 247.

Wofford argues that courts in the Fourth Circuit have consistently determined that student handbooks and policies do not constitute enforceable contracts. However, Wofford relies solely on Fourth Circuit precedent interpreting North Carolina law. *Id.* at 27 (citing e.g. *Shaw v. Elon Univ.*, 400 F. Supp. 3d 360, 365 (M.D.N.C. 2019) (holding that "most North Carolina lower courts and federal courts applying North Carolina law have found that university handbooks, bulletins, guidelines, codes of conduct, manuals, and the like are not independently enforceable contracts."). Moreover, the holding in *Shaw* and other North Carolina cases requiring a separate contract has been questioned. "[T]o the extent that *Shaw* or any other federal district court cases cited by Defendants hold otherwise…the Court respectfully declines to follow them as inconsistent with the North Carolina authorities." *Doe v. Wake Forest Univ.*, 671 F. Supp. 3d 624, 630-31 (M.D.N.C. 2023). "[T]he student's payment of tuition and fees creates a reciprocal obligation on the parties to follow

32

those rules and policies on which continued attendance is conditioned. In other words, a school cannot assert control over the behavior of students (and the related right to expel those who don't abide by the rules) without the reciprocal obligation to follow its own rules for exerting that control." *Id.* at 631. The court should reject this argument as the majority of state courts have. *See Lee v. Univ. of New Mexico*, 449 F. Supp. 3d 1071, 1146–47 (D.N.M. 2020) (noting "the large number of states whose courts recognize that implied contracts arise from student handbooks, and the limited reasoning of cases taking a contrary position.").

Finally, Defendants contend that policies which may be unilaterally altered at any time are not sufficient for contract formation.[7] Here, however, while Section 1.05 provides that Wofford reserves the right to make changes to its policy (WOFFORD/HOGSED 67), it does not give Wofford the unfettered right to modify the contract. It provides: "The Title IX Coordinator may also vary procedures materially **with notice** upon determining that changes to law or regulation require alterations." *Id.* By its own terms, conduct occurring prior to a revision will be adjudicated by the procedures in place when the conduct occurred and, during a Title IX investigation, only minor revisions may be made upon notice. Because Wofford's ability to change the terms is limited, it is not an unenforceable unilateral contract.

### VIII.  There is evidence to support Boswell's claim that Wofford breached the contract precluding a grant of summary judgment on this claim.

In his Complaint, Boswell alleges that Wofford breached its contractual obligations to him and the covenant of good faith and fair dealing when it failed to comply with the express promises set forth in the Policy, and when it applied the Policy in a gender-biased manner. (Compl. ¶ 342). "[t]here exists in every contract an implied covenant of good faith and fair dealing." *Adams v. G.J.*

---

[7]To the extent Defendants cite to their SOMF ¶ 27, Plaintiff's testimony does not support this legal conclusion. Moreover, the documents speak for themselves.

33

*Creel & Sons, Inc.*, 320 S.C. 274, 277 (1995). Additionally, as set forth in his Complaint, Boswell

alleges Wofford's breached the contract in several specific ways.

1)  Failing to provide Plaintiff with "an educational and work environment, including programs and activities, free from discrimination, harassment, and retaliation. Wofford subjected Plaintiff to a hostile educational environment in which he was extensively subjected to discrimination and harassment. (Compl. ¶ 343(a)).

The Nondiscrimination Policy provides that Wofford "is committed to providing an educational and

work environment, including programs and activities, free from discrimination, harassment, and

retaliation." (WOFFORD/HOGSED 69). Boswell testified that this provision was violated because

his desire to go to class and live and work on campus were threatened by Wofford's lack of responses

and retaliatory relief. (Boswell Dep. 60:7-14). He testified that his ability to go to class was impacted

because he did not feel safe walking alone on campus and that the Wofford' President and other

professors' response was to encourage him to attend classes remotely. (Boswell Dep. 60:16-23).

Further, fliers were posted regarding a protest and a petition was circulated that was harassing and

discriminatory against him (Boswell Dep. 68:2-19; 69:15-70:21), Further, Boswell testified that he

reported to Wofford that he was receiving threats online sent using Wofford servers and email, and

Wofford did "nothing." (Boswell Dep. 61:3-62:12).

2)  Failing to properly evaluate Plaintiff's complaint by failing to even consider whether Rand's actions qualified as sexual harassment despite the overwhelming evidence that Rand told numerous individuals that Plaintiff assaulted her. (Compl. ¶ 343(b)).

