IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | | |
|---|---|---|
| Graham Boswell, | ) | Case No. 7:23-cv-05467-JDA |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| Wofford College, David Hogsed, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the Court on Defendants' motion for summary judgment. [Doc. 126; *see also* Doc. 127.] For the reasons stated herein, the Court grants the motion.

## **BACKGROUND**[1]

### **The Alleged Sexual Assault**

On February 11, 2022,[2] Wofford College Campus Safety ("Campus Safety") responded to a call for amnesty for a student, Catherine Rand. [Doc. 137-3 at 32.] A friend of Rand's informed Campus Safety that Rand was bleeding vaginally and in need of medical attention, possibly due to a sexual assault. [*Id.* at 31.] Rand appeared "very distraught" and stated that she did not wish to speak to Campus Safety at the time. [*Id.*]

[1] Pursuant to the undersigned's Rule 56 Summary Judgment Motion Procedures, the parties submitted a joint statement of material facts, movants' statements of material facts, opponent's statements of material facts, and various attachments. [Docs. 133; 133-1; 133-2; 133-3; 133-4; 136; 136-1; 136-2; 136-3; 136-4; 136-5; 136-6; 136-7; 137; 137-1; 137-2; 137-3; 137-4; 137-5; 137-6; 137-7; 147; 148.] The Court will cite to many of these documents as well as other parts of the record for the relevant background included herein.

[2] February 11, 2022, was the night of the Black and Gold Ball, a semiformal event at Wofford College. [Doc. 133 ¶ 5.]

Campus Safety transported Rand to Spartanburg Medical Center so that she could receive medical care. [*Id.*]

At the hospital, Rand reported "moderate mild vaginal bleeding . . . heavier than a period" but denied being sexually assaulted. [*Id.* at 72–76; *but see id.* at 75 ("Initially patient apparently reports on possible sexual assault to the triage nurse.").] Medical personnel performed a complete review of systems and found no evidence of trauma. [*Id.* at 76.] In addition, Rand did not receive a blood alcohol content test. [Docs. 137 ¶ 8; 137-4 ¶ 6.]

On February 13, 2022, Campus Safety received a pair of Rand's bloodied undergarments to be kept as evidence. [Doc. 137-3 at 32.]

The next day, Rand appeared at the Campus Safety office to request a Title IX investigation only. [*Id.* at 33.] Rand provided a video and written statement. [*Id.* at 33, 51–52; Doc. 133 ¶ 1.[3]] According to the written statement, Rand "went with [Boswell] . . . to his apartment" on the night of the incident and "blacked out until [she] woke up naked in [Boswell's] bed." [Doc. 137-3 at 51.] Rand asked Boswell "multiple times" to use protection, but Boswell informed Rand that they had already completed intercourse. [*Id.*] Boswell told Rand to get on her knees, and Rand "kept saying no." [*Id.*] When "everything was over" and Rand went to the bathroom to wash up, she discovered blood "all over [her] dress and body." [*Id.* at 52.] In addition, Rand later stated that she consumed approximately half a bottle of vodka, three alcoholic seltzer beverages, and some amount

[3] The cited document contains two paragraphs labelled with the number one. The Court references the latter paragraph here.

of tetrahydrocannabinol (THC) on the night in question.[4] [Doc. 137-2 at 9–10, 40–41 (11:11–12:19, 60:7–61:22).]

Boswell initially invoked his constitutional right not to speak with Campus Safety or the South Carolina Law Enforcement Division ("SLED"). [Doc. 149 ¶ 6; 137-3 at 20 (294:6–15).] However, Boswell met with Officer Ted Saar on February 14, 2022 [Doc. 149-2 ¶ 15], and he provided a written statement on April 4, 2022 [Docs. 137 ¶ 6; 137-3 at 40–45]. According to Boswell's written statement, Rand flirted with Boswell at a party and indicated that "she wanted to [go] back to [Boswell's] apartment." [Doc. 137-3 at 41.] At that time, Rand spoke clearly and did not appear to be intoxicated. [*Id.*] At Boswell's apartment, Rand kissed Boswell in a forceful and aggressive manner. [*Id.*] Boswell asked Rand if she was drunk, to which Rand replied, "I have had a few drinks, but I am not drunk." [*Id.* (internal quotation marks omitted).] Rand subsequently removed her dress, climbed onto Boswell's bed, and instructed Boswell to join her. [*Id.* at 42.] Throughout the encounter, Rand "paused to reiterate her desire to have sex with [Boswell]." [*Id.* at 42.] Boswell digitally penetrated Rand "for a few minutes." [*Id.* at 43.] Subsequently, Boswell discovered that Rand "had started her period" and was bleeding vaginally. [*Id.*] Rand became embarrassed and went to the bathroom to clean herself up. [*Id.* at 43–44.]

**The Criminal Investigation, Arrest, and Prosecution**

On February 22, 2022, Rand returned to the Campus Safety office to request a criminal investigation. [Doc. 137-3 at 34.] At that time, Campus Safety Officer David Hogsed took over the investigation. [*Id.*] In addition, Campus Safety requested

[4] According to Boswell, Rand inflated these figures. [*See* Doc. 149 at 7.]

assistance from SLED, and SLED Agent Michelle Rice Johnson was assigned to the investigation. [*Id.*]

On March 7, 2022, a search warrant was obtained for Boswell's apartment. [Docs. 137 ¶ 9; 137-3 at 37, 39.] Hogsed executed the search warrant the following day, recovering a mattress cover stained with human blood, a fitted bed sheet, a flat bed sheet, and a white t-shirt. [Docs. 137 ¶ 10; 137-3 at 37, 39.] Hogsed scolded Boswell for calling his father during the search. [Doc. 149-6 at 18 (98:10–16).]

On April 5, 2022, Hogsed and Johnson met with the Seventh Circuit County Solicitor's Office to present Boswell's investigative file for review. [Docs. 137 ¶ 13; 137-3 at 32.] Based on the information presented, the Solicitor's Office agreed that there was probable cause to charge Boswell with third degree criminal sexual assault. [Docs. 137 ¶ 19; 148 ¶ 19.]

On April 11, 2022, the Solicitor's Office, SLED, and Hogsed met with a magistrate judge to obtain an arrest warrant. [Docs. 137 ¶ 21; 137-3 at 20 (295:9–22), 24; 137-4 ¶ 16.] Hogsed signed as the affiant on the warrant. [Docs. 137 ¶ 21; 137-4 ¶ 16.] Hogsed told the magistrate judge about Boswell's statement and described its contents, including Rand's and Boswell's conflicting accounts of what happened on the night in question. [Docs. 137 ¶ 24; 137-2 at 45–46 (81:7–82:5); 137-3 at 20 (295:6–8).] In addition, Hogsed told the magistrate judge that he possessed Rand's medical records, that Rand did not receive a forensic examination, and that Rand did not receive a blood alcohol content test. [Docs. 137 ¶ 24; 137-3 at 13 (159:22–160:7).]

Hogsed omitted the following information in his presentation to the magistrate judge: that medical personnel found no evidence of trauma to Rand; that Rand denied

being sexually assaulted when she was at the hospital; video footage of Rand walking without impairment on the night of the incident; and Boswell's polygraph examination. [Docs. 137 ¶ 26; 137-3 at 12–13, 14 (157:9–160:7, 162:24–165:6).] In addition, Hogsed did not tell the magistrate judge that he failed to recover or test Boswell's jeans or that Rand's dress did not appear to be covered in blood. [Doc. 149-6 at 47 (166:1–21).] Finally, Hogsed did not provide the magistrate judge with a physical copy of Boswell's statement. [Doc.137-2 at 45 (81:14–16).]

The magistrate judge asked to see Hogsed's supplemental report. [Docs. 137 ¶ 25; 137-2 at 46 (82:4–7).] That report contained the following information:

- Hogsed was briefed on the incident on February 12, 2022.
- Hogsed was informed that blood-soaked underwear was recovered from the victim.
- Hogsed was informed that Rand was extremely upset when Campus Safety initially responded to the incident, and she declined to speak with Campus Safety at the time.
- Hogsed viewed video footage depicting Boswell and Rand walking towards and away from Boswell's apartment. He also viewed footage of Rand entering and exiting her residence hall.
- Rand gave a video and written statement on February 14, 2022. At that time, Rand requested that the incident be investigated by the Title IX office only.
- On February 22, 2022, Rand returned to the Campus Safety office and requested that a criminal investigation be initiated.
- Campus Safety requested assistance from SLED, and Johnson was assigned to assist.
- Several witnesses were interviewed. Those witnesses gave conflicting accounts as to whether Rand appeared intoxicated on the night of the incident.
- Johnson interviewed Rand in the Campus Safety office on March 3, 2022.