Boswell testified that Wofford violated its policy prohibiting stalking and (§ 3.03 G at

WOFFORD/HOGSED 70-72) when it ignored reports by Boswell that Rand was accosting

individuals about him and disparaging his character. (Boswell Dep. 76:16:-77:5).

3)  Failing to conduct a "thorough, reliable, impartial, prompt, and fair" investigation of Plaintiff's complaint by the investigators by failing to even reinterview Rand and instead repackaging Rand's interview as a complainant for the investigation report; failing to interview many individuals identified by Plaintiff as witnesses to Rand's defamatory and harassing conduct; the investigation was also far from prompt as the final Report was issued on February 7, 2023, more than ten months after Plaintiff's complaint and the complaint was dismissed on March 13, 2023, over a year after Plaintiff's initial complaint.(Compl. ¶ 343(c)).

34

Sections 7.02 and 8.01(C) of the Policy also provides that investigations of sexual harassment complaints are to be "thorough, reliable, impartial, prompt, and fair." (WOFFORD/HOGSED 92). Boswell made numerous reports of retaliation and Wofford would wait weeks before responding. (Boswell 90:22-91:8). Boswell first reported retaliation and sexual harassment on March 1, 2022, (WOFFORD/HOGSED 59) and Wofford did not even open an investigation until six weeks later. (PLTF 2). The Final report was issued ten months later on February 7, 2023. Rand's actions, including calling Plaintiff a rapist, plainly qualified as sexual harassment. (WOFFORD/HOGSED 59). Her actions are the equivalent of a male student calling a female student a whore-which would undoubtedly be considered sexual harassment.

4) Failing to safeguard Plaintiff's personal information, and providing Plaintiff's personal information to media outlets, contrary to the Policy provision providing "[t]he right to be informed in advance of any public release of information the allegation(s) or underlying incident(s), whenever possible. The right not to have any personally identifiable information released to the public without consent provided, except to the extent permitted by law. The right to preservation of privacy, to the extent possible and permitted by law." (Compl. ¶ 343(d)).

Several provisions of Wofford Policy provide that Wofford will not share or disclose information about any individual who has made a report or complaint of harassment, discrimination, or retaliation. (WOFFORD/HOGSED 76). Boswell specifically testified that Wofford was in direct violation of Section 4.01 of the Nondiscrimination Policy (and federal law) when it responded to media inquiries about Plaintiff in such a way that Wofford indicated the identity of Plaintiff as a respondent in a Title IX matter, (Boswell Dep. 54:9-11). Boswell testified that Wofford also violated section 6.05 by identifying him by name to a media outlet. (Id. 89:1-6).

5) Failing to secure the confidentiality of the Title IX report by allowing Rand to have unrestricted access to the report resulting in Rand submitting a falsified version of the report to the U.S. [A]rmy and failing to sanction Rand for her violations of Wofford's policies. (Compl. ¶ 343(e)).

Wofford's actions in allowing Rand to have unrestricted access to the Title IX Report facilitated Rand's copying and dissemination of the Report in direct violation of numerous provisions of the confidentiality provisions of the Nondiscrimination Policy. (Compl. ¶ 235) (citing Sections 6.05,

35

6.10, and 8.01). Boswell also contends that Wofford violated its IT Policy by allowing Rand unfettered access to the Title IX Report which she then sent portions of to the Army. (Compl.¶¶ 247-50; Boswell Dep. 80:22-81:3-6; 83:21-23). Rand did not deny disseminating the Report; instead she testified that she did not remember if she disseminated the report. (Rand Dep. 250:13-18). Viewing the evidence in a light most favorable to Plaintiff, there is a genuine issue of material fact as to whether Wofford breached its contract with Boswell which precludes granting summary judgment.

## CONCLUSION

For these reasons, Plaintiff respectfully submit that there are issues of fact, which require that this Court deny Defendants' Motion for Summary Judgment in its entirety on all claims.

Respectfully submitted this 2nd day of February, 2026.

Respectfully submitted,

*Attorneys for Plaintiff Graham Boswell*
**DEBORAH B. BARBIER, LLC**
**By: */s/ Deborah B. Barbier***
**Deborah B. Barbier**
**1811 Pickens Street**
**Columbia, South Carolina 29201**
**(803) 445-1032**
**dbb@deborahbarbier.com**

**NESENOFF & MILTENBERG, LLP**

**Helen Setton, Esq. (*pro hac vice*)**
**Stuart Bernstein, Esq. (*pro hac vice*)**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**
**hsetton@nmllplaw.com**
**sbernstein@nmllplaw.com**

Columbia, SC
February 2, 2026

36