- A search warrant was obtained for Boswell's apartment and executed on March 7, 2022. Hogsed recovered a mattress cover stained with human blood, a fitted bed sheet, a flat bed sheet, and a white t-shirt.

- No questions were asked of Boswell on the day the search warrant was executed because Boswell invoked his right to have counsel present during questioning.

[Doc. 137-3 at 32–37.] Based on the evidence presented, the magistrate judge determined that there was probable cause to arrest Boswell, and he issued an arrest warrant. [Doc. 137 ¶ 28; 137-3 at 24; 137-4 ¶ 21.]

On April 11, 2022, an officer approached Boswell as he exited a classroom near the Campus Safety office. [Doc. 137 ¶ 30; 137-6; 137-5 at 3, 5 (124:2–3, 133:11–21); 137-3 at 17 (226:8–228:3).] The officer stated, "I've got to talk to you," and he asked Boswell to come with him. [Docs. 137-3 at 21 (310:24–311:2); 137-5 at 3 (124:13–17).] Other students were in the hallway during this interaction. [Doc. 149-2 ¶ 23; 149-6 at 59, 69 (195:21–25, 257:2–12).] However, there were no students or professors present when officers handcuffed Boswell. [Doc. 137-5 at 4 (129:3–8).] Officers led Boswell behind the building and placed him in a police car. [Doc. 149-6 at 76 (315:2–19).]

A preliminary hearing was held on July 18, 2022. [*See generally* Doc. 137-2.] Based on the evidence and testimony, the presiding judge determined that there was probable cause to go forward. [*Id.* at 51 (105:11–106:1).]

**The Title IX Investigations**

Wofford College retains a nondiscrimination and anti-harassment policy (the "Nondiscrimination Policy") prohibiting sexual harassment. [Doc. 136 ¶ 21; 127-4; 136-6; 149-11.]

At all relevant times, Matthew Hammett held the position of Director of Civil Rights, Title IX, and Risk Assessment at Wofford College. [Docs. 136 ¶ 22; 136-5 ¶ 3.] Sometime during the week of February 14, 2022, Rand informed Hammett that she wished to pursue a Title IX complaint against Boswell. [Doc. 136-5 ¶ 10.] In addition, Rand requested a no contact order and academic support services, both of which were granted. [*Id.*; Doc. 136-4 at 14 (36:1–21).] On February 28, 2022, Boswell received a notice of allegations and notice of investigation informing him that Rand had initiated a Title IX complaint against him. [Doc. 136-4 at 99.] The notice listed available sanctions under the Nondiscrimination Policy. [*Id.*; Doc. 136-5 ¶ 18.]

On March 1, 2022, Boswell sent an email to Hammett, entitled "Title IX Retaliation," calling attention to "documented events and behavior from [Rand]" believed to be retaliatory, "not in [the] spirit of the confidentiality agreement of the Notice of Allegations & Investigation," and/or "in violation of [the] mutual no contact order." [Doc. 136-4 at 103.] In particular, Boswell alleged that Rand told numerous individuals that Boswell had raped her and posted an image on Snapchat with the caption "F*** graham boswell – All I gotta say." [*Id.*] In response, Hammett spoke with Rand "to remind her that she was not to speak about the investigation publicly." [Doc. 136-5 ¶ 23.] Hammett testified that he only considered Boswell's complaints of retaliation and did not consider whether Boswell also complained of sexual harassment. [Doc. 136-4 at 66 (160:8–161:19).]

On March 7, 2022, Boswell requested supportive measures related to his coursework. [Doc. 136-5 ¶ 24.] Hammett testified that he "would have implemented some supportive measures for [Boswell]" in response to that request. [Doc. 136-4 at 31–32 (76:16–77:15).] On April 13, 2022, Boswell's attorneys sent an email to Hammett

requesting that he send an email to Boswell's academic advisor explaining that Boswell should receive academic accommodations. [Docs. 136-4 at 109.] In response, Hammett contacted Boswell's professors directly. [Doc. 136-4 at 60–61 (152:5–153:21).]

On April 18, 2022, Boswell's attorneys submitted a formal Title IX complaint on Boswell's behalf. [Doc. 136 ¶ 45.] On April 25, 2022, Boswell's attorneys sent Hammett an email requesting a response to the April 18 communication. [Doc. 136-4 at 110.] Hammett stated that he "began the investigation process for Boswell's allegations on or around April [25]." [Doc. 136-5 ¶ 28.] Hammet did not recall whether he met with Boswell at that time. [*Id.* ¶ 29.]

On April 28, 2022, Rand received a notice of allegations and notice of investigation informing her that Boswell had initiated a Title IX complaint against her. [Doc. 136-4 at 111 ("The Title IX Office has received a formal complaint from [Boswell] alleging that you engaged in behavior that potentially violates institutional policy, including alleged retaliatory behavior starting on February 25th and going through April 16th, 2022.").] The notice did not include any mention of sexual harassment. [*Id.*; Docs. 136-4 at 68–69 (164:13–165:2); 136-5 ¶ 31.] Nor did the notice initially include all potential sanctions under the Nondiscrimination Policy. [Doc. 136-5 ¶ 32.]

The Title IX investigation into Rand's complaints against Boswell was closed on October 14, 2022, with a finding that Boswell had not violated policy. [Doc. 133 ¶ 53.] Subsequently, Hammett decided to advance the case further to a hearing before a panel pursuant to Section 7.04 of the Nondiscrimination Policy. [Docs. 136 ¶ 55; 136-5 ¶ 36.] The panel held that Boswell did not violate Wofford policy, and a notice of outcome letter was sent to both parties. [Docs. 136 ¶ 55; 136-5 ¶ 36.]

The Title IX investigation into Boswell's complaints of retaliation against Rand was closed on February 17, 2023, with a finding that Rand had not violated policy. [Doc. 136-5 ¶ 37.] Hammett decided not to escalate Boswell's complaint to a hearing panel "based on the totality of the circumstances presented." [*Id.* ¶ 38.]

**The Wofford College and Community Response**

Following the incident, a group of students circulated a petition advocating for better administrative responses to sexual assault and demanding that the "perpetrator"' be removed from campus. [Doc. 136-4 at 104–08.] The petition was sent to Wofford President Nayef Samhat. [*Id.*] Boswell testified that a Wofford professor signed the petition. [Doc. 136-3 at 43 (202:11–14).] Hammett decided to take no action regarding the petition because he "did not feel it violated any policies and because Wofford is committed to respecting students' rights to free expression and to advocate for causes they care about." [Doc. 136 ¶ 12.]

Additionally, Boswell's car was vandalized on campus. [Doc. 136-3 at 17–20 (55:16–58:25).] Surveillance footage did not confirm a perpetrator, and Rand denied involvement. [*Id.*; Doc. 149-8 at 18 (228:12–24).] Boswell testified that when he asked Title IX investigators to review the footage, he was advised that the footage no longer existed. [Doc. 136-3 at 18 (56:1–22).]

Finally, Boswell was not permitted to walk at graduation. [Doc. 136-3 at 11, 36 (44:16–25, 191:4–6).] Hammett cited safety concerns as the reason for the decision.[5]

[5] In September of 2021, Boswell's ex-girlfriend accused Boswell of throwing a beer can at her. [Doc. 136 ¶ 16.] Neither Title IX nor Campus Safety proceedings were initiated due to insufficient evidence. [*Id.*] However, a no-contact order was issued against Boswell. [*Id.*] "[A] pretty large number of months before [graduation]," Boswell's ex-girlfriend's brother pinned Boswell against a wall. [Doc. 136-3 at 37–38 (192:22–193:11).]

[Docs. 136 ¶ 9; 136-3 at 36 (191:7–12).] Wofford also withheld Boswell's transcript until the resolution of the Title IX proceedings. [Doc. 147 ¶ 13; 149-2 ¶ 30.]

**The Present Litigation**

Plaintiff filed the instant suit on October 27, 2023. [Doc. 1.] The following causes of action remain in the case: malicious prosecution against Hogsed and Wofford; false arrest against Hogsed and Wofford; violations of the Fourth Amendment against Hogsed pursuant to 42 U.S.C. § 1983; intentional infliction of emotional distress ("IIED") against Hogsed and Wofford; breach of contract against Wofford; civil conspiracy against Hogsed and Wofford; and respondeat superior against Wofford.[6] [*Id.* ¶¶ 259–358.]

On January 6, 2026, Defendants filed a motion for summary judgment. [Doc. 126; *see also* Doc. 127.] The motion is now fully briefed and ripe for review. [*See* Docs. 149; 151.]

## APPLICABLE LAW

Rule 56 of the Federal Rules of Civil Procedure states, as to a party who has moved for summary judgment: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for

---

Boswell testified that, around the time of his arrest, he feared that he may be physically confronted by someone on campus. [Doc. 136-3 at 39 (195:9–20).]

[6] On January 8, 2026, Boswell and Rand filed a stipulation of dismissal of all claims against Rand with prejudice and without costs. [Doc. 134.]

the non-movant. *Id.* at 257. When determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. *Id.* at 324. Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue. *Id.* Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id*. Further, Rule 56 provides in pertinent part:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
>> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>>
>> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). Accordingly, when Rule 56(c) has shifted the burden of proof to the non-movant, he must produce existence of a factual dispute on every element essential to his action that he bears the burden of adducing at a trial on the merits.

The Fourth Circuit summarized the Court's obligation when faced with cross motions for summary judgment in *Rossignol v. Voorhaar*:

> When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law. When considering each individual motion, the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion.

316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks and citation omitted).

## DISCUSSION

### Counts One, Two, and Three: False Arrest and Malicious Prosecution

Defendants argue that Plaintiff's false arrest and malicious prosecution claims fail because Plaintiff's arrest was effectuated by a facially valid warrant supported by probable cause. [Doc. 127 at 2–14, 16–17, 19–22.] In response, Plaintiff argues that the existence of probable cause is a question of fact for the jury because Hogsed recklessly or intentionally failed to provide certain exculpatory facts to the magistrate judge. [Doc. 149 at 3–15; 18–23.] For the reasons stated herein, the Court agrees with Defendants. The Court begins with Plaintiff's federal claim.

#### *Count Three: Violations of the Fourth Amendment Against Hogsed*

To prevail under § 1983, a plaintiff must show that (1) the defendant deprived him of a constitutional right; and (2) the defendant did so "under color of state statute,

ordinance, regulation, custom, or usage." *Mentavlos v. Anderson*, 249 F.3d 301, 310 (4th Cir. 2001) (cleaned up).[7]

The Fourth Amendment, applicable to the States through the Fourteenth Amendment, guarantees a person's right against unreasonable searches and seizures. U.S. Const. amend. IV, XIV. Relevant here, the Fourth Amendment provides, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." *Id.* Section 1983 actions premised on false arrest, false imprisonment, or malicious prosecution are analyzed under the Fourth Amendment. *See, e.g., Rogers v. Pendleton*, 249 F.3d 279, 294 (4th Cir. 2001) (stating that claims of false arrest and false imprisonment "are essentially claims alleging a seizure of the person in violation of the Fourth Amendment"); *Thompson v. Clark,* 596 U.S. 36, 42 (2022); *see also Lambert v. Williams*, 223 F.3d 257, 260 (4th Cir. 2000) ("What is conventionally referred to as a '§ 1983 malicious prosecution' action is nothing more than a § 1983 claim arising from a Fourth Amendment violation.").

Malicious Prosecution

To succeed on a Fourth Amendment malicious prosecution claim on the merits, a plaintiff must show that "the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated

[7] The state-action requirement of § 1983 "excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Mentavlos*, 249 F.3d at 310 (internal quotation marks omitted). Here, Hogsed agrees that he acted under color of state law during the relevant period, as he worked in conjunction with SLED and the Seventh Circuit Solicitor's Office to effectuate Boswell's arrest. [Doc. 127 at 18 n.10]; *see also* S.C. Code Ann. § 59-154-10(B)–(D) (providing that, in cases of alleged criminal sexual conduct, the campus reporting officer must notify and work in conjunction with SLED).

in [the] plaintiff's favor."[8] *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012). To demonstrate that an officer seized an individual pursuant to an arrest warrant unsupported by probable cause, a plaintiff must show that the defendant "deliberately or with a reckless disregard for the truth made material false statements in his affidavit[9] or omitted from that affidavit material facts with the intent to make, or with reckless disregard of whether they thereby made, the affidavit misleading." *Miller v. Prince George's Cnty.*, 475 F.3d 621, 627 (4th Cir. 2007) (cleaned up) (footnote added); *see also Franks v. Delaware,* 438 U.S. 154, 171 (1978); *United States v. Colkley,* 899 F.2d 297, 300 (4th Cir. 1990).

For the officer to have acted with a "reckless disregard," he must have harbored "serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Miller*, 475 F.3d at 627. Regarding alleged omissions, the officer must have failed to inform the magistrate judge of facts that the officer knew would negate a finding of probable cause. *Id.* Conversely, "[a] plaintiff's allegations of negligence or innocent mistake by a police officer will *not* provide a basis

[8] The parties agree that Plaintiff was seized pursuant to legal process and that the proceedings terminated in Plaintiff's favor. [*See* Doc. 149 at 20.]

[9] Relevant here, the magistrate judge may supplement an affidavit with sworn oral testimony. *See, e.g., United States v. Hill,* 500 F.2d 315, 320 n.2 (5th Cir. 1974) ("In two cases arising from state criminal convictions the Supreme Court intimated that sworn oral testimony before a state magistrate in an application for a search or arrest warrant may constitutionally supplement an affidavit . . . ." (citing *Whiteley v. Warden, Wyo. State Penitentiary,* 401 U.S. 560, 565 n.8 (1971); *Aguilar v. Texas,* 378 U.S. 108, 109 n.1 (1964), *abrogated in part on other grounds by Illinois v. Gates,* 462 U.S. 213 (1983))), *abrogated in part on other grounds by Illinois v. Gates*, 462 U.S. 213 (1983); *see also State v. Dill*, 816 S.E.2d 557, 562 (S.C. 2018) ("Sworn oral testimony is permissible to supplement search warrant affidavits which are facially insufficient to establish probable cause."). The parties do not appear to contest this proposition. [*See generally* Docs. 127; 149; 151.]

for a constitutional violation." *Id.* at 627–28 (internal quotation marks omitted); *see also Myers v. Morris,* 810 F.2d 1437, 1458 (8th Cir. 1987) (requiring "a specific affirmative showing of dishonesty"), *abrogated on other grounds by Burns v. Reed,* 500 U.S. 478 (1991).

Additionally, "the false statements or omissions must be material, that is, necessary to the neutral and disinterested magistrate's finding of probable cause." Miller, 475 F.3d at 628 (cleaned up). "To determine materiality, a court must excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the 'corrected' warrant affidavit [supplemented by sworn oral testimony] would establish probable cause." *Id.* (internal quotation marks omitted).

Probable cause "means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). Accordingly, "[p]robable cause requires more than 'bare suspicion' but requires less than evidence necessary to convict." *Porterfield v. Lott*, 156 F.3d 563, 569 (4th Cir. 1998).

Officers are not required to conduct exhaustive investigations to establish probable cause. *See e.g., McKinney v. Richland Cnty. Sheriff's Dep't*, 431 F.3d 415, 418–19 (4th Cir. 2005) ("The fact that [the officer] did not conduct a more thorough investigation before seeking the arrest warrant does not negate the probable cause established by the victim's identification."); *Wadkins v. Arnold*, 214 F.3d 535, 543 (4th Cir. 2000) ("The question before us is not whether [the officer] exhausted every potential avenue of investigation."); *Torchinsky v. Siwinski*, 942 F.2d 257, 264 (4th Cir. 1991) ("It will, of course, always be

possible to contend in court that an arresting officer might have gathered more evidence, but judges cannot pursue all the steps a police officer *might* have taken that *might* have shaken his belief in the existence of probable cause."). Nor are officers required to resolve conflicting evidence to establish probable cause. *See Colkley*, 899 F.2d at 301–03 (holding that the Fourth Amendment does not require an officer to present all potentially exculpatory evidence to the magistrate judge, provided that the officer did not exclude critical information with the intent to mislead); *Conway v. Jeffry*, No. MJM-25-1826, 2026 WL 2601018, at *6 (D. Md. Sept. 3, 2026) ("[A]n officer confronted with conflicting facts . . . is not precluded from finding probable cause to make an arrest." (collecting cases)); *Paez v. Mulvey*, 915 F.3d 1276, 1286 (11th Cir. 2019) ("[A]rresting officers, in deciding whether probable cause exists, are not required to sift through conflicting evidence or resolve issues of credibility, so long as the totality of the circumstances present a sufficient basis for believing that an offense has been committed." (internal quotation marks omitted)). Finally, officers may rely on victim reports or witness statements to establish probable cause. *See United States v. Beckham*, 325 F. Supp. 2d 678, 687 (E.D. Va. 2004) ("Particularly relevant here is the principle that a finding of probable cause may be based on information provided by a victim or eyewitness to a crime, as it is well-established that when an officer has received information from some person—normally the putative victim or an eye witness—who it seems reasonable to believe is telling the truth, he has probable cause." (cleaned up)).

In the present case, Boswell was arrested on the charge of third degree criminal sexual conduct. [Doc. 137-3 at 24.] South Carolina Code § 16-3-654 provides:

> (1) A person is guilty of criminal sexual conduct in the third degree if the actor engages in sexual battery with the

> victim and if any one or more of the following circumstances are proven:
>
> (a) The actor uses force or coercion to accomplish the sexual battery in the absence of aggravating circumstances.
>
> (b) The actor knows or has reason to know that the victim is mentally defective, mentally incapacitated, or physically helpless and aggravated force or aggravated coercion was not used to accomplish sexual battery.
>
> (2) Criminal sexual conduct in the third degree is a felony punishable by imprisonment for not more than ten years, according to the discretion of the court.

The affidavit submitted by Hogsed in support of the arrest warrant states:

> [O]n February 11, 2022[,] in the city of Spartanburg, one Graham Boswell did, at Wofford College[,] engage in sexual battery in that he engaged in sexual battery with victim, Catherine Rand, who was intoxicated and unable to give consent using force and/or coercion to accomplish the battery, the defendant knowing or having reason to know that the victim was mentally defective, mentally incapacitated, or physically helpless.

[Doc. 137-3 at 24.] In addition, the affidavit indicates that the warrant was "based upon [the] police investigation." [*Id.*]

Regarding the information presented to the magistrate judge, the record indicates that Hogsed:

- described the contents of Boswell's statement, including Rand's and Boswell's conflicting accounts of the incident;
- stated that he possessed Rand's medical records;
- stated that Rand did not receive a forensic examination;
- stated that Rand did not receive a blood alcohol content test; and

- presented a copy of his supplemental report,[10] which included the following information:
    - Hogsed was briefed on the incident on February 12, 2022;
    - Hogsed was informed that blood-soaked underwear was recovered from the victim;
    - Hogsed was informed that Rand was extremely upset when Campus Safety initially responded to the incident, and she declined to speak with Campus Safety at the time;
    - Hogsed viewed video footage depicting Boswell and Rand walking towards and away from Boswell's apartment;
    - Hogsed viewed footage of Rand entering and exiting her residence hall;
    - Rand gave a video and written statement on February 14, 2022, and she requested that the incident be investigated by the Title IX office only;
    - on February 22, 2022, Rand returned to the Campus Safety office and requested that a criminal investigation be initiated;
    - Campus Safety requested assistance from SLED, and Johnson was assigned to assist;
    - several witnesses were interviewed, and they gave conflicting accounts as to whether Rand appeared intoxicated on the night of the incident;
    - Johnson interviewed Rand in the Campus Safety office on March 3, 2022;
    - a search warrant was obtained for Boswell's apartment and executed on March 7, 2022, wherein Hogsed recovered a mattress cover stained with human blood, a fitted bed sheet, a flat bed sheet, and a white t-shirt; and

[10] The record confirms only that the magistrate judge *asked* to see Hogsed's supplemental report. [Docs. 137 ¶ 25; 137-2 at 46 (82:4–7).] That said, the Court assumes Hogsed gave the magistrate judge a copy of the supplemental report in response to that request. *See U.S. Dep't of State v. Ray,* 502 U.S. 164, 179 (1991) ("We generally accord . . . official conduct a presumption of legitimacy.").

- no questions were asked of Boswell on the day the search warrant was executed because Boswell invoked his right to have counsel present during questioning.

[Docs. 137 ¶¶ 23–25; 137-2 at 45–46 (81:7–82:5); 137-3 at 13, 20 (159:22–160:7, 295:6–8), 32–37.]

The record indicates that Hogsed omitted the following exculpatory information in his presentation to the magistrate judge: that medical personnel found no evidence of trauma to Rand; that Rand denied being sexually assaulted when she was at the hospital; video footage of Rand walking without impairment on the night of the incident; and Boswell's polygraph examination. [Docs. 137 ¶ 26; 137-3 at 12–13, 14 (157:9–160:7, 162:24–165:6).] In addition, Hogsed did not tell the magistrate judge that he failed to recover or test Boswell's jeans or that Rand's dress did not appear to be covered in blood. [Doc. 149-6 at 47 (166:1–21).] Finally, Hogsed did not provide the magistrate judge with a physical copy of Boswell's statement. [Doc.137-2 at 45 (81:14–16).]

The Court's inquiry begins and ends with the intentionality requirement. As an initial matter, the parties agree that Hogsed omitted several exculpatory facts in his presentation to the magistrate judge. [*See* Docs. 126-1 at 10–11; 137 ¶ 26; 148 ¶ 26; 149 at 11–14, 21–22.] Crucially, however, the record is bereft of evidence suggesting that Hogsed *intentionally or recklessly* misled the magistrate judge. Although Plaintiff directs the Court to Hogsed's multiple acknowledgements of omission [*see, e.g.,* Doc. 149 at 12 ("Hogsed repeatedly admitted that he did not present to the Magistrate Judge any of the exculpatory evidence he had . . . .")], the fact of omission alone is not sufficient evidence of malice. *See Colkley*, 899 F.2d at 301 ("We have doubts about the validity of inferring bad motive under *Franks* from the fact of omission alone, for such an inference

collapses into a single inquiry the two elements—'intentionality' and 'materiality'—which *Franks* states are independently necessary."); *see also id.* at 300–01 (concluding that there was insufficient evidence to show that the officer intended to mislead the warrant-issuing magistrate judge even though he omitted from his affidavit the fact that none of the six eyewitnesses were able to identify the suspect out of a photo lineup and that he used only the height description provided by one eyewitnesses but did not mention that other witnesses indicated the perpetrator was shorter than the suspect); *Simmons v. Poe*, 47 F.3d 1370, 1384 (4th Cir. 1995) ("Under the commonsense approach articulated in *Colkley,* it is apparent that [the officer's] selection of the profile factors included in the affidavit was not an attempt to mislead the magistrate. [The officer] simply included all the profile factors that were or could be consistent with [the suspect]. [The officer] omitted from the application those profile factors inconsistent with [the suspect], just as he omitted other investigative facts inconsistent with [the suspect] from the application.").

On the contrary, Hogsed testified that, prior to applying for an arrest warrant, he presented Boswell's entire investigative file[11] to the Seventh Circuit Solicitor's Office for

---

[11] [*See* Doc. 137-4 ¶ 12 ("The file that we presented to the Solicitor's Office included the same information and documents that were in the investigative file at the time SLED Agent Johnson applied for the search warrant [statements from Rand and other witnesses, video footage of Plaintiff and Rand both before and after the incident, and documentation of a pair of bloody underwear that was received on the night of the incident], as well as an updated Campus Safety Report of the incident, Plaintiff's statement, Rand's medical records from her emergency room visit, a description of the items found during the search of Boswell's apartment, the report of a polygraph examination that Plaintiff took, and pictures of bruising on a female thigh."); *see also* Docs. 137-2 at 26 (33:11–14) ("Agent Johnson and I took everything that we had and had a meeting with the solicitor's office and presented what we had, including everything."), 42 (74:15–17) ("Everything that I had, I took with me and turned it – I mean, I gave them the paper copies."); 137-3 at 16 (206:17–207:12) ("They were not told about the dress. They were told about – there was no BAC. There was no sexual assault kit. They were told about his polygraph tests. . . . [T]hey were told about the medical records and her statement that the doctor had made

an independent assessment of probable cause. Only after the Solicitor's Office independently corroborated the existence of probable cause did Hogsed prepare and submit a warrant application to the magistrate judge. [*See* Doc. 137-4 ¶ 10 ("Even though I believed that enough information existed in the investigative file to support probable cause to arrest Plaintiff, and my understanding was that SLED Agent Johnson agreed, I declined to seek an arrest warrant for Plaintiff until I was able to speak with the Solicitor's Office and determine whether they agreed that probable cause existed for the arrest.").] As such, the record indicates that Hogsed believed the totality of the evidence in Boswell's investigative file—*including conflicting credibility evidence and exculpatory facts*—supported a finding of probable cause. Accordingly, no reasonable juror could conclude that Hogsed intentionally omitted evidence that he knew would negate probable cause. *See Miller*, 475 F.3d at 627; *see also Gomez v. Atkins,* 296 F.3d 253, 264 (4th Cir. 2002) ("It is important to our analysis that [the officer] conducted himself, from a procedural standpoint, in a prudent and deliberate manner. After carrying out his Follow-up investigation, he drafted a written Report and, before seeking judicial action against [the suspect], he presented the case to his supervisors and the legal advisor of the Sheriff's Department. After receiving their supportive opinions, he provided his proposed affidavit to the Department's legal advisor for her review. It was only after following these 'in-house' review procedures that [the officer] presented the affidavit to the magistrate and sought the issuance of a murder warrant against [the suspect]."); *Wadkins,* 214 F.3d at 541–42 (concluding that an officer's "conference with the Commonwealth's Attorney and

---

in front of her about – I think you brought it up earlier that the doctor made a statement that [there was] tearing, but it wasn't indicated in the medical records.").]

the subsequent issuance of the warrants by a neutral and detached magistrate weigh[ed] heavily toward a finding that [the officer was] immune"); *Osborne v. Georgiades,* 679 F. App'x 234, 249 (4th Cir. 2017) (Traxler, J., dissenting)[12] ("[I]nsofar as the record contains facts relating to [the officer's] intent with regard to the arrest warrant, they suggest that he harbored no deceit and wanted to make sure he covered all his bases before arresting [the suspect]. . . . [P]rior to applying for the arrest warrant, [the officer] took the recording of the [victim's] interview to . . . the prosecutor[] for her assessment of the case. After watching the interview . . . and discussing the merits of the case with [the officer], [the prosecutor] wanted to move forward with the prosecution. Only after receiving the go-ahead from the prosecutor did [the officer] prepare and submit his warrant application.").[13] Plaintiff has thus failed to establish the requisite intent required to sustain his § 1983 malicious prosecution claim.[14]

---

[12] The *Osborne* majority concluded that the defendant waived any challenge to the district court's holding regarding intentionality. *See Osborne*, 679 F. App'x at 238.

[13] Relatedly, a police officer is not liable for a plaintiff's unlawful seizure following a formal indictment or preliminary hearing in the absence of evidence that the officer misled or pressured the prosecution. *Evans*, 703 F.3d at 648; *Taylor v. Meacham*, 82 F.3d 1556, 1564 (10th Cir. 1996). In the present case, a preliminary hearing was held in which a judge independently concluded that the evidence was sufficient to bind Boswell over for trial. [*See generally* Doc. 137-2.] Hogsed was subject to full cross-examination at the preliminary hearing. [*See* Doc. 137-4 ¶¶ 26–27.] As such, there is no evidence that Hogsed misled or pressured the prosecution.

[14] Because the Court concludes on the merits that Hogsed is entitled to summary judgment on Boswell's malicious prosecution claim, the Court need not decide whether Hogsed is entitled to a good-faith defense. [*See* Docs. 127 at 20 n.11; 149 at 23–24.] Nevertheless, for the reasons previously stated, the Court concludes that Plaintiff has forecasted insufficient evidence to show that Hogsed's omissions before the magistrate judge were made maliciously.

False Arrest

Although Boswell may challenge the constitutional validity of the arrest warrant, a false arrest claim is not the appropriate cause of action for him to do so. Where a plaintiff has been arrested pursuant to a facially valid warrant, his claim is for malicious prosecution rather than false arrest. *See Porterfield v. Lott,* 156 F.3d 563, 568 (4th Cir. 1998) ("[A] claim for false arrest [under § 1983] may be considered only when no arrest warrant has been obtained."); *Smith v. Munday,* 848 F.3d 248, 257 (4th Cir. 2017) ("A claim for false arrest alleges that a warrantless arrest lacked probable cause; a claim for malicious prosecution alleges that an arrest made pursuant to a warrant lacked probable cause."); *Wallace v. Kato*, 549 U.S. 384, 390 (2007) ("If there is a false arrest claim, damages for that claim cover the time of detention up until issuance of process or arraignment, but no more. From that point on, any damages recoverable must be based on a malicious prosecution claim and on the wrongful use of judicial process rather than detention itself."). Accordingly, the Court grants summary judgment to Hogsed as to Plaintiff's § 1983 false arrest claim.

***Count One: Malicious Prosecution Against Hogsed and Wofford***

Under South Carolina law, the elements of malicious prosecution are: "(1) the institution or continuation of original judicial proceedings; (2) by or at the instance of the defendant; (3) termination of such proceedings in [the] plaintiff's favor; (4) *malice in instituting such proceedings*; (5) lack of probable cause; and (6) resulting injury or damage." *Law v. S.C. Dep't of Corr.*, 629 S.E.2d 642, 648 (S.C. 2006) (emphasis added). "'Probable cause' is defined as a good faith belief that a person is guilty of a crime when this belief rests on such grounds as would induce an ordinarily prudent and cautious man,

under the circumstances, to believe likewise." *Jones v. City of Columbia*, 389 S.E.2d 662, 663 (S.C. 1990).

As discussed in detail previously, Plaintiff has failed to forecast sufficient evidence showing that Hogsed acted maliciously because Hogsed presented Boswell's full investigative file to the Seventh Circuit Solicitor's Office and received independent corroboration of the existence of probable cause. *See Prosser v. Parsons*, 141 S.E.2d 342, 347 (S.C. 1965) ("As a general rule, advice of a prosecuting attorney may constitute a defense to an action for malicious prosecution, providing that the advice is sought in good faith and received after a full and complete disclosure of all material facts."); *White v. Coleman*, 277 F. Supp. 292, 297 (D.S.C. 1967) ("[I]f the person instituting the prosecution acted on the basis of advice given by the prosecuting attorney, after a full and fair disclosure of the facts, probable cause exists.") (applying South Carolina law). Accordingly, the Court grants summary judgment to Defendants as to Plaintiff's state law malicious prosecution claim.

***Count Two: False Arrest Against Hogsed and Wofford***

As under federal law, the proper channel for Plaintiff's state law claims proceeds under malicious prosecution, not false arrest. *See Carter v. Bryant,* 838 S.E.2d 523, 528 (S.C. Ct. App. 2020) ("In the event no probable cause existed [for an arrest pursuant to a facially valid warrant], the remedy is to sue for malicious prosecution, not false arrest."). Because Plaintiff was arrested pursuant to a facially valid warrant, the Court grants summary judgment to Defendants as to Plaintiff's state law false arrest claim.

**Count Six: IIED Against Hogsed and Wofford**

To recover for IIED under South Carolina law, a plaintiff must show:

> (1) the defendant intentionally or recklessly inflicted severe emotional distress, or was certain, or substantially certain, that such distress would result from his conduct;
>
> (2) the conduct was so extreme and outrageous so as to exceed all possible bounds of decency and must be regarded as atrocious, and utterly intolerable in a civilized community;
>
> (3) the actions of the defendant caused plaintiff's emotional distress; and
>
> (4) the emotional distress suffered by the plaintiff was severe such that no reasonable man could be expected to endure it.

*Argoe v. Three Rivers Behavioral Health, L.L.C.,* 710 S.E.2d 67, 74 (S.C. 2011) (internal quotation marks omitted). "[I]t is a matter for the court, not a jury, to determine in the first instance whether the conduct in question can reasonably be regarded as so extreme and outrageous as to permit recovery." *Williams v. Grimes Aerospace Co.,* 988 F. Supp. 925, 942 (D.S.C. 1997) (applying South Carolina law). To this end, South Carolina courts have expressed that IIED claims must not become "a panacea for wounded feelings rather than reprehensible conduct." *Hansson v. Scalise Builders of S.C.*, 650 S.E.2d 68, 70 (S.C. 2007) (internal quotation marks omitted).

Defendants argue that Plaintiff's IIED claim fails because "the facts, even taken in the light most favorable to Plaintiff, fall far short of being extreme, outrageous, and exceeding all possible bounds of decency." [Doc. 127 at 22–25.] In response, Plaintiff argues that "this case is not even close to one simply about wounded feelings." [Doc. 149 at 25.]

In support of his claim, Plaintiff alleges the following:

- Boswell was subjected to a public and humiliating arrest and criminal prosecution without probable cause.
- Boswell's arrest was covered extensively by the media and televised on Wofford's campus.
- Boswell was the subject of "violent messages and threats" on social media.
- Fliers regarding a campus protest were posted on professors' doors with direct references to Boswell's bond hearing.
- Boswell's car was vandalized while parked on campus.
- A petition signed by Wofford students and faculty was circulated calling for Boswell's removal from campus and describing Boswell as having a history of violence.
- Boswell's arrest was incorporated into a class discussion by a Wofford professor.
- Wofford prohibited Boswell from participating in any graduation ceremonies on the false premise of his "safety."
- Wofford failed to properly address Boswell's Title IX complaints and did not consider whether Boswell endured sexual harassment.

[Doc. 149 at 25–28.] However, these alleged acts are not "so extreme and outrageous so as to exceed all possible bounds of decency." *Argoe,* 710 S.E.2d at 74 (internal quotation marks omitted). As an initial matter, Plaintiff has presented insufficient evidence to show that Boswell's arrest was malicious, negating any suggestion that the arrest was extreme, outrageous, or beyond typical bounds of decency. *See Roberts v. City of Forest Acres*, 902 F. Supp. 662, 672 (D.S.C. 1995) (concluding that an officer's conduct did not meet the high threshold of extreme and outrageous conduct required for an IIED claim under South Carolina law where the officer had probable cause to arrest the plaintiff). In addition, much of the conduct that Plaintiff complains of is not directly attributable to

Defendants. Further, Defendants articulated reasonable justifications for their own conduct: for example, Wofford stated that it chose not to censor its students due to policies protecting their freedom of expression, and it prohibited Boswell from participating in graduation activities to protect Boswell from the threat of physical violence. [Doc. 127 at 23–25.] Even assuming for the sake of argument that Defendants intended for such conduct to cause Boswell distress, Boswell has nevertheless failed to forecast sufficient evidence to satisfy the high standard for IIED claims, and no reasonable factfinder could conclude otherwise. *See, e.g., Doe v. Erskine Coll.,* No. Civ.A 8:04-23001RBH, 2006 WL 1473853, at *14 (D.S.C. May 25, 2006) (granting summary judgment to the defendants on the plaintiff's IIED claim concerning a college's response to sexual assault allegations, where the "[t]he alleged acts of the defendants that the plaintiff claim[ed] [were] outrageous include[d] the alleged failure to remove [the plaintiff] from on-campus encounters with [a] male student, the alleged failure to investigate [the plaintiff's] complaint in a timely manner, . . . allegedly distributing [the plaintiff's] medical records . . . without [the plaintiff's] consent, and . . . allegedly defaming [the plaintiff] in [a] letter . . . [denying the plaintiff's appeal]"). Accordingly, the Court grants summary judgment to Defendants as to Plaintiff's state law IIED claim.

**Count Seven: Breach of Contract Against Wofford**

The elements for breach of contract under South Carolina law are (1) the existence of a contract, (2) its breach, and (3) damages caused by such breach. *Fuller v. E. Fire & Cas. Ins.*, 124 S.E.2d 602, 610 (S.C. 1962); *Branche Builders, Inc. v. Coggins*, 686 S.E.2d 200, 202 (S.C. Ct. App. 2009). For the reasons stated herein, Plaintiff has failed to

forecast sufficient evidence to show that Wofford owed—or breached—a contractual duty to Plaintiff.

"It is commonly held that a contract exists between a college and its students." *Carter v. Univ. of S.C.*, 602 S.E.2d 59, 61 n.4 (S.C. Ct. App. 2004); *see also R.J. Hendricks, II v. Clemson Univ.,* 578 S.E.2d 711, 717 (S.C. 2003) (ruling that "some aspects of the student/university relationship are indeed contractual"); *Organiscak v. Cleveland State Univ*., 762 N.E.2d 1078, 1081 (Ohio 2001) ("It is axiomatic that when a student enrolls in a college or university, pays his tuition and fees, and attends such school, the resulting relationship may reasonably be construed as being contractual in nature.") However, the parties do not identify, and the Court has not located, South Carolina law regarding the extent to which student handbooks and policies provide the terms of that implied contract.

Under South Carolina law, a general policy statement is enforceable as a contract if the statement is "definitive in nature, promising specific treatment in specific situations." *Hessenthaler v. Tri-Cnty. Sister Help, Inc.*, 616 S.E.2d 694, 698 (S.C. 2005). Relatedly, "courts in numerous states hold that implied contracts exist between universities and their students, and student handbooks and other published policies—*if specific*—help define these implied contracts." *Lee v. Univ. of N.M.,* 449 F. Supp. 3d 1071, 1146 (D.N.M. 2020) (emphasis added) (collecting cases); *see also Doe v. Wake Forest Univ.,* 671 F. Supp. 3d 624, 630–31 (M.D.N.C. 2023) ("[T]he student's payment of tuition and fees creates a *reciprocal* obligation on the parties to follow those rules and policies on which continued attendance is conditioned. In other words, a school cannot assert control over the behavior of students . . . without the reciprocal obligation to follow its own rules for exerting

that control." (applying North Carolina law)); *Sharick v. Se. Univ. of Health Scis., Inc.,* 780 So. 2d 136, 138 (Fla. Dist. Ct. App. 2000) ("It is generally accepted that the terms and conditions for graduation are those offered by the publications of the college at the time of enrollment." (internal quotation marks omitted)); *Wickstrom v. N. Idaho Coll.,* 725 P.2d 155, 157 (Idaho 1986) ("[T]he general nature and terms of the agreement are usually implied, with specific terms to be found in the university bulletin and other publications.") (internal quotation marks omitted); *Brody v. Finch Univ. of Health Scis./The Chi. Med. Sch.*, 698 N.E.2d 257, 265 (Ill. App. Ct. 1998) ("A contractual relationship exists between a college or university and its students, and the terms of the contract are generally set forth in the school's catalogs, bulletins, and brochures."); *Harwood v. Johns Hopkins Univ*., 747 A.2d 205, 209 (Md. Ct. Spec. App. 2000) ("The terms of the contract are contained in the brochures, course offering bulletins, and other official statements, policies and publications of a university, and the university is required to . . . enforce its policies consistent with the terms." (internal quotation marks omitted)); *but see Doe v. Marymount Univ.,* 297 F. Supp. 3d 573, 587–88 (E.D. Va. 2018) ("Under Virginia law, a [u]niversity's student conduct policies are not binding, enforceable contracts; rather, they are behavior guidelines that may be unilaterally revised by [a university] at any time."). Based on South Carolina law regarding the enforceability of policy statements and "the large number of states whose courts recognize that implied contracts arise from student handbooks [and policies]," *Lee*, 449 F. Supp. 3d at 1147, the Court assumes that an

implied contractual relationship existed between Plaintiff and Wofford and that Wofford's published policies—*if specific*—supplied the contours of that contract.[15]

Nevertheless, Plaintiff's breach-of-contract claim fails because the provisions cited by Plaintiff lack promissory language imposing specific contractual obligations on Wofford, or Plaintiff has otherwise forecasted insufficient evidence to prove that Wofford breached those provisions.

First, Plaintiff claims that Wofford breached a provision of the Nondiscrimination Policy providing that Wofford "is committed to providing an educational and work environment, including programs and activities, free from discrimination, harassment, and retaliation." [Doc. 149 at 35 (internal quotation marks omitted); *see also* Doc. 1 ¶¶ 224,

---

[15] Wofford argues that the policies in question are not enforceable as contracts because they may be unilaterally altered at any time. [*See* Doc. 127 at 27.] However, several courts have suggested that universities may unilaterally alter their policies without rendering the student-university contract unenforceable. *See Mahavongsanan v. Hall,* 529 F.2d 448, 450 (5th Cir. 1976) ("Implicit in the student's contract with the university upon matriculation is the student's agreement to comply with the university's rules and regulations, which the university clearly is entitled to modify so as to properly exercise its educational responsibility."); *Univ. of Miss. Med. Ctr. v. Hughes,* 765 So. 2d 528, 535 (Miss. 2000) ("It is the conclusion of this Court, in keeping with the law of sister jurisdictions, that while the student-university relationship is contractual in nature, implicit in the university's general 'contract' with its students is a right to change the university's academic degree requirements if such changes are not arbitrary or capricious. . . . A strict view of contract law—that it is a breach of contract for the [u]niversity to modify its degree requirements in any instance after a student has enrolled—is rejected. Such a rule would interfere unnecessarily in the [u]niversity's discretion to manage its academic affairs. Moreover, a strict view of the parties' relationship would require the conclusion that a new contract was formed each semester when [the plaintiff] paid his tuition." (collecting cases)).

Moreover, Section 1.05 of Wofford's Nondiscrimination Policy contains explicit guardrails to revision: specifically, "[c]onduct reported to have occurred prior to the implementation of [the] Policy will be adjudicated pursuant to the procedures listed herein," and "[t]he Title IX Coordinator may . . . vary procedures materially *with notice* upon determining that changes to law or regulation require alterations." [Doc. 127-4 at 2 (emphasis added).]

343(a).] To this end, "Boswell testified that . . . his desire to go to class and live and work were threatened by Wofford's lack of responses and retaliatory relief." [Doc. 149 at 35; *see also* Doc. 149:3 at 16–18, 20–22 (60:7–62:12, 68:2–70:21).] This provision of the Nondiscrimination Policy is not enforceable as a contract, as it does not create an expectation or promise that Wofford will follow a specific process or course of conduct. *See Hessenthaler*, 616 S.E.2d at 699 ("The nondiscrimination provision in this case was not specific and did not make any promises regarding disciplinary procedure or termination decisions. Therefore, we hold that the handbook did not contain promises enforceable in contract."); *King v. Marriott Int'l, Inc.,* 520 F. Supp. 2d 748, 756 (D.S.C. 2007) ("In this case, [the defendant's] promise that 'there will be no discrimination or recrimination' against an employee who asserts a complaint against the [c]ompany does not create an expectation that employment is guaranteed or that a particular process must be complied with before an employee is terminated."), *aff'd,* 267 F. App'x 301 (4th Cir. 2008); *Lee,* 449 F. Supp. 3d at 1147 ("To create contractual rights, . . . the terms of the representation must be sufficiently explicit to create a reasonable expectation of an implied contract." (internal quotation marks omitted)).

Second, Plaintiff claims that Wofford breached Section 3.03(G) of the Nondiscrimination Policy by ignoring Boswell's reports that Rand was accosting individuals about him and disparaging his character. [Doc. 149 at 35; *see also* Docs. 1 ¶ 343(b); 149-3 at 27–28 (76:16–77:5); 149-11 at 5.] Again, Plaintiff has failed to identify specific contractual language creating a mandatory duty on the part of Wofford. Specifically, Section 3.03(G) of the Nondiscrimination Policy merely states that "Wofford College *reserves the right* to impose any level of sanction, ranging from a reprimand up

to and including suspension or expulsion/termination, for any offense under this Policy." [Doc. 149-11 at 5 (emphasis added)]; *see Horton v. Darby Elec. Co.,* 599 S.E.2d 456, 461 & n.7 (S.C. 2004) (ruling that an employee manual did not create contractual obligations in part because the employer's progressive discipline policy contained permissive rather than mandatory language).

Third, Plaintiff claims that Wofford breached provisions of the Nondiscrimination Policy providing that investigations of sexual harassment complaints are to be "'thorough, reliable, impartial, prompt, and fair.'" [Doc. 149 at 35–36 (citing Sections 7.02[16] and 8.01(C) of the Nondiscrimination Policy); *see also* Doc. 1 ¶¶ 236, 343(c).] To this end, Plaintiff claims that he made numerous reports of retaliation and sexual harassment, but Wofford waited six weeks before opening a formal investigation and ten months before issuing a final report. [Doc. 149 at 35–36.] In addition, Plaintiff alleges that Title IX investigators failed to interview Rand and other witnesses and instead "repackag[ed] Rand's interview as a complainant for the investigation report." [*Id.* at 35.] As an initial matter, the Court cannot consider the terms "thorough, reliable, impartial, prompt, and fair" in isolation; rather, the Court must consider them in the context of the Nondiscrimination Policy as a whole. *See Thomas-McCain, Inc. v. Siter*, 232 S.E.2d 728, 729 (S.C. 1977) (providing that the intention of the parties is to be determined by looking at the agreement as a whole, rather than focusing exclusively on one provision). Here, the Nondiscrimination Policy's broad reference to "thorough, reliable, impartial, prompt, and fair" investigations does not give rise to obligations independent of the obligations

[16] The parties have not provided the Court with the text of Section 7.02. [*See generally* Docs. 127-4; 136-6; 149-11.]

imposed by the more specific provisions in the Nondiscrimination Policy.[17] *See Doe v. Trustees of the Univ. of Penn.*, 270 F. Supp. 3d 799, 812 (E.D. Pa. 2017) ("[T]he promises of 'fairness' do not give rise to 'fairness' obligations that are independent of, and separate from, the obligations imposed by the more specific provisions in the Disciplinary Procedures, which themselves describe proceedings designed to be 'fair.'"). Accordingly, Plaintiff cannot prevail on his breach-of-contract claim without identifying some other, specific provision in the Nondiscrimination Policy that was allegedly breached. *See id.* at 814–15 ("[T]he [c]omplaint cannot—and does not—state a breach of contract claim upon which relief can be granted insofar as it alleges that [the defendant] failed to provide a 'fair' investigation or 'fair' hearing without identifying some other, specific provision in the [d]isciplinary [p]rocedures that was allegedly breached."); *Doe v. Wake Forest*, 671 F. Supp. 3d at 632 ("[S]ubjective or 'aspirational' claims related to the overall 'fairness' of the process and whether the hearing officer or others made 'mistakes' of judgment in handling the claims against the [plaintiff], including the ultimate correctness of the decision to find [the plaintiff] 'responsible' for misconduct and suspend him, are not enforceable identifiable objective contractual promises."). The Court declines to scour

[17] *See, e.g.,* Section 6.03 of the Nondiscrimination Policy ("The College will make every reasonable effort to ensure that the resolution of a complaint occurs in as timely and efficient a manner as possible. The timelines set forth in this Policy are intended as guidelines and may be altered for good cause. The College will strive to complete the resolution of a complaint (not including an appeal, if applicable) within 90 calendar days of the receipt of the complaint, absent extenuating circumstances. If circumstances, such as the complexity of the case, non-availability of parties and witnesses, College breaks, or other circumstances require the resolution to extend past 90 calendar days, the College will notify the parties of that fact."). [Doc. 127-4 at 5; *see also* Doc. 127 at 29.]

the Nondiscrimination Policy to identify any such enforceable contractual duties.[18] *See Murthy v. Missouri,* 603 U.S. 43, 67 n.7 (2024) ("[J]udges are not like pigs, hunting for truffles buried in the record." (cleaned up)).

Fourth, Plaintiff argues that Wofford breached Section 4.01 of the Nondiscrimination Policy by responding to media inquiries about Plaintiff in such a way that Wofford indicated the identity of Plaintiff as a respondent in a Title IX matter. [Doc. 149 at 36; *see also* Doc. 149-11 at 6.] However, the portion of the record cited in support of this proposition contains only a conclusory mention of Section 4.01 and forecasts no attendant evidence regarding Wofford's breaching conduct. [Doc. 149-3 at 13 (54:9–11).] In addition, Plaintiff argues that Wofford breached Section 6.05 of the Nondiscrimination Policy by identifying him by name to a media outlet. [Doc. 149 at 36; *see also* Doc. 1 ¶ 246.] However, Plaintiff has not directed the Court to any evidence proving that the individual who made the alleged disclosure was an agent of Wofford. [*See* Doc. 151-2 at 7 (89:1–8 ("Q: But we don't know who said it, right? A: We don't.")); *see also* Docs. 149-3 at 29 (80:7–21); 1 ¶¶ 111–13.] Without such evidence, Plaintiff has not created a genuine issue of material fact regarding whether Wofford breached a contractual duty owed to Plaintiff. *See Anderson,* 477 U.S. at 248 (conclusory allegations or denials, without more, are insufficient to preclude granting a summary judgment motion).

Fifth, Plaintiff argues that Wofford breached Sections 6.05, 6.10, and 8.01 of the Nondiscrimination Policy because it "[f]ail[ed] to secure the confidentiality of the Title IX

---

[18] In any case, the parties have not provided the Court with a full copy of the Nondiscrimination Policy. [*See generally* Docs. 127-4; 136-6; 149-11.]

report by allowing Rand to have unrestricted access to the report resulting in Rand submitting a falsified version of the report to the U.S. Army and failing to sanction Rand for her violations of Wofford's policies." [Doc. 149 at 36; *see also* Doc. 1 ¶¶ 235, 304 ("On or about March 16, 2023, Rand contacted Captain Haskett, the Captain in the U.S. Army who had been conducting an investigation of Plaintiff in relation to Plaintiff's process of commissioning with the army. Rand falsely stated to the Captain that Plaintiff had raped her, and materially misrepresented Wofford's investigation of the assault claim by presenting Captain Haskett with an incomplete copy of the Title IX investigation report, which deliberately excluded all of the exculpatory evidence upon which Plaintiff had been found not responsible."), 343(d).] Plaintiff also contends that Wofford violated its Information Technology Policy by providing Rand with unfettered access to the Title IX Report. [Doc. 149 at 37; *see also* Docs. 1 ¶ 247; 149-3 at 29–30, 31 (80:22–81:6, 83:21-23).] With regard to these provisions, Plaintiff has again failed to identify specific contractual language creating an enforceable duty on the part of Wofford or otherwise explain how Wofford committed a breach.[19]

---

[19] In particular, Section 6.05 of the Nondiscrimination Policy provides that "documents prepared in anticipation of the facilitated and/or the formal resolution processes . . . ; documents, statements, and other information introduced in interviews and meetings; and outcome letters **may not be disclosed** outside of those processes except as may be required or authorized by law." [Doc. 1 ¶ 246 (emphasis in original) (internal quotation marks omitted).] However, Plaintiff fails to explain how *Rand's* disclosure to the U.S. Army created a duty on the part of *Wofford* under this provision.

Further, Section 6.10 of the Nondiscrimination Policy directs *advisors*—not Wofford—to refrain from sharing records with third parties. [*Id.*] Similarly, Section 8.01 of the Nondiscrimination Policy appears directed at the actions of "*the parties [and] their Advisors*"—not Wofford. [*Id.* (emphasis added).]

Finally, Wofford's Information Technology Policy states,

Finally, Plaintiff contends that Wofford breached the implied covenant of good faith and fair dealing. [Doc. 149 at 34–35.] However, Plaintiff's underlying breach-of-contract claim does not survive summary judgment, and "there is no separate cause of action for the implied covenant of good faith and fair dealing." *RoTec Servs. Inc. v. Encompass Servs., Inc.,* 597 S.E.2d 881, 884 (S.C. Ct. App. 2004).

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to Plaintiff's breach-of-contract claim.[20]

**Count Eight: Civil Conspiracy Against Hogsed and Wofford**

The tort of civil conspiracy has three elements: "(1) a combination of two or more persons; (2) for the purpose of injuring the plaintiff; (3) causing plaintiff special

> All programs and files within any computer system shall be considered confidential and private and as such may be accessed only by those with a legitimate need to access such information and to whom permission has been granted by the person responsible for its security. All Wofford employees and students must take appropriate steps to safeguard privacy and confidential information. . . . Anyone who has knowledge of an attempt by anyone to violate this policy shall make known this violation to the Chief Information Officer.

[*Id.* ¶¶ 247–50 (internal quotation marks omitted).] As previously stated, the Court determines the intention of the parties by examining the agreement as a whole, *see Thomas-McCain*, 232 S.E.2d at 729, and Plaintiff has not provided the Court with the full text of the Information Technology Policy [*see generally* Doc. 149]. As such, the Court cannot adequately define Wofford's duty to "take appropriate steps to safeguard privacy and confidential information" or report attempted violations of the policy to the Chief Information Officer. *See Trs. of the Univ. of Penn.*, 270 F. Supp. 3d at 812.

[20] Because the Court grants summary judgment to Defendants on the foregoing bases, the Court need not determine whether Plaintiff manifested assent to the terms of the contract. [*See* Doc. 127 at 26–27.] That said, it is well settled that "[e]ach party to a contract is charged with full knowledge of its complete contents, regardless of whether they actually read [the terms of] the contract." *Phillips & Jordan, Inc. v. McCarthy Improvement Co.,* No. 5:18-cv-00559-JMC, 2020 WL 5793377, at *18 (D.S.C. Sept. 29, 2020) (applying South Carolina law).

damage." *Kuznik v. Bees Ferry Assocs.,* 538 S.E.2d 15, 31 (S.C. 2000). To establish a conspiracy, a plaintiff must produce either direct or circumstantial evidence "from which a party may reasonably infer the joint assent of the minds of two or more parties to the prosecution of the unlawful enterprise." *First Union Nat'l Bank of S.C. v. Soden,* 511 S.E.2d 372, 383 (S.C. Ct. App. 1998). "A conspiracy is actionable only if overt acts pursuant to the common design proximately cause damage to the party bringing the action." *Id.* Finally, "[n]o conspiracy can exist if the conduct challenged is a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment." *McMillan v. Oconee Mem'l Hosp.,* 626 S.E.2d 884, 887 (S.C. 2006).

In support of their motion for summary judgment, Defendants argue that Plaintiff's civil conspiracy claim fails because "no combination or agreement of two or more persons was entered into, no unlawful act was committed, and Plaintiff has failed to allege that a separate overt act occurred distinct from acts that support Plaintiff's other causes of action." [Doc. 127 at 32.] The Court agrees with Defendants.

As an initial matter, no conspiracy can exist between Wofford College and Hogsed where Hogsed acted within the scope of his employment. *See McMillan,* 626 S.E.2d at 887. To this end, Plaintiff has produced no evidence that reasonably leads to the inference that Defendants positively or tacitly came to a mutual understanding with any third party to accomplish a common and unlawful plan to injure Plaintiff. Crucially, mere speculation about a party's motives does not constitute proof of a conspiracy. [*See* Doc. 149-3 at 56 (199:1–20)]; *Soden,* 511 S.E.2d at 383.

Moreover, as previously discussed, Plaintiff has failed to forecast evidence sufficient to create a genuine dispute of material fact as to whether Defendants engaged in malicious prosecution, false arrest, Fourth Amendment violations, intentional infliction of emotional distress, or breach of contract. As such, Plaintiff has not put forth sufficient evidence that Defendants committed an unlawful act. Because the record is devoid of any evidence suggesting or proving that Defendants undertook any unlawful enterprise with a third party for the purpose of injuring Plaintiff, the Court grants summary judgement to Defendants on Plaintiff's state law conspiracy claim.

**Count Nine: Respondeat Superior Against Wofford**

The doctrine of respondeat superior is not an independent cause of action, "only a means to impute liability for a separate cause of action." *Hart v. City of Santee,* No. 5:16-cv-03338-JMC, 2017 WL 3158779, at *7 (D.S.C. July 25, 2017). Because Plaintiffs' underlying claims fail, the doctrine of respondeat superior is thereby inapplicable.

## CONCLUSION

Based on the foregoing reasons, Defendants' motion for summary judgment [Doc. 126] is GRANTED.

IT IS SO ORDERED.

s/Jacquelyn D. Austin
United States District Judge

September 30, 2026
Greenville, South Carolina